Appeal No. 22-3190

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

PROTECT OUR PARKS, INC., *et al.*,
Plaintiffs-Appellants,

v.

PETE BUTTIEGIEG, SECRETARY OF THE U.S. DEPARTMENT OF
TRANSPORTATION, *et al.*,
Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of Illinois
Hon. Robert Blakey
1:21-cv-02006

---

### PLAINTIFFS-APPELLANTS PROTECT OUR PARKS, INC., *ET AL.*'S
### OPENING BRIEF

---

Richard A. Epstein
16 Thomas Place
Norwalk CT 06853

Michael Rachlis
Rachlis Duff & Peel LLC
542 South Dearborn
Suite 900
Chicago, Illinois 60605

Thomas G. Gardiner
Catherine M. Keenan
GKWW
53 W. Jackson Boulevard
Suite 950
Chicago, Illinois 60604

*Attorneys for Plaintiffs-Appellants*

---

### ORAL ARGUMENT REQUESTED

---

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, Inc., et al. v. Pete Buttigieg, Secretary of the U.S. Dept. of Transportaion

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Protect Our Parks, Inc., Nichols Park Advisory Council, Stephanie Franklin, Sid E. Williams, Bren A. Sheriff,

    W.J.T. Mitchell, and Jamie Kalven

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Richard Epstein, Rachlis Duff & Peel, LLC (Michael Rachlis), Gardiner Koch Weisberg & Wrona (Thomas G. Gardiner

    and Catherine M. Keenan)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Richard Epstein    Date: December 23, 2022

Attorney's Printed Name: Richard Epstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]  No [ ]

Address: 16 Thomas Place, Norwalk, CT 06853

Phone Number: 773-450-4476    Fax Number:

E-Mail Address: raepstein43@gmail.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, Inc., et al. v. Pete Buttigieg, Secretary of the U.S. Dept. of Transportaion

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Protect Our Parks, Inc., Nichols Park Advisory Council, Stephanie Franklin, Sid E. Williams, Bren A. Sheriff,

W.J.T. Mitchell, and Jamie Kalven

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Richard Epstein, Rachlis Duff & Peel, LLC (Michael Rachlis), Gardiner Koch Weisberg & Wrona (Thomas G. Gardiner

and Catherine M. Keenan)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Michael Rachlis    Date: December 23, 2022

Attorney's Printed Name: Michael Rachlis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: Rachlis Duff & Peel LLC

542 S Dearborn Street, Suite 900, Chicago, IL 60605

Phone Number: 312-733-3955    Fax Number: 312-733-3952

E-Mail Address: mrachlis@rdaplaw.net

rev. 12/19 AK

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, Inc., et al. v. Pete Buttigieg, Secretary of the U.S. Department of Transportation, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Protect Our Parks, Inc.; Sid E. Williams; Bren A. Sheriff; Nichols Park Advisory Council; W.J.T. Mitchell;

Jamie Kalven; Stephanie Franklin

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Rachlis Duff & Peel, LLC

Gardiner Koch Weisberg & Wrona

(3) If the party, amicus or intervenor is a corporation:

   i) Identify all its parent corporations, if any; and

   Not Applicable

   ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   Not Applicable

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   Not Applicable

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   Not Applicable

Attorney's Signature: _____ Date: December 23, 2022

Attorney's Printed Name: Thomas G. Gardiner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 53 West Jackson Boulevard, Suite 950, Chicago, Illinois 60604

Phone Number: 312-362-0000   Fax Number: 312-362-0440

E-Mail Address: tgardiner@gkwwlaw.com

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, Inc., et al. v. Pete Buttigieg, Secretary of the U.S. Department of Transportation, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Protect Our Parks, Inc.; Sid E. Williams; Bren A. Sheriff; Nichols Park Advisory Council; W.J.T. Mitchell;

    Jamie Kalven; Stephanie Franklin

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Rachlis Duff & Peel, LLC

    Gardiner Koch Weisberg & Wrona

(3)   If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        Not Applicable

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        Not Applicable

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    Not Applicable

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    Not Applicable

---

Attorney's Signature: *Catherine M. Keenan*    Date: December 23, 2022

Attorney's Printed Name: Catherine M. Keenan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 53 West Jackson Boulevard, Suite 950, Chicago, Illinois 60604

Phone Number: 312-362-0000    Fax Number: 312-362-0440

E-Mail Address: ckeenan@gkwwlaw.com

rev. 12/19 AK

# Table of Contents

Table of Contents...................................................................................i

Table of Authorities...........................................................................iv

JURISDICTIONAL STATEMENT ...............................................1

STATEMENT OF ISSUES ..............................................................2

INTRODUCTION...............................................................................3

STATEMENT OF THE CASE..........................................................6

      A. Jackson Park's State Law Dedication Provides That It "Shall Be Held As A Public Park, For The Recreation, Health And Benefit Of The Public, And Free To All Persons Forever." ........6

      B. The Foundation Decides Where to Place The OPC and the Parameters of the Development, Irrespective of its Destruction of the Park and its Trees, Historic Roadways and the Midway. ...................................................................................7

      C. Federal Reviews Are Performed Without Alternative Sites Considered Despite Adverse Effects Under Various Federal Statutes..........................................................................................9

      D. Despite the Development's Size and Effects, the Federal Reviews Conclude Without Any Environmental Impact Statement Being Required .......................................................12

      E. The Transfer of Land Demanded By The Foundation Under the Master Agreement................................................................14

      F. Procedural History..................................................................15

SUMMARY OF ARGUMENT.......................................................18

STANDARD OF REVIEW ............................................................................19

ARGUMENT .............................................................................................20

I.    The District Court Erred In Its Rule 12 Dismissal Of Plaintiffs'
State Court Claims For Violation Of Public Trust, Ultra Vires
And Related Constitutional Violations ............................................20

    A. The District Court Erred In Its "Sufficient Legislative
Intent" Analysis ...............................................................21

    B. Subsequent Illinois Decisions Confirm That Plaintiffs
Have Stated a Claim That Constructing the OPC In
Jackson Park Violates the Public Trust Doctrine ...........29

    C. The "Use" Agreement Between The City and The
Foundation Is a Sham Transaction That Violates the
Public Trust Doctrine, Is Ultra Vires, and Violates
Various Provisions of the Illinois Constitution By
Covertly Transferring Ownership to The Foundation ....33

II.    The District Court Erred In Dismissing Plaintiffs' State Law
Claim For Improper Delegation ................................................37

III.    The District Court Erred In Disallowing Plaintiffs Leave To
Amend To Add Additional Claims Pertaining To The
Foundation's Ability To Meet The Preconditions For Taking
Possession Of Jackson Park ......................................................42

IV.    The District Court's Abdication To The Agencies And Private
Parties In Rejecting Plaintiffs' Federal Claims Is Reversible
Error ..........................................................................................44

    A. The District Court Misconstrued Applicable Law by
Ignoring the Blatant Segmentation of the OPC Project
Prohibited Under NEPA, Section 106, and Section 4(f) .45

1. *The OPC project is an integrated project that includes all major roads in Jackson Park and the road expansions of Lake Shore Drive and Stony Island Avenue* ........................................................ 45

2. *The extensive work in Jackson Park is a major federal program or project covered by NEPA, Section 106, and Section 4(f)* .................................................... 47

3. *The federal agencies' actions are the factual and proximate cause of the environmental harms in this case* ................................................................ 57

4. *The judicial deference shown in this case has illegally blocked the EIS that is clearly required here* ............. 59

CONCLUSION ........................................................... 65

Type-Volume Certification ........................................ 66

Certificate of Service ................................................ 67

# Table of Authorities

## Cases

*1550 MP Road LLC v. Teamsters Local Union No. 700,*
    2019 IL 123046 (Ill. Mar. 21, 2019)..........................................................36

*Agostini v. Felton,*
    521 U.S. 203 (1997) ...................................................................................44

*American Hospital Association v. Becerra,*
    142 S. Ct. 1896 (2022) ..............................................................................56

*Arizona v. California,*
    460 U.S. 605 (1983) ............................................................................. 44-45

*Becerra v. Empire Health Foundation,*
    142 S. Ct. 2354 (2022) ..............................................................................56

*Branigar v. Village of Riverdale,*
    396 Ill. 534 (Ill. 1947) ...............................................................................35

*Brodner v. City of Elgin,*
    420 N.E.2d 1176 (Ill. Ct. App. 1981) ......................................................39

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) ...................................................................................39

*Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) ............................................................................. 56-57

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S 402 (1971) ............................................................................*passim*

*City of Madison v. State,*
    1 Wis.2d 252 (Wis. 1957).........................................................................25

*City of West Chicago v. NRC,*
    701 F.2d 632 (7th Cir. 1983).....................................................................53

*Cotton Bros. Baking Co., Inc. v. Indus. Risk Insurers,*
  690 F. Supp. 1541 (W.D. La. 1988) ............................................... 43

*Delaware Riverkeeper Network v. F.E.R.C.,*
  753 F.3d 1304 (D.C. Cir. 2014) ............................................ 54-55

*Dep't of Transp. v. Assoc. of American Railroads,*
  575 U.S. 43 (2015) ................................................................. 39

*Dep't of Transp. v. Public Citizen,*
  541 U.S. 752 (2004) ............................................................ 57-58

*Douglass v. City Council of Montgomery,*
  24 So. 745 (Ala. 1898) ............................................................ 28

*Dubicz v. Commonwealth Edison Co.,*
  377 F.3d 787 (7th Cir. 2004) .................................................. 19

*Foman v. Davis,*
  371 U.S. 178 (1962) ................................................................ 43

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,*
  109 F. Supp. 2d 30 (D. D.C. 2000) ...................................... 62-63

*Friends of the Parks v. The Chicago Park District,*
  786 N.E.2d 161 (Ill. 2003) ...................................................... 34

*Friends of the Parks v. Chicago Park District,*
  2015 WL 1188615 (N.D. Ill. Mar. 12, 2015) .................... 32, 33-34

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ............................................................ 39

*Hamann v. Lawrence,*
  354 Ill. 197 (Ill. 1933) ............................................................ 41

*Highway J Citizens Grp. v. Mineta,*
  349 F.3d 938 (7th Cir. 2003) ............................................... 53-54

v

*La Salle Nat. Trust, N.A. v. Village of Westmont,*
  636 N.E.2d 1157 (Ill. Ct. App. 1994) ........................................39

*Lake Michigan Federation v. U.S. Army Corps of Engineers,*
  742 F. Supp. 441 (N.D. Ill 1990) ........................................ 29-32

*Malec v. City of Belleville,*
  384 Ill. App. 3d 465 (Ill. Ct. App. 2008) ............................ 42-43

*Martini v. Netsch,*
  272 Ill.App.3d 668 (Ill. Ct. App. 1995) ....................................43

*McCormick Harvesting Machine Co. v. C. Aultman & Co.,*
  169 U.S. 606 (1898) ...................................................................24

*Metropolitan Sanitary District of Greater Chicago ex rel. O'Keeffe v. Ingram Corp.,*
  85 Ill.2d 458 (Ill. 1981) ............................................................43

*Microsoft Corp. v. DAK Indus., Inc.,*
  66 F.3d 1091 (9th Cir. 1995) ....................................................35

*Milhau v. Sharp,*
  15 Barb. 193 (N.Y. Gen Term 1853) ........................................22

*Old Town Neighborhood Ass'n Inc. v. Kauffman,*
  333 F.3d 732 (7th Cir. 2003) ..............................................50, 51

*Orchard Hill Building Co. v. United States Army Corps of Engineers,*
  893 F.3d 1017 (7th Cir. 2018) ..................................................20

*Paepcke v. Public Bldg. Comm'n of Chicago,*
  263 N.E.2d 11 (Ill. 1970) ............................................. 24-29, 43

*People ex rel. Caldwell v. Reynolds,*
  10 Ill. 1 (Ill. 1848) ....................................................................41

*People ex rel. Chicago Dryer Co. v. City of Chicago,*
413 Ill. 315 (Ill. 1952) .......................................................... 38-39

*People ex rel. Scott v. Chicago Park District,*
360 N.E.2d 773 (Ill. 1976) ..........................................21, 23, 29

*People v. Pollution Control Board,*
83 Ill. App. 3d 802 (1st Dist. 1980) .........................................40

*Pierce v. Pierce,*
351 Ill. App. 336 (Ill Ct. App. 1953) ......................................34

*Protect Our Parks, Inc. v. Buttigieg,*
10 F.4th 758 (7th Cir. 2021)............................................49, 54

*Protect Our Parks, Inc. v. Buttigieg,*
39 F.4th 389 (7th Cir. 2022)...................... 16, 46-47, 50, 58

*Reichelderfer v. Quinn,*
287 U.S. 315 (1932) .................................................................27

*Scachitti v. UBS Fin. Servs.,*
215 Ill.2d 484 (Ill. 2005) .........................................................43

*Scottsdale Mall v. State of Indiana,*
549 F.2d 484 (7th Cir. 1977).............................................. 51-52

*Sierra Club v. U.S. Army Corps of Eng'rs,*
803 F.3d 31 (D.C. Cir. 2015) .................................................54

*State v. Public Service Com.,*
275 Wis. 112 (Wis. 1957) ........................................................25

*Tamayo v. Blagojevich,*
526 F.3d 1074 (7th Cir. 2008) ................................................19

*Thayer v. City of Boston,*
206 F. 969 (D. Mass. 1913)............................................. 27 n.2

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ................................................................57

<u>Federal Statutes and Regulations</u>

5 U.S.C. § 706 ...............................................................................1

23 U.S.C. § 138(a) ......................................................................1, 9

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

28 U.S.C. § 1367(a) ........................................................................1

33 U.S.C. § 408 (Section 408 of the Rivers and Harbors Act).......................9

33 U.S.C. § 1251 *et seq.* (Section 404 of the Clean Water Act) ....................9

42 U.S.C. §§ 4321-4347 (National Environmental Policy Act ("NEPA"))
    ...............................................................................*passim*

42 U.S.C. § 4332(2)(C) ..................................................................59

49 U.S.C. § 303(c) (Section 4(f) of the Department of Transportation Act)
    ...............................................................................*passim*

54 U.S.C. §102501 (Museum Act)....................................................20

54 U.S.C. §§ 200501-200511 (Urban Park and Recreation Recovery Act
("UPARR")) ...............................................................................1, 9

54 U.S.C. § 306108 (Section 106 of the National Historic Preservation Act
of 1966)...................................................................................*passim*

23 C.F.R. § 771.111(f)(1)-(3).........................................................53

23 C.F.R. § 774.15 .......................................................................64

23 C.F.R. § 774.15(a) .................................................................55

40 C.F.R. § 1506.8 ....................................................................47

40 C.F.R. § 1508.13 ..................................................................59

40 C.F.R. § 1508.17 ..................................................................47

40 C.F.R. § 1508.18 (2003) ......................................................47

40 C.F.R. § 1508.18 (2019) ......................................................50

40 C.F.R. § 1508.25(a)(2) .........................................................55

40 C.F.R. § 1508.27 ..................................................................59

40 C.F.R. § 1508.27(b)(3) .........................................................62

40 C.F.R. § 1508.27(b)(4) .........................................................62

40 C.F.R. § 1508.27(b)(7) .........................................................63

40 C.F.R. § 1508.27(b)(8) .........................................................62

Federal Rules

Fed. R. App. Pro. 4(a)(B)(iii) ......................................................1

Fed. R. Civ. Pro 12.............................................................*passim*

Fed. R. Civ. Pro 12(b)(6)..............................................16, 18, 32

Fed. R. Civ. Pro 54(b) ...............................................................16

Illinois Statutes and Regulations

Illinois Constitution, Article I, Section 12 ................................20

11 Ill. Law & Prac. Constitutional Law § 69 .............................40

Private Laws, 1869, vol. 1, p. 360...............................................................7, 24

Other Authorities

Notice of Final Federal Agency Action on Proposed Transportation Project in Illinois, 86 Fed. Reg. 8677 (Feb. 8, 2021) ...................................................45

Restatement (Second) Torts § 821B, Public Nuisance.................................28

Restatement (Third) Torts § 26 Law of Physical Harm..............................58

Richard A. Epstein, The Public Trust Doctrine, 7 Cato J. 411 (1987).. 23-24

Robert Natalson, Legal Origins: 57-60 in the Origins of the Necessary and Proper Clause, Gary Lawson, et al. ..............................................................22

Robert Natalson, *The Constitution and the Public Trust,* 52 Buff. L. Rev. 1077 (2004)....................................................................................................22

Joseph Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471 (1970)......................................21

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the underlying action pursuant to 28 U.S.C. § 1331 (federal question), as well as 28 U.S.C. § 1367(a) (supplemental jurisdiction).  The federal statutes involved in the case are 5 U.S.C. § 706, 23 U.S.C. § 138(a), 42 U.S.C. §§ 4321-4347, 49 U.S.C. § 303(c), 54 U.S.C. § 306108, and 54 U.S.C. §§ 200501-200511.

The United States Court of Appeals for the Seventh Circuit has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  On November 3, 2022, the district court entered a final judgment in favor of Defendants [A.040-A.043].  On that date, the court entered judgment for Defendants on Plaintiffs' seven remaining claims for violation of various federal statutes brought against the heads of various federal agencies acting in their official capacities, based on the reasoning set forth in the District Court's prior ruling on the Plaintiffs' Motion for Preliminary Injunction.  [A.044-A.092]  Previously, on March 29, 2022, the District Court dismissed all of Plaintiffs' state law claims [A.003-A.039], and on January 6, 2022, the District Court denied Plaintiffs leave to amend their complaint [A.001-A.002].  Plaintiffs timely filed a notice of appeal on December 5, 2022. *See* Fed. R. App. Pro. 4(a)(B)(iii).

## **STATEMENT OF ISSUES**

Did the District Court err in dismissing Plaintiffs' state law claims including their claims that the transfer of 19.3 acres of the heart of Jackson Park to the Barack Obama Foundation (the "Foundation") was in violation of the public trust doctrine, that the City of Chicago's (the "City") conduct as alleged in the entire complaint was *ultra vires* and in violation of the Illinois Constitution?

Did the District Court err in denying Plaintiffs leave to file its one and only proposed First Amended Complaint that pleaded new claims based on new evidence supporting both direct and derivative actions alleging the failure to comply with express conditions precedent required to take legal possession of the same acres in Jackson Park as mandated in the controlling master agreement between the City and the Foundation?

Did the District Court err in dismissing Plaintiffs' cause of action for violation of Illinois law for the City's unprecedented delegation of authority to a private party with conflicting interests, and when the City's resolutions and conduct expressly allowed the Foundation total discretion to select, solely for its own benefit, the public trust land for the construction of the Obama Presidential Center ("OPC") and the

commensurate destruction of Jackson Park, its roadways, trees, and surrounding area?

Did the District Court, contrary to the Supreme Court's decision in *Overton Park v. Volpe*, and other recent Supreme Court authority, extend uncritical deference to the federal governmental reviews under various federal statutes including, *inter alia*, the National Environmental Policy Act of 1969 ("NEPA") and the Department of Transportation Act of 1966 ("TA" or "Section 4(f)") in defining the scope of the project as well as in determining that no Environmental Impact Statement ("EIS") was necessary, thereby allowing for the destruction of hundreds of mature trees and established migratory bird habitats in the world-famous historical Frederick Law Olmsted park?

Is the District Court's decision that the OPC is not a unified and intertwined project supported by federal funds and approvals an improper segmentation of a single project in violation of NEPA, Section 4(f) and other federal environmental and historic preservation statutes?

## **INTRODUCTION**

The City of Chicago's Lakefront along with the City's public trust property, public parks, trees, migratory bird habitats and other environmental elements are in grave danger.  The danger has reached its

zenith as the City and the Chicago Park District acted to transfer to a private entity for a private use a critical 19.3-acre portion of priceless and irreplaceable lakefront public property in historic Jackson Park. That deal represents a rare trifecta of horrific public policy schemes with tragic environmental consequences and historically poor outcomes.

First, pursuant to the self-interested demands of the Foundation, the City and the Park District submissively contorted themselves to turn over possession and control of the public site in a "give away" deal under which the Foundation paid a laughable infinitesimal amount—$10—for a priceless historical Olmsted site worth easily hundreds of millions of dollars.

Second, the Foundation appears to have failed to satisfy the conditions precedent to taking possession of the site under the Master Agreement of May 19, 2019, between the City and the Foundation. More specifically, and as Plaintiffs attempted to raise in their one and only proposed amended complaint, the Foundation did not establish that it had the required sufficient funds to complete the development as required by its agreement with the City.  Nor did it fund a sufficient endowment to maintain, operate and improve the OPC.  Yet, only three days after it gained possession, the Foundation precipitously rushed in and clearcut at

least 300 standing old growth trees, which figure will increase by two or three times if the project proceeds as is currently planned.

Third, the Foundation picked the treasured Olmsted Park without complying with federal policy and the unambiguous dictates of both NEPA and Section 4(f), which allow for its use "only if (1) there is no prudent and feasible alternative to using that land." In this case, using "that land" manifestly referred to "the construction of the OPC in Jackson Park by the Obama Foundation." However, to forestall the review of alternatives necessitated by federal law, the Defendants acted as if the relevant project was confined to the modification of DuSable Lake Shore Drive, Stony Island Avenue, and Cornell Avenue, none of which would have been touched if there had been no plans for the OPC. This illegal segmentation infected both directly and indirectly all of the complained of federal reviews, and brought on (and will bring further) destruction of trees, bird and wildlife habitats, and the unprecedented eradication of the historic features of Olmsted's Jackson Park. All of this destruction is and will transpire without reviews of alternatives and without conducting an EIS.

The letter and spirit of longstanding federal laws have utterly broken down, as the District Court abjectly deferred to federal agencies with oversight responsibility (who themselves largely deferred to the City

and Foundation).  In so doing, the Defendants artificially concocted and deconstructed a single ever-expanding project into its constituent smaller pieces so that various reviews concentrated exclusively on road construction only *after* the piecemeal destruction of Jackson Park.  This appeal allows this Court to stop these problematic diversions from established state and federal law.

## STATEMENT OF THE CASE

### A. Jackson Park's State Law Dedication Provides That It "Shall Be Held As A Public Park, For The Recreation, Health And Benefit Of The Public, And Free To All Persons Forever."

In Frederick Law Olmsted's Jackson Park, only about 200 out of its 551 acres are open clear, and free green space, as the remainder covers two large bodies of water (the west and east lagoons), limited access areas (*i.e.*, golf course), buildings, and its critical roadways and vistas, including key integral transportation routes such as Cornell Drive, the Midway Plaisance, Marquette Drive and Hayes Drive.  [A.110-A.111, A.118-A.119, Compl. ¶¶ 54, 78; Dkt. 80, Ex. 12, Balkany Decl.; Dkt. 31-1, Ex. 2, Mitchell Decl.]  Olmsted's unique conception and Jackson Park's precise construction had been continually honored and respected since the Park's founding in 1871, through nurtured plantings of robust trees, varieties of

natural shrubbery and flowery landscaping and grassy meadows, prudent maintenance, and pragmatic upgrades of its landscape, vistas, and related pathways and service streets and roads. [A.117-A.118, Compl., ¶ 77]

Notably, Jackson Park was uniquely created and dedicated as public park by a specific land grant from the Illinois legislature in 1869 to the Park Commissioners, placing it in the public trust. Its grant operates in perpetuity, such that that the demised property "shall be held, managed and controlled by [the Commissioners] and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever." [Private Laws, 1869, vol. 1, p. 360; *see* A.105, A.160, Compl. ¶¶ 37, 226.]

### B. The Foundation Decides Where to Place The OPC and the Parameters of the Development, Irrespective of its Destruction of the Park and its Trees, Historic Roadways and the Midway.

Around 2014 and 2015, the Foundation started looking for a site for what was proposed to be a traditional presidential library, like the thirteen already in existence in private locations all around the country. Defendants City of Chicago and the Park District, under direction of then city Mayor Rahm Emanuel, former Chief of Staff to the former president, gave the Foundation free rein in choosing that site. [A.108, A.167, Compl.

7

¶¶ 45, 256].  So without further substantive discussion, debate or review, whatever the Foundation asked of the City, it got.  [A.113-A.115, Compl., ¶¶ 63-68]

By deferring to the Foundation, at no point did the City perform its fiduciary duty and conduct the required due diligence to independently identify and negotiate to secure the best location for the repurposed private OPC, which as matter of tradition, public interest and law did not have to be built on public parkland at all, when one superior site lies to the west of Washington Park, along with other sites on the South Side of Chicago.  Instead, and in full deference, the City shrugged off all the Jackson Park negatives.  [*See* A.108-A.110, Compl. ¶¶ 46-47, 52-53]  The City conducted a few *pro forma* public hearings. Minutes after these hearings were concluded, the City instantaneously ratified its predetermined approval of the OPC proposals -- including its 235-foot tower and numerous other buildings -- without any actual further deliberations on the project's many legal, environmental, and historic public policy concerns created by this expansive private development on public parkland.  [A.112, Compl., ¶¶ 58-62]

### C. Federal Reviews Are Performed Without Alternative Sites Considered Despite Adverse Effects Under Various Federal Statutes.

The OPC's linked massive roadway "improvements" project was backed by some $200 million federal dollars, which in turn triggered, and required, major federal regulatory reviews and permitting requirements under the following statutes:  (1) Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c) and 23 U.S.C. § 138(a); (2) Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108 (hereinafter "Section 106"); (3) the Urban Park and Recreation Recovery Act (hereinafter "UPARR"), 54 U.S.C. §§ 200501-200511; (4) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347; (5) permitting requirements under Section 404 of the Clean Water Act and Section 408 of the Rivers and Harbors Act, which in turn were "subject to continuing review under the National Environmental Policy Act and the National Historic Preservation Act." [*See* Dkt. 1-1, Compl. Ex. 1 (excerpt of resolution from Chicago Department of Planning)]

At all times, the City acted as a biased judge and jury despite the ever present conflict of interests as it largely dominated the federal review process.  Starting in December 2017, it was at the forefront of the Section 106 process ostensibly conducted by Defendant Federal Highway

Administration ("FHWA"). Initially, the FHWA correctly identified the "undertaking" to include the construction of the OPC in Jackson Park by the Foundation, the closure of roads to accommodate the OPC and to reconnect fragmented parkland, the relocation of an existing track and field on the OPC site to adjacent parkland in Jackson Park, and the construction of a variety of roadway, bicycle and pedestrian improvements in and adjacent to the park.  [*See* Dkt.1-1, Compl. Ex. 3, January 16, 2020, Assessment of Effect Report at 1] That report then concluded that the "undertaking" created adverse effects on Jackson Park and the Midway Plaisance "because it will alter, directly or indirectly, characteristics of the historic property that qualify it for inclusion in the National Register." [*Id.* at 40, § 3.5.2.1]

Yet, the federal agencies persistently refused to look at and consider the existing alternatives presented which required review because of the required search under the federal statutory mandates to avoid, minimize or mitigate the park-wide adverse effects of this vast undertaking.  Such review would have led to different outcomes than those demanded by the Foundation and City.  [*See, e.g.,* A.153, Compl. ¶ 200]

These actions caused significant public outcry.  For example, in a Section 106 meeting on August 5, 2019, Abby Monroe, the City official in

charge, refused to allow any direct questions from the floor, and prescreened and edited all the written questions submitted.  She halted the meeting early to stifle any objections to the Jackson Park site or mention of alternative sites on the South Side.  [A.120, Compl. ¶ 81; Dkt.1-1, Compl. Ex. 5] Thereafter, the pandemic only tightened the City's grip on the process. [A.116, A.166, A.168, Compl. ¶¶ 74, 252, 253, 263][1]  For example, a May 2020 public meeting was sparsely attended because individuals and groups were locked under stay-at-home orders due to COVID-19. The next in-person meeting at a South Side location took place on October 2020, just as local citizens were encouraged by the City to stay home as COVID numbers spiked.

At the same time, the federal government's Section 4(f) report, over multiple objections, approved the placement of the OPC just where Foundation demanded.  [Dkt. 1-2, Compl. Ex. 8 at 2]  In so doing,

---

[1] The City's website (https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html) reports on these steps in the review process:  (i) April 2020 – issuance of draft Section 4(f) reports; (ii) May 6, 2020 – "meeting" controlled by the City about resolution of adverse effects; (iii)  May 20, 2020 – a second meeting controlled by the City about resolution of adverse effects (comments due May 26, 2020); (iv) July 2020 – MOA issued; (v) July 2020 – meeting on MOA; (vi) September 28, 2020 – Environmental Assessment issued requesting comments; (vii) October 13, 14, and 15, 2020 – meetings regarding EA including in person; (viii)  October 30, 2020 – meeting regarding MOA; (ix) November 2020 – MOA Issued; (x) Section 4(f) report issued; (xi) FONSI issued.

Olmsted's elaborate network of roads which forms an integral part of the overall design, both for its scenic vistas and community transportation, is approved for destruction. Shutting Cornell Drive and Midway Plaisance South has already tied up traffic in and around Jackson Park. [Dkt. 1-2, Compl. Ex. 10 at 12-14]

Notwithstanding the momentous road closures, destruction of the historic public park, and road expansions, the new report only focused on the expansion of Lake Shore Drive and Stony Island Avenue, as everything else was deemed "local" and thus not subject to Section 4(f), so alternative sites for the OPC were not reviewed or mentioned—just as the Foundation and City demanded from the outset.

## D. Despite the Development's Size and Effects, the Federal Reviews Conclude Without Any Environmental Impact Statement Being Required.

The initial required Environmental Assessment (EA) released at the end of September 2020 acknowledged the plethora of adverse impacts, which it then promptly dismissed as temporary, insignificant and/or mitigated. [Dkt 1-2, Compl. Ex. 10] Among its astonishing claims was the purported one-to-one parity between small replacement saplings five years from today *if* the OPC is then completed and *if* they take root with the immediate destruction of mature trees several feet in diameter. [A.143-

A.144, Compl., ¶¶ 164-65]. Relatedly, it was claimed that about forty percent (40%) of the targeted trees were in a "declining" condition. [Dkt. 46, p. 14] Yet, their own study concluded that ninety-two percent (92%) of trees slated for removal were *in good or fair condition* [Dkt. 61-22, Fed. Defs. Ex. 17, Part 1, Appendix D-1]

The removal of those trees also compounds the systematic risks to migratory birds, as does the noise and dust from the planned construction work. In addition, erecting a 235-foot OPC tower building perched over to the Mississippi flyway would only aggravate these losses. [A.144-A.145, Compl., ¶¶ 167-69]

Nonetheless, in February 2021, the federal agencies published a Finding of No Significant Impact ("FONSI"), which accepted in full the conclusions of the EA, as well as the Section 4(f) and Section 106 reviews. [Dkt. 1-2, Compl. Ex. 11, FONSI at 1]. These finding are the building blocks for which the other federal reviews rely and incorporate.

### E. The Transfer of Land Demanded By The Foundation Under the Master Agreement.

On August 13, 2021, the City and the Foundation, pursuant to the Master Agreement, transferred the designated 19.3 acres to the Foundation after claiming that all conditions precedent to the transfer had been satisfied including, *inter alia*:

> A.    Section 12(h): <u>Construction Funds</u>. The Foundation shall have submitted to the City a certification that the Foundation has received funds and/or gift pledge commitments in writing that in the aggregate equal or exceed the Projected Total Construction Costs of the Presidential Center.

> B.    Section 12 (j):  <u>Endowment</u>.  The Foundation shall have established an endowment having as its sole purpose paying, as and when necessary, the costs to operate, enhance and maintain the Presidential Center and the other Project Improvements during the term of the Use Agreement.

However, as Plaintiffs' proposed First Amended Complaint alleged, [Dkt. 107, Pls' Mtn. to Amend Compl., Ex. 1] neither condition was met. Contrary to the terms of Section 12(j) of the Master Agreement, the Foundation had not received gift pledges and commitments that equaled or exceeded the total construction costs of the OPC.  [*Id.,* ¶ 292] The Foundation claimed that it had complied with Paragraph 12(h), when it certified that it had "received" $485 million, a figure close to the stated $482 million in anticipated costs of construction at the time (March 2021).

14

Nonetheless before the August 13th closing date, the president of the
Foundation, Valerie Jarrett, announced that the cost of the "bricks and
mortar" to build the OPC "is a little less" than $700 million, or over $200
million more than the figure used in the March 13, 2021, certification.
[*Id.,* ¶ 297] Beyond the obvious discrepancy, the failure to update the
financial records was in breach of Section 13(iv) of the Master Agreement
which required the Foundation at closing to show that it still met the
financial requirements.  [Dkt. 1-1, Compl. Ex. 2 at 85961]

Separately, the Foundation acknowledged that it needed to raise an
endowment of $470 million to cover operations, maintenance, and
improvements of the OPC.  But, as evidenced by the Foundation's 990 tax
form and its audited financial reports, it had contributed to that fund only
$1 million as of June 2021.  [Dkt. 107, Ex. 1, ¶ 300]

## F.  Procedural History.

On April 14, 2021, Plaintiffs filed their Complaint [A.093-A.174],
which was initially assigned to Judge Jorge Alonso.  The City then moved
to transfer the case to Judge John Robert Blakey, who had presided over
an earlier case with one of the plaintiffs and two of the defendants, but
which did not involve any federal statutory issues raised in the new
Complaint; and further in that prior matter, all rulings on the state court

claims were reversed and dismissed for lack of subject matter jurisdiction by this Court.  Plaintiffs opposed such a transfer, but before any written submission could be made, Judge Blakey issued a minute entry asking that the matter be assigned to him as "related" to the earlier case [*see* Dist. Ct. Case No. 18-cv-3424, Dkt. 178]  Judge Blakey also stated that he discussed the matter with Judge Alonso, who agreed to the transfer. [*Id.*] The Executive Committee assigned the matter to Judge Blakey on June 8, 2021. [Dkt. 17]

On June 15, 2021, Plaintiffs filed their motion for preliminary injunction, seeking to stop construction of the OPC pending the review of their case on the merits.  [Dkt. 30]  After briefing, the District Court issued a one sentence order denying Plaintiffs' motion for preliminary injunction, without an opinion, which was thereafter issued on August 12, 2021. [A.044-A.092]  That interlocutory decision was later affirmed by this Court.  *See* 39 F. 4th 389  (7th Cir. 2022).

The City and the Obama Foundation also filed, on June 15, 2021, a Rule 12(b)(6) motion to dismiss Plaintiffs' state law claims.  [Dkt. 28] After the motion was briefed and argued [Dkts. 29, 69, & 78-1], on March 29, 2022, the District Court granted Defendants' motion.  [A.003-A.039] The Plaintiffs then sought an order under Fed. R. Civ. Pro 54(b) to

immediately appeal the dismissal of both state law claims, which request was denied on July 1, 2022. [Dkt. 127]

In light of the newly discovered financial shortfalls with regard to the City's transfer to the Foundation in August 2021 discussed in Section E, *supra*, Plaintiffs sought to amend their complaint for the first and only time. [Dkt. 107] On January 6, 2022, the day after briefing was completed, Judge Blakey denied leave to amend, stating that the Plaintiffs had brought a third-party beneficiary claim barred under Section 34 of the Master Agreement. [*See* A.001] The Plaintiffs, however, did not make such a claim, but rather pleaded two counts for breach of the Agreement under separate theories, one direct and one derivative. [Dkt. 107, Ex. 1]

After the Seventh Circuit affirmed the preliminary injunction ruling on July 1, 2022, the parties stipulated that there were no disputes over the scope of the administrative record, no pertinent facts outside the administrative record, and no disputed issue of fact material to the disposition of the remaining federal claims. [Dkts. 138, 146] Accordingly, the District Court entered judgment for the Defendants on all seven of the federal claims claims for the reasons set forth in the District Court's preliminary injunction ruling. [A.041-A.043]

## SUMMARY OF ARGUMENT

The District Court misinterpreted key fundamental state law principles in its Rule 12(b)(6) decision in favor of the City, Park District and Foundation in the Foundation's unprecedented effort to seize and take control of historic Jackson Park, exposed by the District Court's ill-founded simulacrum public trust analysis, its unsupported ruling on improper delegation, and the hasty and ill-thought out rejection of Plaintiffs' one request for leave to amend.

With disastrous public policy and national consequences, the District Court has also clearly erred in interpreting every relevant precedent of NEPA, Section 106, and Section 4(f) to allow the Defendants to skirt the required rules of segmentation by engaging in a novel "no-look" review of the OPC project. The District Court closed its eyes to the Defendants' gambit of a self-serving narrow redefinition of their project in order to block honest and objective consideration of any feasible alternative outside of Jackson Park. However, the standard of review applied by the District Court is contrary to the operative test set forth in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), which states that:

> [T]he generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry. Certainly, the Secretary's decision is entitled to a presumption of regularity. But that

18

presumption is not to shield his action from a thorough, probing, in-depth review.

*Overton Park*, 401 U.S. at 415 (citations omitted).

Against this clear imperative, the District Court allowed the Defendants to use an impermissibly perverse definition of a major federal action that necessarily dismembered Jackson Park and eliminated examination of any alternative site for the OPC outside of Jackson Park, thereby wrongfully dooming Plaintiffs' claims challenging the flawed reviews and the Federal Defendants' failure to prepare an EIS.

## **STANDARD OF REVIEW**

An appellate court reviews *de novo* a district court's grant or denial of a motion to dismiss under Rule 12(b)(6). *See, e.g., Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008) (reversing grant of motion to dismiss). A denial of a motion for leave to amend is examined on an abuse of discretion standard. *Dubicz v. Commonwealth Edison Co.,* 377 F.3d 787, 793 (7th Cir. 2004) (reversing trial court decision denying leave to amend). The findings in support of the summary judgment for the Defendants on the federal review claims are normally reviewed on a *de novo* basis, and must be set aside if an agency determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if it is

unsupported by substantial evidence. *See Orchard Hill Building Co. v. United States Army Corps of Engineers,* 893 F.3d 1017, 1023-24 (7th Cir. 2018) (reversing summary judgment).

## ARGUMENT

I.     **The District Court Erred In Its Rule 12 Dismissal Of Plaintiffs' State Court Claims For Violation of Public Trust, *Ultra Vires* And Related Constitutional Violations.**

The decision of the District Court reveals its fundamental misunderstanding of the origin and function of the public trust doctrine. The public trust doctrine has constitutional dimensions that the legislature cannot avoid by simply authorizing the challenged conduct. *See, e.g.*, Illinois Constitution, Article I, Section 12, "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."  Yet the decision below repeatedly stated that once the legislature has spoken, the courts must do its bidding no matter what the purpose or terms of the challenged transaction.  It was reversible error to dismiss Plaintiffs' public trust claims (or any of their related constitutional claims (Counts VIII and XIII)) on the ground that "sufficient legislative intent exists" in the

Museum Act to permit diverting a portion of Jackson Park for the

Presidential Center as the District Court did below.  [A.015, Order at 13]

### A.  The District Court Erred In Its "Sufficient Legislative Intent" Analysis.

In *People ex rel. Scott v. Chicago Park District,* 360 N.E.2d 773 (Ill.

1976), the Illinois Supreme Court wrote: "While the courts certainly

should consider the General Assembly's declaration that given legislation

is to serve a described purpose, this court recognized . . . that the 'self-

serving recitation of a public purpose within a legislative enactment is not

conclusive of the existence of such purpose.'" *Id.* at 781 (citation omitted).

*Scott's* precise holding applied to the state's transfer of tidal lands to a

private party, but its overarching principle reaches all forms of

government abuse.  *Scott* also relied on Joseph Sax, *The Public Trust*

*Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68

MICH. L. REV. 471, 490 (1970): "'When a state holds a resource which is

available for the free use of the general public, a court will look with

considerable skepticism upon any governmental conduct which is

calculated either to reallocate that resource to more restricted uses or to

subject public uses to the self-interest of private parties." *Scott*, 360

N.E.2d at 780 (citing Sax).  While Illinois law does not contain any flat

prohibition against the transfer of public property to private ownership, it does insist that a state or municipality, like any fiduciary, must receive fair value for the property that it so transfers, just like any private trustee. The duty is constant regardless of the type of property. It is thus wholly irrelevant that the trust property is fully submerged, formerly submerged, or never submerged, contrary to the District Court's decision. [A.012, Order at 10]

Accordingly, it is settled that both private and public trustees are subject to duties of loyalty, good faith and care. Robert Natalson, Legal Origins: 57-60 in the Origins of the Necessary and Proper Clause, Gary Lawson, et al. Elsewhere, Natalson has written emphatically: "I have not been able to find a single public pronouncement in the constitutional debate contending or implying that the comparison of government officials and private fiduciaries was inapt." Natalson, *The Constitution and the Public Trust,* 52 BUFF. L. REV. 1077, 1086 (2004).

Thus *Milhau v. Sharp*, 15 Barb. 193, 206-07 (N.Y. Gen Term 1853), overturned a contract for constructing an elevated private train down Broadway, issued for a "trifling" sum well below other competitive bids. *Milhau* is consistent with the historical view that *any* trust over *any* kind of resource, whether public or private, imposes a standard set of fiduciary

duties—loyalty, care, and candor—on all trustees.  Yet against the

uniform weight of history, practice, and precedent, the District Court

wrongly stated that Illinois public trust cases require that courts act as if

different levels of deference are required based upon the property's

relationship to navigable waterways.

Contrary to the District Court's analysis, whether land was

currently submerged, formerly submerged or never submerged has

absolutely nothing whatsoever to do with the appropriate level of care

required by the government in public trust cases.  Nor is it correct to say

that a court should never engage in second-guessing the particular merits

of legislative judgments.   A similar standard, if applied to private

fiduciaries, would gut the entire doctrine and give self-interested political

actors massive opportunities for looting and abuse. Some judicial oversight

is strictly necessary, as *Scott* explicitly holds, and which the District Court

failed to do despite Rule 12's motion requirement that all inferences from

the well-pled allegations be interpreted in favor of the non-moving party.

Just as governments cannot confiscate property without paying just

compensation, in the public trust context the correct synthesis reads "nor

shall public property be transferred to private use, without just

compensation."  *See* Richard A. Epstein, The Public Trust Doctrine, 7 Cato

J. 411 (1987).  The just compensation element plays no role in public-to-public transfers, but it is critical in public-to-private transfers. Private parties must compensate public bodies either in cash or kind, for the property they receive.

The District Court multiplies its errors by misreading *Paepcke v. Public Bldg. Comm'n of Chicago*, 263 N.E.2d 11 (Ill. 1970) when asking how to interpret grants that do not contain an explicit authorization of government action.  *Id.* at 18-21. In *Paepcke*, four acres in Washington Park, out of a total of 380, were transferred from use as park land to become the site of a public school. *Id.* at 14.  In contrast here, a huge chunk of Jackson Park – including arguably the most valuable acreage – is given away to a private party under a 99-year "use agreement" (*i.e.*, a disguised lease) for $10 in cash.

This transfer at issue is flatly inconsistent with the initial dedication to the Park Commissioners. 1869 Statute, §§ 1, 4.  Supreme Court authority states that these specific grants follow the rules applicable to patents and land grants, such that once issued, they are "entitled to the same legal protection as other property," *and thus cannot be set aside by legislative action.  See McCormick Harvesting Machine Co. v. C. Aultman & Co.*, 169 U.S. 606, 608-09 (1898).

Justice Burt in *Paepcke* well knew that these legislative dedications could not be repealed or modified at will.  He therefore sought to find a middle path between two extremes. The dedication should not be so literally construed as to admit no exceptions for converting parkland to some other public use.  Nor should it be gutted so that it imposed no restrictions at all. Ultimately, he concluded:

> [W]e think it appropriate to refer to the approach developed by the courts of our sister State, Wisconsin, in dealing with diversion problems. In at least two cases, *City of Madison v. State*, 1 Wis.2d 252, 83 N.W.2d 674; and *State v. Public Service Com.*, 275 Wis. 112, 81 N.W.2d 71, the Supreme Court of Wisconsin approved proposed diversions in the use of public trust lands under conditions which demonstrated (1) that public bodies would control use of the area in question, (2) that the area would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was negligible when compared to the greater convenience to be afforded those members of the public using the new facility. We believe that the present plans for Washington Park meet all of these tests.

*Paepcke,* 263 N.E.2d at 19.

The District Court wrongly read *Paepcke*, 263 N.E.2d at 19, to hold that, because the OPC site sits upon never-submerged land, reviewing "courts need only examine whether there exists 'sufficient manifestation of legislative intent to permit the diversion and reallocation' at issue" [A.

015, Order at 13], without assessing how all five portions of the *Paepcke* test apply to the OPC transaction.

First, the conversion of a part of Washington Park to a school did not strip the public of its control over any portion of Washington Park.  In contrast, the OPC deal cedes control over a huge section of Jackson Park to a private entity under a disguised 99-year lease.  Second, a public school is open to the public, but the OPC decides whom to admit to its facility and why, along with other obvious safety issues that will create further limitations on access. Third, the limited four-acre loss in Washington Park is tiny relative to its total size, unlike the grant to the OPC, which destroys a huge chunk, both by acreage and value, of Jackson Park. [*See* Dkt. 31-1, Ex. 2, Mitchell Declaration]  Fourth, the new school had only a modest effect on other public uses in Washington Park, but the OPC will transform huge portions – in excess of ten percent of usable space in Jackson Park – by ripping out roads, cutting down trees, obstructing bird migration, and removing historical resources.  [A.118-A.119, Compl., ¶¶ 78-79]. Fifth, the political opposition, if any, to the school in *Paepcke* was limited.  But the Foundation's incursion into Jackson Park has been wrapped in controversy from 2015 forward.  Finally, the five *Paepcke* factors never mention the huge subsidies conferred by the city, state and

nation, on the OPC—which only strengthens the need for discovery to determine the extent of the City's giveaway in disregard of its public trust obligations.  These matters are not properly resolved on a Rule 12(b)(6) motion.

*Paepcke* also consciously uses the term "beneficiaries," precisely because the public trust doctrine follows the law of private trusts in requiring duties of care and loyalty. Thus, it would be utterly pointless to grant standing to give "meaning and vitality" as the *Paepcke* court did to the state's public trust obligation, only to conclude that all state actors are immune from constitutional attack no matter how egregious their behavior, simply by bowing to legislative intent.

Justice Burt then charts a middle path between total rigidity and total plasticity. In *Reichelderfer v. Quinn*, 287 U.S. 315 (1932), certain lands "were perpetually dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States." *Id.* at 317.  Justice Harlan Fiske Stone held that the dedication's terms did *not* preclude the construction of a fire engine house in the park over the protest of some nearby neighbors.[2]  The fire engine house could

---

[2] *Paepcke*, 263 N.E. 2d at 17, cited multiple cases, all of which involve public-to-public transfers. *See, e.g., Thayer v. City of Boston,* 206 F. 969 (D. Mass. 1913) (schoolhouse in park).

not be enjoined as either a private or public nuisance, *see* Restatement (Second) Torts § 821B, Public Nuisance, because it did not unreasonably interfere with the plaintiffs' quiet enjoyment of his own property. Justice Stone did not allow plaintiffs to circumvent that objection by insisting that the public dedication conferred *on them* an "easement" to restrict that park land solely for park purposes. But Stone's opinion did not undermine *Paepcke's* central holding that *citizens* under Illinois law had an undivided interest in public lands as beneficiaries, regardless of where they lived in the City. Indeed, Justice Stone explicitly distinguished the failed neighbor easement from the citizen standing cases. Thus, *Douglass v. City Council of Montgomery*, 24 So. 745, 746 (Ala. 1898), held that land previously conveyed to the City solely for use as a public park could not be reconveyed to a *private* party for use as a railroad line, in what "appeared to be the necessity of better transportation facilities and the exigencies of the public business." Nonetheless that conveyance "was an illegal transaction and a fraud in law," notwithstanding the absence of any specific intention on the part of the city to engage in wrongful activity. When that grant to the railroad failed, the property reverted to the next private party in the chain of title.

**B.    Subsequent Illinois Decisions Confirm That Plaintiffs Have Stated a Claim That Constructing the OPC In Jackson Park Violates the Public Trust Doctrine.**

The first important post-*Paepcke* case, *Scott*, *supra* at 21-22, involved an explicit conveyance by the state of Illinois of 194.6 acres of submerged land to the U.S. Steel Corporation for $19,460, its apparent fair market value.  Presumptively, the public trust doctrine permitted the transfer because it "may afford foundation for wharves, piers, docks and other structures in aid of commerce," *id.* at 777, where "commerce" is a broader term than "navigation."  *Scott,* however, set aside this transaction solely because of its "adverse effect" on the use of other nearby public waters. It also noted that "the sole purpose seems to be to appropriate the submerged land for the private use of the railroad company. Here, too, we can perceive only a private purpose for the grant." *Id.* at 780-81.  *Scott* further bolsters Plaintiffs' claim that the negative impacts on Jackson Park (and its roads and vistas, as well as its lagoon, topography and the like) far exceed in severity the relatively minor impacts sufficient to block the transfer in *Scott*.

Next, in *Lake Michigan Federation v. U.S. Army Corps of Engineers,* 742 F. Supp. 441 (N.D. Ill 1990) (*Loyola*), Judge Aspen wrote: "The very purpose of the public trust doctrine is to police the legislature's disposition

of public lands. If courts were to rubber stamp legislative decisions, as Loyola advocates, the doctrine would have no teeth." *Id.* at 446.  Judge Aspen then struck down the University's plan to expand its campus by reclaiming (after receiving public approvals, city, state and federal) twenty acres of submerged land in Lake Michigan.  Loyola's program protected the shoreline from erosion, and would have constructed new athletic facilities open to the reasonable public use, but subject to Loyola's ownership rights. "By the terms of the conveyance, Loyola is not allowed to construct buildings or parking areas on the lakefill. The state also has a right of reentry should Loyola attempt to transfer the property to any entity which does not operate as a nonprofit educational institution." *Id.* at 445. Judge Aspen nonetheless concluded that "while the project has some aspects which are beneficial to the public, the primary purpose of the grant is to satisfy a private interest [of expanding its campus]," and further that the public will lose its current "unrestricted access to the submerged lands." *Id.* at 445-46.  He then rejected Loyola's argument that "the public will gain from the construction of the lakefill is merely a value dependent assessment of the best use of the property. This judgment is not only highly subjective, but also irrelevant to an analysis of the propriety of a grant of public land." *Id.* at 446.

The scattered references to *Loyola* by the District Court [A.012, Order at 10] use rose-colored glasses to bless the OPC transaction by claiming a host of benefits such as cultural, artistic, and recreational opportunities—such as an educational museum, branch of the Chicago Public Library, and space for large-scale athletic events [*See also* A.020-21 A.033, Order at 18, 31] The Court never asked whether these promised benefits were worth their cost, or even capable of being realized, and left totally unmentioned the huge corresponding negative impacts.

Indeed, an enormous chasm divides the two cases, as the *Loyola* deal is far more favorable to the public than the OPC. In *Loyola*, the property in question was kept open to the public; here the OPC will be kept under the Foundation's lock and key; in *Loyola* all construction was banned; here massive and complex construction is contemplated; in *Loyola,* the university incurred costs that benefitted the public (which Judge Aspen noted); in the instant case, the OPC is only made possible with government subsidies in cash and in kind that run to hundreds of millions of dollars; in *Loyola*, all parties undertook exhaustive environmental reviews; in the instant case, the "local" nature of the OPC project has supplied the pretext to block any meaningful federal environmental and other reviews of the OPC site; in *Loyola,* controlling erosion is a major

environmental benefit; here, the construction of the OPC will pose environmental threats to Jackson Park.  If the *Loyola* deal was rightly struck down, the OPC should be a goner.  But even if the *Loyola* deal had been allowed, the ample reasons to find public trust violations in regards to private transfer in Jackson Park should preclude the dismissal of Plaintiffs' public trust claim under Rule 12(b)(6).

Finally, in *Friends of the Parks v. Chicago Park District,* 2015 WL 1188615 (N.D. Ill. Mar. 12, 2015) (*Lucas*), Judge Darrah refused to grant the Defendant's Rule 12 motion to dismiss the Plaintiffs' complaint, which challenged the transfer of public trust land for the construction of the Lucas Museum of Narrative Arts.  Like *Loyola*, *Lucas* requires rejection of the Defendants' motion to dismiss in this case.  In *Lucas*, the Plaintiffs were prepared to spend millions of dollars their own money to build their museum on an abandoned parking lot south of Soldier Field.  That project required no public subsidies, and did not dismantle a world-class public park but only removed rubble from Chicago's lakeshore.  On balance, while privately funding the *Lucas* project could have arguably produced a net public benefit, if the defendants in *Lucas* could not achieve dismissal, then the District Court erred in allowing that motion here.

### C. The "Use" Agreement Between The City and The Foundation Is a Sham Transaction That Violates the Public Trust Doctrine, Is *Ultra Vires*, and Violates Various Provisions of the Illinois Constitution By Covertly Transferring Ownership to The Foundation.

Basic trust law does not allow trustees, both public and private, to transfer any property held in trust to a private party unless, at the very least, they receive full compensation for the property transferred. This constraint cannot be evaded by the simple expedient of granting a long-term lease of virtually identical value.  In *Lucas*, Judge Darrah used this principle to challenge the explicit lease arrangement between the Park District and the Lucas Museum because "[t]he Complaint alleges enough facts to state that Defendants intend to transfer the exclusive right to use and control the Museum Site to a private entity. The Complaint plausibly states a claim that the agreement violates the public trust doctrine." 2015 WL 1188615 at *7.

Under *Lucas,* the transfer of a 99-year lease for $10 in total is tantamount to the outright transfer of the fee.  It is pure fabrication to say that under the OPC "use" agreement the City "retains" ownership of the Presidential Center site, at least in the context of a Rule 12 motion. All the economic value will go to the Foundation, so that the City's so-called

"ownership" interest consists of the right to receive *no* rents for 99 years plus the right to repossess a depreciated building when the lease expires. Indeed, *Lucas* sparked the City and the Obama Foundation to relabel their proposed 99-year lease—originally denominated as such—into a "use" agreement that executed the same transfer to the OPC of the 19.3 three acres of Jackson Park for 99 years. The Court could not identify a single substantive difference (because there is none) between the initial lease and the hastily concocted use agreement, which in fact gave the Foundation exclusive "use," making the grant of Defendants' motion to dismiss wholly improper. *See Pierce v. Pierce,* 351 Ill. App. 336 (Ill. App. 1953) (finding lease to be equivalent of sale, such that right of partition applied to leaseholder).

This "use" agreement, moreover, differs substantively from the transaction between the Chicago Bears and the Chicago Park District held in *Friends of the Parks v. The Chicago Park District*, 786 N.E.2d 161 (Ill. 2003). The Bears' control over Soldier Field was confined to a limited number of days per year, which gave the Park District complete power to lease Soldier Field in a three-year deal to the Chicago Fire soccer team. "Chicago Fire Signs Deal with city to return to Soldier Field" Chicago Business Journal, 10/8/2019,

34

https://www.bizjournals.com/chicago/news/2019/10/08/chicago-fire-signs-deal-with-city-to-return.html.  As with other claims of supposed licenses, courts must analyze the "economic realities" of the transaction.  *Microsoft Corp. v. DAK Indus., Inc.*, 66 F.3d 1091, 1095 (9th Cir. 1995). "[T]he fact that the agreement labels itself a 'license' ... does not control our analysis." *Id.* at 1095 n.2.

Furthermore, as Plaintiffs' constitutional claims in Counts VIII and XIII rely upon the transfer and the sham nature of the "use" agreement, it was erroneous for the Court to dismiss those claims for similar reasons. [*See* A.163-A.164, A.168]

Relatedly, the District Court erred in dismissing Plaintiffs' *ultra vires* cause of action.  An act is generally "ultra vires" in two situations: one, where the corporation has no power to take an act, and second where the corporation has the power to perform an act and but exercises it irregularly.  *See Branigar v. Village of Riverdale,* 396 Ill. 534, 542 (1947).  Acts that abdicate public authority to a private party are *ultra vires* for both reasons.

The complaint viewed as a whole identifies many *ultra vires* activities that cannot be resolved at the pleadings stage. One is the convoluted effort to transfer property to a private party where the City

abdicated control over the transaction to the Foundation, forcing continual acquiescence to its demands (discussed also in Section II, *infra*).  *See 1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046 (Ill. Mar. 21, 2019) (holding that where a municipality exceeds its statutory authority in entering into a contract, the municipality's act is *ultra vires*, and the resulting contract is void *ab initio*).  A second is executing a permanent transfer of public trust lands through a one-sided lease-turned-use agreement [A.163-A.164, Compl. ¶¶ 239-240], controlled throughout by the OPC. The District Court's insistence that the City retained control after the 99-year giveaway embodies both the hurried bias and rush to judgment and a basic failure on a Rule 12 motion to review the complaint's allegations in the light most favorable to the non-moving party. Furthermore, the City acted *ultra vires* by exerting improper dominance and control throughout the federal review process – with the sole objective of advancing the welfare of a private party.  [A.116, *Id.,* ¶ 74]

The District Court ignored all these well-pleaded allegations in rejecting the Plaintiffs' *ultra vires* claim [A.026], when it wrongly stated that "Defendants point out, the City's actions in the 2018 federal review process—undertaken after the Park District transferred the land to the City and after the City executed the 2018 Use Agreement—have no

bearing on whether state law authorized the land transfer or the 2018 Use Agreement." [*Id.*] Of course, the District Court's adoption of the Defendants' self-serving statement is manifestly wrong: without obtaining approvals through the federal review process, the project could not proceed, as the City Council itself recognized.  [Dkt.1-1, Compl. Ex. 2 at 85884]  The allegations made were more than appropriate under Rule 12's notice pleading standards to establish *ultra vires* behavior.

## II.     The District Court Erred In Dismissing Plaintiffs' State Law Claim For Improper Delegation.

The 2015 Ordinance on its face delegated the selection of the site for the OPC to the Obama Foundation:

> WHEREAS, While the City Council is **confident** in the quality and thoroughly of both UIC's and UChicago's proposals, ***the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library.*** (Emphasis supplied.) [Dkt.1-1, Compl. Ex. 1, Ordinance at 4]

Once that declaration was made, the City, without one dissenting voice, dutifully did whatever the Foundation asked whenever it asked for it. Thus, the Foundation dictated that Jackson Park would be the location for the OPC campus (*no longer* a library as of 2016).  [Dkt. 1-1, Compl. Ex. 2 at 85879-85881] The Foundation demanded that the City take over control from the Park District, knowing that the City was much easier and

simpler to control and manipulate, without Park District statutes in the way. [Dkt. 1-1, Compl. Ex. 2 at 85883] Pursuant to plan, the Foundation demanded, and promptly received, approval to eradicate traditional landmarks in Jackson Park including the Midway Plaisance. It also cut out the heart of Olmsted's Jackson Park: "the Foundation has proposed shifting the boundaries of the Original Site to the north and east to incorporate portions of the Midway Plaisance and Cornell Drive, and CDOT has proposed closing these and additional road segments within the park." [A.114, Compl. ¶ 66] Similarly, the City agreed to major expansions of Stony Island Avenue and Lake Shore Drive, to allow for the closure of Cornell Avenue to vehicular traffic, so that the OPC could be sited exactly where the Foundation dictated. "The need for the FHWA action arises as a result of changes in travel patterns caused by the closed roadways." [Dkt.1-2, Compl. Ex. 10 at 12] The City's actions made it abundantly clear that that Foundation was boss. That is precisely what Illinois law prohibits.

Illinois courts have expressed a long-standing hostility to improper delegations of legislative authority to private parties. In a landmark 1952 decision, the Illinois Supreme Court held that a statute allowing owners of property to vote to rename the street violated the nondelegation doctrine.

The court noted that such a statute "is not a mere contingency," but rather "give[s] the property owners unbridled discretion of what the law shall be," *People ex rel. Chicago Dryer Co. v. City of Chicago*, 413 Ill. 315, 323 (1952). Nor was it permissible to pass a municipal ordinance that allowed a majority of property owners to overrule both a minority of property owners and the town at large. *Id.* at 323-24. Illinois courts routinely apply this holding to all types of land use disputes. *See Brodner v. City of Elgin*, 420 N.E.2d 1176, 1178 (Ill. Ct. App. 1981); *La Salle Nat. Trust, N.A. v. Village of Westmont*, 636 N.E.2d 1157, 1169 (Ill. Ct. App. 1994) ("legislative power may not be delegated to private individuals").

Illinois law is, moreover, buttressed by decisions from the U.S. Supreme Court: "By any measure, handing off regulatory power to a private entity is 'legislative delegation in its most obnoxious form.'" *Dep't of Transp. v. Assoc. of American Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). More recently, the anxious debate in *Gundy v. United States,* 139 S. Ct. 2116 (2019) also portends an increased emphasis on the nondelegation doctrine. "If a majority of this Court were willing to reconsider the approach we have taken [toward nondelegation] for the past 84 years, I would support that effort." *Id.* at 2131 (Alito, J. concurring).

Illinois law has already moved in just that direction. In *People v. Pollution Control Board*, 83 Ill. App. 3d 802 (1st Dist. 1980), the court found an improper delegation of authority where the endorsement from a private organization exempted a body from the PCB's noise standards. That action gave "private organizations the right to determine which events will be exempt from the law and which will not. . . . . [T]he will of the associations is thrust upon the public at large without regard for the necessity, beneficence, or reasonableness of their actions.  The legislature's delegation of the power to endorse is to private organizations whose interests may be adverse to interests of others similarly situated or directly affected by the exercise of the power delegated." 83 Ill. App. 3d at 809. *See also* 11 Ill. Law & Prac. Constitutional Law § 69 ("The delegation of the state's legislative power to private persons whose interest may be adverse to the interest of others similarly situated or directly affected by the exercise of power is not lawful.")

That form of impermissible delegation is evident in the previously cited Chicago's 2015 Obama Center Ordinance which speaks *not* in terms of mere "advice" or "consultation" but of "deference"—a different animal altogether—to the former President and his Foundation relative to the OPC's location, design, and with regard to the tailor-made "use

40

agreement," whose adverse impacts on roads, historical sites, and environmental impacts are far more dangerous than the delegation of an exemption from the PCB. The subsequent 2018 ratification by the City Council does not somehow cure the defect, but acts as a rubber stamp—a confirmation of the deference provided—done without performing any independent review of alternative sites, including one near Washington Park, even though the proposed development involves public, not private land.  [Dkt. 1-1, Compl. Ex. 2]

The District Court cites to *Hamann v. Lawrence*, 354 Ill. 197, 204 (1933) for the proposition that "[w]hile the "legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet cannot understandingly or advantageously do itself." (quoting *People ex rel. Caldwell v. Reynolds*, 10 Ill. 1 (1848)).  Whenever a transfer of public trust property to a private party is proposed, the local government must be able to evaluate and protect such interests so as to protect the public purse and public trust, including situations where, as here, a massive development requiring multiple street closures and the destruction of public trust property and parkland is being demanded by the private party.  The public bodies must step up to avoid massive conflicts of

interest when a private party *de facto* is allowed to decide major questions solely for its own interest, exactly as has occurred here.  The District Court erred in its dismissal of this cause of action.

### III.    The District Court Erred In Disallowing Plaintiffs Leave To Amend To Add Additional Claims Pertaining To The Foundation's Ability To Meet The Preconditions For Taking Possession Of Jackson Park.

On November 24, 2021, the Plaintiffs made their only effort to amend their complaint against the City and Foundation in order to bring claims that both parties were in material breach of the Master Agreement. [Dkt. 107]  Briefing was completed by January 5, 2022, and the District Court issued its short opinion the following day, denying that motion to amend.  [A.001-A.002]  The Court held that the Plaintiffs lacked standing to sue on the ground that they were proceeding solely as third-party beneficiaries in actions that were barred by Clause 34 of the Master Agreement.  *Id.*

That haste bred reversible error, for at no point did the Plaintiffs ever make a third-party beneficiary claim.  The Plaintiffs' basis for standing was correct because they are both taxpayers and residents who under Illinois law have long been allowed to challenge illegal transfers:

> It is established that a taxpayer can enjoin the misuse of public funds, based upon taxpayers' ownership of such funds and their liability to replenish the public treasury for the deficiency caused by

42

misappropriation thereof. Consequently, a taxpayer has standing to bring suit, even in the absence of a statute, to enforce the equitable interest in public property which he claims is being illegally disposed of. *Martini [v. Netsch],* 272 Ill.App.3d 668, at 696, 208 Ill.Dec. 974, 650 N.E.2d 668 (1995)(citing *Metropolitan Sanitary District of Greater Chicago ex rel. O'Keeffe v. Ingram Corp.,* 85 Ill.2d 458, 476, 55 Ill.Dec. 535, 426 N.E.2d 860 (1981), and *Paepcke v. Public Building Comm'n of Chicago,* 46 Ill.2d 330, 341, 263 N.E.2d 11 (1970)).

*Malec v. City of Belleville*, 384 Ill. App. 3d 465, 468-69 (Ill. Ct. App. 2008).

Alternatively, the proposed claim could be characterized as a derivative action, where "the direct injury to be remedied is not personal to the taxpayer. Rather, the right of action is that of the governmental entity." *See Schachitti v. UBS Fin. Servs.*, 215 Ill.2d 484, 494 (2005).

The district court's ruling falls beyond the pale of uniform law that liberally allows amendments under Rule 15. *See, e.g., Foman v. Davis,* 371 U.S. 178 (1962); *Cotton Bros. Baking Co., Inc. v. Indus. Risk Insurers,* 690 F. Supp. 1541, 1547 (W.D. La. 1988) (noting "legion of case law" permitting amendment). The motion was filed approximately six months after filing the original complaint, on issues that only arose **after** the Defendants' initial motion to dismiss was filed and briefed and **after** the preliminary injunction was adjudicated by the District Court. The motion for leave was filed promptly after these issues arose. No discovery had occurred [*see* Dkt. 106, 11/17/21 Minute Order granting Defendants' oral motion to stay

discovery]; no rulings on the motion to dismiss had been made; and no trial date had been set. The District Court abused its discretion in denying Plaintiffs' leave to amend.

## V.    The District Court's Abdication To The Agencies And Private Parties In Rejecting Plaintiffs' Federal Claims Is Reversible Error.

The District Court's final decision on the Plaintiffs' federal claims was arbitrary and capricious, suffering from the fatal error of undue deference to the federal administrative decisions issued pursuant to NEPA, Section 106 and Section 4(f) and which themselves underlie the other administrative decisions complained of. That untoward deference led both the District Court (as well as this Court when ruling upon Plaintiffs' appeal from the denial of the preliminary injunction) to reject the Plaintiffs' challenge to the illegal segmentation of the OPC project, and to its decision to deny an EIS because destruction of Jackson Park was deemed of insufficient "significance" to trigger an EIS.

Undoubtedly, the Defendants will argue that this Court's decision affirming the denial of the preliminary injunction is law of the case. However, as the Supreme Court has held, the law of the case doctrine "does not apply if the court is 'convinced that [the prior decision] is clearly erroneous." *Agostini v. Felton,* 521 U.S. 203, 236 (1997)(quoting *Arizona v.*

44

*California*, 460 U.S. 605, 618 n.8 (1983)).  As demonstrated below,

irrespective of the standard applied, the District Court's final decision in

regards to the federal claims should be reversed.

> **A.** **The District Court Misconstrued Applicable Law by Ignoring the Blatant Segmentation of the OPC Project Prohibited Under NEPA, Section 106, and Section 4(f).**
>
> 1. *The OPC project is an integrated project that includes all major roads in Jackson Park and the road expansions of Lake Shore Drive and Stony Island Avenue.*

Throughout the federal review process relative to the OPC, it was

common ground that the relevant project was the construction of the OPC

in Jackson Park. The description of that project is given with the Notice of

Final Federal Agency Action on Proposed Transportation Project in

Illinois, 86 Fed. Reg. 8677 (Feb. 8, 2021), which speaks of one inclusive

project:

> The proposed construction along Lake Shore Drive, Stony Island Avenue, Hayes Drive, *and other roadways* in Jackson Park and the construction of proposed trails and underpasses in Jackson Park, Cook County, Illinois.  (Emphasis added).

Thereafter, the description talks about the widening of Lake Shore Drive

(U.S. Route 41) and widening Stony Island Avenue, coupled with bicycle

and pedestrian accommodations in Jackson Park, with further connections

to Cornell Drive, Hayes Drive, and Marquette Drive.  Despite that fact,

the District Court wrongly insisted on treating the four (4) roads in

Jackson Park and the expansion of Lake Shore Drive and Stony Island

Avenue as two separate projects even though the Section 4(f) Report

concluded as follows: "The need for the [Federal Highway Administration]

action [which is the expansion of Lakeshore Drive and Stony Island] arises

as a result of changes in travel patterns caused by the closed roadways."

[Dkt. 1-2, Compl. Ex. 10 at 12]

Those roads are central elements of Jackson Park, and by no stretch

of the imagination can they be called local. The four (4) so-called "local"

roads left unnamed include these key arteries: the Midway Plaisance

going east, Cornell Drive going north and south, Hayes Drive and

Marquette Drive going east and west.  Cornell Drive forms part of the road

that links Interstate 90 to Lake Shore Drive.  Physically, none of them are

lined with any houses or businesses.  They all run through Jackson Park

as testimony to Olmsted's original vision of an integrated urban park,

linking Northern Indiana to the Chicago Loop.  [Dkt. 1-2, Compl. Ex. 8,

December 18, 2020, Final Section 4(f) Evaluation at 3, 5-7]

Nonetheless, the scope of the OPC project is not recognizable from

the narrow description advanced by the District Court or this Court later,

which wrote:  "The plans for the Center *require* the closure of portions of

46

three roads within Jackson Park. To accommodate the resulting effect on traffic, the Chicago Department of Transportation has proposed using federal funding to build or improve other roads, bike paths, and pedestrian walkways in the park. To be clear, the plan to close portions of existing roads in the park did not require federal approval." *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 393 (7th Cir. 2022). This statement is the product of excessive deference so as to escape meaningful review in violation of Supreme Court authority, and clearly incorrect insofar as it insists that the conversion of Cornell Drive into a bicycle path is not a transportation project.

2.  *The extensive work in Jackson Park is a major federal program or project covered by NEPA, Section 106, and Section 4(f).*

Pursuant to 40 C.F.R. § 1508.18 (2003), a major federal action "includes actions with effects that may be major, and which are *potentially* subject to Federal control and responsibility." (Emphasis added.) "Actions include new and continuing activities, including projects and programs entirely or *partly* financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17)." 40 C.F.R. § 1508.18(a) (emphasis added).

47

Building the OPC in Jackson Park certainly meets this definition as a major federal project. It is backed by millions of federal dollars, which renders indefensible any notion that the fungible federal dollars used to finance the roadwork in Jackson Park were dedicated *only* for use on Stony Island Avenue and Lake Shore Drive, when shutting down the Midway Plaisance going east was done *solely* to accommodate a specific demand from the Foundation to place the OPC further north to improve its visibility along the Midway.

In this context, the various government agencies have been tasked with using their expertise to balance many conflicting interests. But they have never been granted total discretion given the risk that politically savvy applicants and administrative allies will undermine the statutory scheme. Accordingly, Section 4(f) specifically provides, consistent with "the policy of the United States Government that *special effort"* is to be made to protect public parks, that a transportation project can be approved "only if" there is no prudent and feasible alternative to using the land and "all possible planning to minimize harm" to the park is included. 49 U.S.C. § 303(c) (emphasis supplied). To achieve the statutory purpose, the phrase "transportation program or project" cannot be construed narrowly to sidetrack the statute as the District Court has done here.

The relevant case law starts with the Supreme Court's decision in *Overton Park*, whose operative passage, never cited in either Court opinion or by the Defendants, reads:

> Even though there is no *de novo* review in this case . . ., the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry. Certainly, the Secretary's decision is entitled to a presumption of regularity. But that presumption is not to shield his action from a thorough, probing, in-depth review.

*Overton Park*, 401 U.S. at 415 (citations omitted).

This articulation allows the presumption in favor of administrative regularity to be rebutted by a "thorough, probing, in-depth" review that is required in all cases. Yet, the District Court and this Court totally disregarded this principle by writing that: "The City's objective was to build the [OPC] in Jackson Park, so from the Park Service's perspective, building elsewhere was not an alternative, feasible or otherwise." *Protect Our Parks, Inc. v. Buttigieg,* 10 F.4th 758, 764 (7th Cir. 2021) (denying motion to stay pending appeal). The District Court admitted the improper deference and unilateral action here when it noted that the Foundation admitted that they "made the decision to locate the OPC in Jackson Park, and there exists no evidence that this decision required federal review or involvement." [A.076] This Court followed suit writing that:

49

> [A]s the district court recognized, segmentation refers only to the situation that arises when an agency arbitrarily separates related *federal* actions from one another. The [OPC] is a local project, and the federal government has no authority to fix its location. Without federal involvement we do not even reach the issue whether the federal government segmented its actions. *See Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 735 (7th Cir. 2003). That is because the NEPA requires an impact statement only for "major Federal actions," which the relevant regulations define to mean actions that are "potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (2019).

*Protect Our Parks v. Buttigieg*, 39 F. 4th 389, 393-94 (7th Cir. 2022).

That narrow definition of a program or project cuts the heart out from *Overton Park* by allowing the project owners to determine the scope of their own projects. That analysis is also contrary to the Court's jurisprudence discussed *supra*. Section 4(f), Section 106, NEPA (and similar federal statutes) would be a dead letter if federal authorities could not fulfill their statutory role in such developments (*i.e.*, by withholding funds) if major decisions on land use like the OPC are relegated to the status of local projects, nullifying the statutory language providing for federal reviews when a "major action" is "potentially subject" to federal control. However, while private parties may ignore statutes and make their own decisions to define a project, such unilateral acts do not remove

the project from federal review.  That narrow view then allows both the City and the Foundation to ignore the fact that superior sites are available, without any of the numerous adverse effects of the OPC.

The District Court's (and this Court's) reliance upon *Old Town Neighborhood* was thus singularly inapt because the local project in Goshen was, by design, done without federal funds. *Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 734 (7th Cir. 2003). Instructively, however, *Old Town Neighborhood* also held that the project's provisional immunity would be lost if the city ever received federal funds for any local work, as the entire project would then be a single undertaking covered by the "step-transaction" doctrine. *Id.* at 736.

Reliance upon *Scottsdale Mall v. State of Indiana,* 549 F.2d 484 (7th Cir. 1977) is equally improper. Both the District Court and this Court quoted in isolation a snippet stating that the law "does not infringe on the right of a state to select a project to be financed solely out of its own funds" – which Jackson Park is not.  [A.076]  The fuller statement of facts indicates that Indiana had engaged in impermissible segmentation of a single project when it turned down federal funds for the last stage of a highway construction project, having accepted federal funds for its three prior stages, during which time it cooperated closely with the federal

51

government.  *Id.* at 488.  *Scottsdale Mall's* extensive coordination between the federal and state officials counted as a "major federal action" that called for an EIS under NEPA.

In Jackson Park, a similar financial integration has been achieved because extensive federal funds were used not just potentially, but *actually*, on the extensive site preparation for the OPC.  In light of that integrated initial plan, it is wrong to say that "one of the alleged project 'segments' [namely the OPC] does not actually fall under federal review." [A.076]  Because the Foundation strategically ignored NEPA and other federal environmental protections when it chose to build in Jackson Park, (decisions to which the City deferred), it did not exempt itself from a federal review.  Surely no private entity gets that free pass!  Why else was its size, location, and design important to the federal reviews? NEPA, Section 106, and Section 4(f) would be gutted if they could be sidelined solely by the unilateral decision of a regulated party to define the scope and location of its own project, thereby eliminating the required review of any alternatives. While NEPA, Section 106, and Section 4(f) do not give any federal agency the power to dictate the specific location of a private development, the federal agencies and the courts have a role, and are legally obliged to deny an application if it fails to meet the standards

articulated in Section 4(f) and other relevant statutes. *Overton Park* demands no less.

The applicable regulations under 23 C.F.R. § 771.111(f)(1)-(3) and elsewhere do not let courts defer to any agency interpretation on segmentation. *See Highway J Citizens Grp. V. Mineta*, 349 F.3d 938, 962 (7th Cir. 2003) (*quoting City of West Chicago v. NRC*, 701 F. 2d  632, 650 (7th Cir. 1983)).  There, Citizens challenged the Ackerville Bridge/Lovers Lane Project and the County Highway 164 Project because a "contamination plume" containing arsenic and trichlorethylene was migrating toward the Ackerville Bridge.  Citizens asked the court to suspend the project until the plume was isolated and corrected, and also "to require the FHWA to prepare an Environmental Impact Statement ("EIS") for the Ackerville Bridge Project." *Id.* at 942.  Segmentation became an issue because the plaintiffs had treated the two projects as one. The *Mineta* court noted that: "*If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference.*" *Id.* at 953 (emphasis added).  The initial "if" says it all.  In *Mineta*, the requisite analysis was in fact made under the "hard look" doctrine, *id.* at 954—never once invoked in the

reviews of Jackson Park—to explain why the plume did not pose a menace to the bridge requiring remediation. *Id.* at 955. The absence of any causal connection between the bridge and the highway justified the segmentation because the repair of bridges was tightly confined by location, whereas the OPC's road construction is not. The physical separation in *Mineta* could never take place with the OPC in Jackson Park. Unfortunately, *Mineta's* hard-look methodology was abandoned in this case when it was insisted (incorrectly) that the Plaintiffs' position "fail[ed] to take into account the deference courts owe to agencies with respect to the scope of a project." *Protect Our Parks*, 10 F.4th at 763.

The relevant pattern is clearly illustrated by comparing two pipeline cases. In *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 33 (D.C. Cir. 2015), the Court held "that the federal government was not required to conduct NEPA analysis of the entirety of the [593 mile] Flanagan South pipeline, including portions not subject to federal control or permitting." The reviews in question could have involved close to 2,000 minor water crossings. But since the interconnections at each location were wholly independent of the others, all of them need not be reviewed to deal with any one case. But in *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304 (D.C. Cir. 2014), the Court did hold that segmentation on the so-

called Northeast Project was impossible precisely because the upgrade

work done on 200 miles of continuous pipeline did require a close look at

the cumulative and interactive impact of the individual repairs which

made segmentation impermissible.  By contrast, the huge deference that

both this the District Court and this Court have exhibited is inconsistent

with the treatment of cumulative impacts under 40 C.F.R. § 1508.25(a)(2),

Similarly, the doctrine of constructive use, also ignored in the matter

at bar, guards against evasions practiced in this case.

> (23) **(a)**  A constructive use occurs when the
> transportation project does not incorporate land
> from a Section 4(f) property, but the project's
> proximity impacts are so severe that the
> protected activities, features, or attributes that
> qualify the property for protection under
> Section 4(f) are substantially impaired.
> Substantial impairment occurs only when the
> protected activities, features, or attributes of
> the property are substantially diminished.

23 C.F.R. § 774.15(a).

Thus, for any project that creates a common law nuisance, the

review must take into account adverse consequences, including, but not

limited to, the massive damage to trees and birds, both local and

migratory. The entire roadwork system in Jackson Park is a

transportation project supported directly and/or indirectly by federal

55

monies and federal permits; such federal review covers both the land occupied *and* the collateral damage to nearby locations, including not just the trees cut down, but also those whose root systems will be compromised by the changes in the water flow and water table, or by noise and vibrations.

The elevated standard of review required by *Overton Park* makes it clear that the standard of deference found in *Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) has no place in this analysis. That result is indeed fortified by three recent opinions from the Supreme Court in different statutory schemes that also reject the uncritical deference shown by the District Court to the government's characterization of the OPC project in Jackson Park. Specifically, in *American Hospital Association v. Becerra,* 142 S. Ct. 1896 (2022), the Supreme Court rejected the Department of Health and Human Services' interpretation of a Medicare reimbursement formula reduction. The Court made no mention or reference to the *Chevron* doctrine, and instead focused on the text and structure of the statute when it held that a cut in Medicare reimbursement was not consistent with the statute. Then, the Supreme Court decided *Becerra v. Empire Health Foundation,* 142 S. Ct. 2354 (2022), again without any mention of *Chevron* deference, and performed

its own analysis of the text and structure of the Medicare statutes when it found certain individuals were entitled to Medicare benefits. In a sharply divided Court, neither side appealed to a *Chevron* deference. Finally, and most importantly, in *West Virginia v. EPA,* 142 S. Ct. 2587 (2022) the Court did not apply *Chevron* when it refused to accept the EPA's broad interpretation of a Clean Air Act provision dealing with the "best system of emissions reduction… that has been adequately demonstrated." *Id.* at 2596. Consistent with these decisions, and the undisputed record, the District Court's deference to federal agencies on the segmentation and related issues was arbitrary, capricious and otherwise clearly erroneous, requiring reversal of the judgment entered on the federal reviews which were all impacted by such errors, and, at a minimum, those claims under Section 4(f), NEPA and Section 106 claims where the required analysis and work were not performed.

> 3. *The federal agencies' actions are the factual and proximate cause of the environmental harms in this case.*

Both the District Court (and this Court later) cited *Dep't of Transp. V. Public Citizen*, 541 U.S. 752 (2004), for the proposition that the federal agencies' actions were somehow not the factual and proximate cause of the harms to Jackson Park. This Court stated that "[t]he Park Service's approval was a factual cause of the Center's placement in Jackson Park,

because construction could not start without its approval, but the agency's limited authority prevented it from being a proximate cause of any damage resulting from the Center." *POP*, 39 F.4th at 399. But why? In *Public Citizen* nothing any agency did could override the presidential decision. Neither NEPA, Section 106, nor Section 4(f) played any role in *Public Citizen*. But in this case the agency decisions (and the failures to perform the adequate analyses) determined whether the OPC could go ahead. It is common that two or more actions could be called "the" proximate cause, and no one could deny that the decision of government agencies to authorize private activities counts as a "substantial factor"— the usual test for proximate cause—in bringing about the harm. Restatement (Third) Torts § 26, Law of Physical Harm. To hold the opposite would render the environmental statutes a dead letter in every case.

*Public Citizen* also asked whether some intervening causal event severed the connection between some "but for" cause and the undesired result, *i.e.*, increased road traffic and pollution that could require an EIS. 541 U.S. at 754. Yet that causal connection could not be established as the new Mexican trucks on the roads might well have been offset by a decline in American trucks on the same roads. However, no such offset is

58

conceivable with the approval of the OPC in Jackson Park. Cornell Drive will be converted into a bike path, and the expansion of Stony Island Avenue and Lake Shore Drive are all necessary to construct the OPC in Jackson Park, and all part of one integrated plan. That the Foundation and City have self-selected a scope does not make their characterizations accurate – factually or legally.

      *4.   The judicial deference shown in this case has illegally blocked the EIS that is clearly required here.*

A federal agency must prepare an EIS for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency finds that no EIS is required because the proposed action will not have a significant impact, then the agency reports its decision in a FONSI (finding of no significant impact). 40 C.F.R. § 1508.13. Further, an EIS must be prepared when an EA reveals that a proposed action *may* significantly impact the environment. 42 U.S.C. § 4332(2)(C). The applicable regulations look to both context and intensity in deciding "significance." *See* 40 C.F.R. § 1508.27. Here, the District Court wrongfully found no significant environmental impact that required preparing an EIS. Recall that *Overton Park* categorically requires this Court "to engage in a substantial inquiry" that provides a "thorough,

probing, [and] in-depth" review. Yet the District Court improperly deferred to the agency by refusing to ask a single hard question about the wholesale destruction of Jackson Park outlined above.

Those omissions were particularly glaring on the massive destruction of trees. Here, both the District Court (and this Court) relied on a "meticulous tree survey" which only asked what new trees could reduce the damage from cutting at least *eight* hundred (800) trees, the vast majority of which are mature or near maturity and in good to fair condition, taking one hundred (100) years or longer to reach full size. [*See* Dkt. 61-22, Fed. Defs. Ex. 17, Part 1, Appendix D-1; Dkt. 80, Ex. 11, Mitchell Supp. Decl., ¶ 11] The clear-cutting of these trees will prove doubly significant because of their critical location in Jackson Park. [*Id.*; Dkt. 80, Ex. 12, Balkany Decl., ¶ 4 & Ex. A thereto]

These large trees have for decades provided safe nests to local and migratory birds. [Dkt. 1-2, Compl. Ex. 10 at 29-34] They absorb large amounts of water that helps stabilize the local environment, and they remove large amounts of carbon dioxide from the air. Countless recent studies speak to their critical role in maintaining the fragile ecological balance. *See, e.g.*, The Morton Arboretum, Benefits of Trees, available at https://mortonarb.org/plant-and-protect/benefits-of-trees/ ("Numerous

scientific studies have shown that trees promote health and well-being by reducing air pollution, encouraging physical activity, enhancing mental health, promoting social ties, and even strengthening the economy.").

In the face of this evidence, both the EA (and its referenced Tree Memorandum [Dkt. 31-1, Ex. 6, AE Appendix D, Trees Technical Memorandum]) concluded erroneously that clear-cutting about 800 mature trees was "insignificant," relying upon, *inter alia,* possible future replacement with saplings, without pointing to a similar determination made anywhere else in the United States, especially in a city, like Chicago, that is in fact *tree poor*. [Dkt. 80, Ex. 10, Mark Rivera, "Chicago tree canopy dwindling; calls for equity, tree planting in underserved communities," June 30, 2021]

Nor does it matter, as the District Court claimed, that there were some "unaffected 500-plus acres of Jackson Park," or, indeed several thousand acres along the Chicago Lakefront, or the millions of acres nationwide. Any purported ratio would gut both NEPA and the TA by allowing government agencies to use the largest possible denominator to trivialize any government action. What matters is finding some justification for swapping out 800 old-growth trees today for the *promise* of perhaps planting 800 saplings five or more years later. As noted, the

freestanding OPC can be placed elsewhere on the South Side of Chicago, without having to engage in the first major do-over of *any* Olmsted Park ever.  Plaintiffs do not know of a single regulation, case, or practice that defers to any agency judgment that equates mature trees from a historic park with saplings.

Any well-designed EA or EIS must examine the intensity of any factor that affects "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources [and] park lands [and] [t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources."  40 C.F.R. §§ 1508.27(b)(3),(8).  Those vulnerable areas are found everywhere in Jackson Park, which is listed on the National Register of Historic Places (as is the Midway Plaisance, and the Chicago Boulevard Historic District), and is an acknowledged Olmsted masterpiece.  [Dkt. 31-1, Ex. 2, Mitchell Decl., ¶¶ 8, 11]

Another intensity factor is whether "the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4), that is, whether there is "a substantial dispute" about the

action's size, nature, or impact. *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 32 (D. D.C. 2000) (citations omitted). In the present case, the public is engaged in a prolonged fierce and loud dispute regarding the disruption of traffic patterns, the destruction of trees, the mammoth size of the main OPC building, the awkward placement of the OPC on the Midway Plaisance, the destruction of key features of Jackson Park, and, in particular, the wisdom of locating the OPC in an Olmsted public park and its impact on the community and public.

To that end, in response to a nonbinding advisory referendum in the November 2022 election, citizens voted overwhelmingly (by 82 percent) to halt the destruction of trees in Jackson Park, in connection with the OPC and any related activities such as a one-time proposed Tiger Woods-designed golf course extension which together could result in the loss of several thousand more trees. *See*, Patty Wetli, South Side Voters Speak Up for Trees in Jackson Park and South Shore, Is Anybody Listening? WTTW News, Nov. 9, 2022 https://news.wttw.com/2022/11/09/south-side-voters-speak-trees-jackson-park-and-south-shore-anyone-listening.

An EIS is also required "if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R.

§1508.27(b)(7), or to examine activities governed by explicit "constructive use" regulations, *see supra* at 55.  23 C.F.R. § 774.15.  These various indirect effects require a more comprehensive analysis even when a transportation project does *not* incorporate land from a Section 4(f) property, so long as the proximity of the project generates severe negative impacts on protected activities, features, or attributes protected under Section 4(f).

Hence, the agency is duty-bound to consider the trees already cut down *and* the trees now likely to be damaged to further compromise the Park's ability to provide migratory and local birds places to nest, forage, and seek shelter in other trees throughout Jackson Park, particularly where the risk of a new grandiose Jackson Park golf course remains lurking. [Dkt. 47-1, Cox Decl., at 3].   The failure to perform an EIS in these circumstances is reversible error under any standard of review.

## <u>CONCLUSION</u>

The Plaintiffs respectfully request that the District Court's decisions set forth above be reversed, and that the case be remanded for further proceedings.

Respectfully Submitted,

PROTECT OUR PARKS, INC.;
NICHOLS PARK ADVISORY
COUNCIL; STEPHANIE FRANKLIN;
SID E. WILLIAMS; BREN A.
SHERIFF; W.J.T. MITCHELL; and
JAMIE KALVEN,
Plaintiffs-Appellants

  /s/ Richard Epstein
Richard Epstein
One of their attorneys

Richard A. Epstein
16 Thomas Place
Norwalk CT 06853
repstein@uchicago.edu

Michael Rachlis
Rachlis Duff & Peel LLC
542 South Dearborn
Chicago, Illinois 60605
mrachlis@rdaplaw.net

Thomas G. Gardiner
Catherine M. Keenan
GKWW
53 W. Jackson Blvd.
Suite 950
Chicago, Illinois 60604
tgardiner@gkwwlaw.com
ckeenan@gkwwlaw.com

*Attorneys for Plaintiffs-Appellants*

## **Type-Volume Certification**

The undersigned counsel hereby certifies that this brief complies with the type-volume limitations of Circuit Rule 32(a), (b), and (c) of this Court, because the brief contains 13,999 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

                                     /s/ Richard Epstein  
                                     Richard Epstein

**Certificate of Service**

I hereby certify that on February 16, 2023, I electronically-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in these consolidated appeals are registered CM/ECF users and that service will be accomplished by and through the CM/ECF system.

 /s/ Richard Epstein
Richard Epstein

Appeal No. 22-3190

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

PROTECT OUR PARKS, INC., *et al.*,
Plaintiffs-Appellants,

v.

PETE BUTTIEGIEG, SECRETARY OF THE U.S. DEPARTMENT OF
TRANSPORTATION, *et al.*,
Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois
Hon. Robert Blakey
1:21-cv-02006

## PLAINTIFFS-APPELLANTS PROTECT OUR PARKS, INC., *ET AL.*'S REQUIRED SHORT APPENDIX TO OPENING BRIEF

| | | |
|---|---|---|
| Richard A. Epstein | Michael Rachlis | Thomas G. Gardiner |
| 16 Thomas Place | Rachlis Duff & Peel LLC | Catherine M. Keenan |
| Norwalk CT 06853 | 542 South Dearborn | GKWW |
| | Suite 900 | 53 W. Jackson Boulevard |
| | Chicago, Illinois 60605 | Suite 950 |
| | | Chicago, Illinois 60604 |

*Attorneys for Plaintiffs-Appellants*

## ORAL ARGUMENT REQUESTED

## <u>Appendix Certification</u>

The undersigned counsel hereby certifies that all of the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix.

<u>  /s/ Richard Epstein          </u>

## Table of Contents for Required Short Appendix

| Docket. No. Cite | Date of Entry or Filing | Description | Appendix Number |
|---|---|---|---|
| Dkt. 117 | 1/6/2022 | Minute Entry | A.001-A.002 |
| Dkt. 119 | 3/29/2022 | Memorandum Opinion and Order | A.003-A.039 |
| Dkt. 147 | 11/3/2022 | Minute Entry | A.040 |
| Dkt. 148 | 11/3/2022 | Final Judgment In Favor Of Defendants | A.041-A.042 |
| Dkt. 149 | 11/3/2022 | Judgment In A Civil Case | A.043 |

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.3**
**Eastern Division**

Protect Our Parks Inc, et al.

                                    Plaintiff,

v.                                                      Case No.: 1:21−cv−02006
                                                        Honorable John Robert Blakey

Pete Buttigieg, et al.

                                    Defendant.
_____

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Thursday, January 6, 2022:

    MINUTE entry before the Honorable John Robert Blakey: The Court denies Plaintiffs' motion for leave to amend [107]. Plaintiffs seek to add two claims: Count XV, which alleges breach of the master agreement, and Count XVI, an unjust enrichment claim, also predicated on the alleged breach of the master agreement. The former claim would fail because Plaintiffs have no standing to sue for breach of a contract to which they are not parties. The claims are futile. See Kaplan v. Shure Bros., 266 F.3d 598, 602 (7th Cir. 2001) (Under Illinois law, a cause of action based on a contract may be brought only by a party to that contract, by someone in privity with such a party, or by an intended third−party beneficiary of the contract.)(citing White Hen Pantry, Inc. v. Cha, 574 N.E.2d 104, 109 (Ill. App. Ct. 1991); Altevogt v. Brinkoetter, 421 N.E.2d 182, 18687 (Ill. 1981)); NHI−2, LLC v. Wright Prop. Mgmt., Inc., No. 15 C 7913, 2018 WL 1138542, at *2 (N.D. Ill. Mar. 2, 2018) ("the only parties that may bring a breach of contract claim under a contract are those that have signed the contract at issue") (citing W.W. Vincent and Co. v. First Colony Life Ins. Co., 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). And the latter is tied to the former and adds nothing new to the allegations already on file. See Benson v. Fannie May Confections Brands, Inc., 944 F.3d 639, 648 (7th Cir. 2019) (in Illinois, a request for relief based upon unjust enrichment is tied to the fate of the underlying claim). Plaintiffs argue that they have standing to sue and cite cases to support that argument; to the extent those cases support Plaintiffs' standing argument generally, they do not establish standing to sue for breach of contract, which is what Plaintiffs seek to do. E.g., Malec v. City of Belleville, 891 N.E.2d 1039, 1041 (Ill. Ct. App. 2008) (finding standing to assert claims alleging violations of the TIF Act, and certain provisions of the Illinois Municipal Code). Accordingly, and because the parties and the Court have already devoted significant resources addressing the current complaint, the Court declines to grant leave to amend. Mailed notice(gel, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was

generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| PROTECT OUR PARKS, INC, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-CV-2006 |
| | ) | |
| v. | ) | |
| | ) | |
| PETE BUTTIGIEG, et al., | ) | Judge John Robert Blakey |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This dispute is the latest effort by Plaintiff Protect Our Parks, joined by various individuals and the Nichols Park Advisory Council to block the construction of the Obama Presidential Center ("OPC") in Jackson Park on the south side of Chicago. Plaintiffs sue the City of Chicago ("City"), the Chicago Park District ("Park District"), the Barack Obama Foundation ("Obama Foundation") and various federal agencies, bringing eight state law claims and seven federal claims. [1]. The City, Park District and Obama Foundation move to dismiss all of the state law claims, [28]. For the reasons set forth below, the Court grants Defendants' motion [28] in its entirety.

## I.    Factual Background[1]

In 1869, the Illinois General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and

---

[1] The Court takes these facts from the Plaintiffs' Complaint and its attachments. Given the extensive history of this case, the Court assumes general familiarity with the factual background and this Court's prior orders (incorporated herein by reference as needed) and limits its factual recitation to a brief summary of those facts essential to the motion to dismiss now before it.

A.003

Lake." [1] ¶ 37; Private Laws, 1869, vol. 1, p. 358. The statute provided for the formation of a board of public park commissioners to be known as the "South Park Commissioners." *Id*. The Act authorized these commissioners to select certain lands, which, when acquired by said Commissioners, "shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Private Laws, 1869, vol. 1, p. 360. Pursuant to this authority, the commissioners acquired the land now known as Jackson Park.    [1] ¶ 37. The Illinois Legislature enacted the Park District Consolidation Act in 1934, which consolidated the existing park districts, including the South Park District, into the Chicago Park District. *Id*.; 70 ILCS 1505/1.  The Park District therefore came to hold Jackson Park in the public trust.

In March 2014, the Obama Foundation initiated a nationwide search for the future site of the OPC. [1] ¶ 39.  Both the University of Chicago and the University of Illinois Chicago proposed potential locations in Chicago.  *Id*. ¶ 40.  In 2015, the City Counsel passed an ordinance ("2015 Ordinance") outlining a number of proposed sites for the OPC and authorizing the transfer of a portion of Jackson Park to the City, in the event the Obama Foundation was interested in building and operating the OPC in Jackson Park. *Id*. ¶ 111; [1-1], Ex. 1.  The proposed Jackson Park site lies on the western edge of Jackson Park and includes existing parkland bounded by South Stony Island Avenue on the west, North Midway Plaisance on the north, South Cornell Drive on the east, and East Hayes Drive on the south.  [1] ¶ 54; [29-1] ("Report

to the Planning Commission") at 2.[2]  Around the same time, the Illinois General Assembly also amended the Illinois Park District Aquarium and Museum Act ("Museum Act") to explicitly authorize cities and park districts to purchase, erect, and maintain museums, including presidential libraries, in public parks and to permit certain third parties to build, improve, maintain and operate these museums.  *See* 70 ILCS 1290/1.

The Chicago Plan Commission and Chicago City Council reviewed the matter, held public hearings, and subsequently approved this inter-governmental transfer of a portion of Jackson Park.  [1] ¶¶ 58–63; [1-1].  As part of its approval, the City Council passed an ordinance ("2018 Ordinance") allowing the City to accept title to the Jackson Park site from the Park District and to enter into agreements governing the Obama Foundation's use of the site.  [1] ¶¶ 63–66; [1-1], Ex. 2.  One of the agreements authorized by the 2018 Ordinance—the 2018 Use Agreement—sets the terms by which the Obama Foundation may use the Jackson Park site for the OPC. [1-1], Ex. 2 (Ex. D).  In addition to the various structures that will comprise the OPC, the site will include new parkland created by vacating portions of streets adjacent to existing parkland.  [1] ¶¶ 54–57, 65–67, 73; [29-2] ("May 17, 2018 Report to the Chicago Plan Commission").[3]

---

[2] Plaintiffs rely on the Planning Commission Report in their Complaint, [1] ¶ 60, so the Court may properly consider it on a motion to dismiss.

[3] The Court may also rely on this Report because Plaintiffs rely on it in their Complaint, [1] ¶¶ 61–62.

## II.    Procedural Background

In May 2018, Plaintiff Protect Our Parks and several individuals sued the City of Chicago and the Chicago Park District seeking to stop the construction of the OPC in Jackson Park, bringing public use doctrine and *ultra vires* state law claims and multiple federal constitutional claims.  This Court granted summary judgment to the defendants on all claims, *see Protect Our Parks, Inc. v. Chi. Park Dist.*, 385 F. Supp. 3d 662 (2019) (*POP I*); and plaintiffs appealed, *see Protect Our Parks, Inc. v. Chicago Park District*, 971 F.3d 722, 728 (7th Cir. 2020) (*POP II*), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chicago*, No. 20-1259, 2021 WL 1602736 (U.S. Apr. 26, 2021).  The Seventh Circuit affirmed summary judgment on the federal claims but vacated the ruling on the state law claims, finding that the plaintiffs failed to demonstrate Article III standing.  *Id.* at 732.  On remand, this Court dismissed the state law claims for lack of jurisdiction.

Undeterred, Protect Our Parks, along with new individuals and the Nichols Park Advisory Council (collectively "Plaintiffs") sue again to stop construction on the OPC.  [1].  They again bring familiar public trust doctrine and *ultra vires* claims (Counts VI and VII), but add six new state law claims for: violation of Article VIII, Section 1 of the Illinois Constitution (Count VIII); violation of the Illinois Constitution Takings Clause (Count IX); improper delegation of authority (Count XI); violation of Article I, Section 2 of the Illinois Constitution (Count XII); violation of Article I, Section 16 of the Illinois Constitution (Count XIII); and violation of the Illinois State Agency Historic Preservation Resources Act (Count XV).  *Id.*  They also bring seven federal claims relating to the OPC project's federal regulatory review.  Accordingly,

4

in addition to suing the City, the Park District, and the Obama Foundation, they also sue numerous federal officials in their official capacities. *Id.*

Plaintiffs moved for a preliminary injunction based upon their federal claims, which the Court denied. [94]. An appeal of that decision remains pending.[4] The City, Park District and Obama Foundation ("Defendants" for purposes of this opinion) also moved to dismiss all eight state law claims, [28], and is now ripe for decision.

Before the Court considers the merits of Defendants' motion [28], however, it pauses to address the binding effect of the rulings in the prior iteration of this dispute. This Court's prior summary judgment ruling on the state law claims does not implicate res judicata principles, nor does it constitute law of the case, since the Seventh Circuit found the plaintiffs lacked standing. *POP II,* 971 F.3d at 728. Of course, the Seventh Circuit's decision, however, does bind this Court and the parties, and constitutes law of the case.

---

[4] Of course, this Court retains jurisdiction to decide Defendants' motion to dismiss notwithstanding the pending preliminary injunction appeal. *See, e.g., Wis. Mut. Ins. Co v. United States*, 441 F.3d 502, 505 (7th Cir. 2006) ("[A]n appeal taken from an interlocutory decision does not prevent the district court from finishing its work and rendering a final decision. This is so for appeals concerning preliminary injunctions." (citing *Kusay v. United States*, 62 F.3d 192, 193–94 (7th Cir. 1995)). Further, the Court finds no reason to delay decision on this motion to dismiss the state law claims pending outcome of Plaintiffs' injunction appeal, because Plaintiffs only sought a preliminary injunction based on their federal law claims. *Cf. May v. Sheahan*, 226 F.3d 876, 880 n.2 (7th Cir. 2000) (holding that even in those cases in which an interlocutory appeal may divest a district court of some aspects of a case, the district court has "authority to proceed forward with portions of the case not related to the claims on appeal, such as claims against other defendants or claims" that "cannot be (or simply are not) appealed."); *City of Chi. v. Sessions*, 321 F. Supp. 3d 855, 881 (N.D. Ill. 2018) (noting that, even if a district court retains jurisdiction to decide the merits of a case while an interlocutory injunction appeal remains pending, it "should use such power only in a manner that preserves the status quo and thus the integrity of the appeal.").

### III.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raises a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2019). It tests the sufficiency of the complaint, not the merits of the case. *See Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). A court must accept as true all well-pled factual allegations; it need not accept mere legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Further, when an exhibit "incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

### IV.    Analysis

#### A.    Standing

The Seventh Circuit's decision in *POP II* provided a strong reminder that, before a court can address the merits of any claim, it must assure itself of its jurisdiction. 971 F.3d at 729. Defendants summarily posit that Plaintiffs now sufficiently allege standing, [29] at 11, but the Court will nevertheless spend a moment on standing before proceeding to the merits.

To establish Article III standing, a plaintiff must show that it has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In *POP II*, the

Seventh Circuit held that the plaintiffs lacked Article III standing on their state law claims because they did not identify any injuries to their "separate concrete interests." 971 F.3d. at 731. The court also held that their status as municipal taxpayers did not confer standing because they failed to establish that the City spent any taxpayer monies on the allegedly illegal actions. *Id*. at 734.

Here, to establish standing, Plaintiffs newly allege that, for years, the individual Plaintiffs, as well as members of Protect Our Parks and NPAC, have used and enjoyed Jackson Park and the surrounding public areas and intend to continue using them for recreation and to, *inter alia*, study the architecture and enjoy the aesthetics and animal population. [1] ¶¶ 12–19. The Complaint also alleges that Plaintiffs have standing as municipal taxpayers. *Id*. ¶ 22

The allegations regarding Plaintiffs' use and enjoyment of the property suffice to demonstrate a concrete injury cognizable under Article III for their state law claims *See POP II*, 971 F.3d at 731 n.1 (noting that such injuries suffice to establish Article III standing but finding plaintiffs had failed to allege such injuries (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) and citing *Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."))).[5] The Court now proceeds to the merits.

---

[5] As in the last case, Plaintiffs again fail to establish standing for their state law claims based on their alleged status as municipal taxpayers. In *POP II*, the court held that Plaintiffs' municipal taxpayer status did not confer standing because they failed to identify both "an action on the city's part that is allegedly illegal" related to the City's monetary expenditures or "adequately show[] that city tax dollars will be spent on that illegal activity." 971 F.3d at 736. So too here, and thus *POP II* controls. Plaintiffs do not allege anything new on these points. Accordingly, even though they have standing for their

### B.    Public Trust Violation (Count VI)

In *POP II* and again here, Plaintiffs' primary state law claim rests on the public trust doctrine.  [1].  As the Seventh Circuit succinctly explained, "the public trust doctrine, established by American law in *Illinois Central Railroad Co. v. Illinois*, prohibits a state from alienating its interest in public lands submerged beneath navigable waterways to a private party for a private purpose."  *POP II*, 971 F.3d 722, 729 (7th Cir. 2020).  It may only alienate such public land to a private party "if the property will be 'used in promoting the interests of the public' or 'can be disposed of without any substantial impairment of the public interest in the lands and water remaining.'"  *Id.* (quoting *Illinois Central*, 146 U.S. at 453).

Although this original doctrine only applied to "navigable waterways," Illinois has extended the doctrine to other land such that, once the "land has been dedicated to a public purpose,…the government 'holds the properties in trust for the uses and purposes specified and for the benefit of the public.'"  *POP II*, 971 F.3d at 730 (quoting *Paepcke v. Pub. Bldg. Comm'n of Chi.*, 263 N.E.2d 11, 15 (Ill. 1970)).  This is precisely how Jackson Park became public trust land pursuant to the Illinois Legislature's 1869 grant.  *See* § I, *supra*.

### 1.    The Standard of Review Applicable to Plaintiffs' Public Trust Claim.

In moving to dismiss Plaintiffs' public trust claim, Defendants argue that Illinois law affords different levels of deference to a legislature's reallocation of public

---

state law claims (to the extent that the claims rest upon Defendants' alleged illegal use of Jackson Park), they do not have standing via any expenditure of City money related to the OPC site projects.

trust land depending on whether the land constitutes never submerged, formerly submerged, or presently submerged land.  [29] at 20.  Defendants contend that the OPC site constitutes never submerged public land[6] and argue that Illinois law affords great deference to the legislature's reallocation of statutorily-created, never submerged land pursuant to *Paepcke*, 263 N.E.2d at 15–16.  [29] at 20–21.  According to Defendants, pursuant to *Paepcke*, the Court need only look to the Museum Act to determine whether it reflects the requisite "manifestation of legislative intent" to reallocate portions of Jackson Park here.  [29] at 21.

Plaintiffs disagree. They do not dispute that Jackson Park constitutes never submerged land.  Instead, they argue that Illinois law does not (or perhaps should not) adjust its level of scrutiny based on the type of land at issue.  [69] at 20 (arguing that "[w]hether land was currently submerged, formerly submerged or never submerged has absolutely nothing whatsoever to do with the appropriate level of deference").  Plaintiffs contend that the Court cannot look solely to the Museum Act because "[s]imple legislative authorization never satisfies the requisites of the public trust doctrine."  *Id.* at 19.  Plaintiffs argue that the Court must apply Wisconsin's five-part test, which Plaintiffs insist the *Paepcke* Court adopted as the standard to resolve public trust reallocation disputes.  *Id.* at 22 (quoting *Paepcke*, 263 N.E.2d at 19 and discussing Wisconsin's five-part test set out in *City of Madison v. State*, 83 N.W.2d 674 (Wis. 1957)).

---

[6] This was a hotly disputed issue in the prior case.  *See POP I*, 385 F. Supp. 3d at 677–78 (discussing the parties' dispute and finding that Jackson Park constitutes never submerged land).

Here, Defendants' approach prevails.  Illinois applies the public trust doctrine using varying levels of deference, based upon the property's relationship to navigable waterways.  *See, e.g.*, *Paepcke*, 263 N.E.2d at 15−19 (applying public trust doctrine to never-submerged park land); *Friends of the Parks v. Chi. Park Dist.*, 786 N.E.2d 161, 169−170 (Ill. 2003) (applying public trust doctrine to formerly submerged land); *Lake Michigan Fed'n v. United States Army Corp. of Eng'rs*, 742 F. Supp. 441, 444−46 (N.D. Ill. 1990) (applying public trust doctrine to presently submerged land).  The Illinois Supreme Court in *Paepcke* recognized that the Illinois legislature enjoys significant control over allocation of statutorily created never-submerged public trust land. There, the court considered allowing Chicago's Public Building Commission, with the Park District's cooperation, to construct a school-park facility on never-submerged land within Washington Park.  *Id*. at 14.  As in this case, the land at issue derived from the 1869 Act.  *Id*. at 13. The *Paepcke* Court affirmed the trial court's dismissal of plaintiffs' challenge under the public trust doctrine because "sufficient manifestation of legislative intent" existed to "permit the diversion and reallocation contemplated" by defendants' plan.  *Id*. at 18−19.

During oral argument on Defendants' motion, Plaintiffs insisted that "there is no hint in [*Paepcke*] of any deference that was given to the government."  [113] at 46:7–8.  Not so.  The *Paepcke* Court held that "courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations" and "[i]n this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom."

*Id*. This language plainly underscores deference to legislative intent over reallocation of statutorily-created public use land.

Further, contrary to Plaintiffs' insistence, *Paepcke* did not adopt Wisconsin's five-factor approach to resolve reallocation disputes. [69] at 22. Although the *Paepcke* Court noted the approach that Wisconsin had taken in two cases, it explicitly held that the Wisconsin approach was "not controlling under the issues as presented in this case" because there existed a statute that evinced the requisite legislative intent. 263 N.E.2d at 19; *see also Friends of the Parks v. Chi. Park Dist.*, 14-cv-9096, 2015 WL 1188615, at *5 (N.D. Ill. Mar. 12, 2015) (*Lucas I*) (noting that the "'Wisconsin test' . . . was not adopted as applicable in public trust cases, and the Illinois Supreme Court again declined to use the test in *Friends of the Parks*." (citing *Friends of the Parks*, 786 N.E.2d at 170)). Instead, the court merely commented that Wisconsin's factors "might serve as a useful guide for future administrative action." [7] *Paepcke*, 263 N.E.2d at 19.

Notably, although Plaintiffs insist that *Paepcke* adopted the Wisconsin approach, they acknowledged in their brief, [69] at 23, and at oral argument, [113] at 30:15–21, 40:6–12, that the Seventh Circuit disagrees when it held:

> Once such land has been dedicated to a public purpose, the Illinois Supreme Court has explained, the government "hold[s] the properties in trust for the uses and purposes specified and for the benefit of the

---

[7] At most, *Paepcke* suggests that, if no authorizing legislation exists from which a court can infer legislative intent, then the Wisconsin factors may prove useful. For example, in *Clement v. O'Malley*, the Appellate Court affirmed dismissal of a public trust claim relating to the Park District's proposal to construct a golf driving range in Jackson Park. 420 N.E.2d 533, 540–41 (Ill. App. Ct. 1981), *af'd sub nom. Clement v. Chi. Park Dist.*, 449 N.E.2d 81, 84 (Ill. 1983). There, the court found that there did not exist any authorizing legislation from which the court could infer sufficient legislative intent, so instead it applied the Wisconsin approach to affirm dismissal. *Id.*

> public." *Paepcke*, 263 N.E.2d at 15. Dedication to a public purpose isn't an "irrevocable commitment[]," *id.* at 16, and judicial review of any reallocation is deferential, particularly if the land in question has never been submerged. Nonetheless, the doctrine requires courts to ensure that the legislature has made a "sufficient manifestation of legislative intent to permit the diversion and reallocation" to a more restrictive, less public use. *Id.* at 18.

*POP II*, 971 F.3d at 730. Plaintiffs argue that the Seventh Circuit "inelegantly stitches together three disconnected statements" from *Paepcke* and "thus misstates" its logic. [69] at 23; *see also* [131] at 42:6–10, 48:20–49:2. Despite Plaintiff's unfounded criticism, however, the Seventh Circuit's interpretation controls here.

Finally, Plaintiffs also argue that this case requires a "heightened degree of scrutiny given both the lack of diligence and self-evident insider favoritism" that led to the "flawed transactions that the City and Park District have entered into with the Obama Foundation." [1] ¶ 235. According to Plaintiffs, this purported heightened scrutiny derives from the private trust context, which imposes fiduciary duties on trustees; and thus, public trusts impose (or perhaps, should impose) the same fiduciary obligations on government actors. [69] at 19–20. ("[A]ny trust over any kind of resource, whether public or private, imposes a standard set of fiduciary duties."). Because of these purported fiduciary duties, Plaintiffs argue, this Court must "second-guess" the "particular merits of legislative judgments" about reallocation of any public trust land to counter "the evident dangers of self-interest [*sic*] political actors." *Id.* at 21.

As Defendants rightly point out, [29] at 28, Illinois law does not impose public trust fiduciary duties analogous to those in the private trust context, nor does it recognize some "heightened scrutiny" based upon the concept of public trust fiduciary

12

duties.  This Court, sitting in diversity, must apply Illinois law as it exists, not as Plaintiffs think it ought to be.  As the Supreme Court instructs, "state law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law'."  *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).  Having done that above, the Court concludes that Illinois law affords considerable deference to reallocation of statutorily-created public use land.  Courts need only examine whether there exists "'sufficient manifestation of legislative intent to permit the diversion and reallocation" at issue.  *Paepcke*, 263 N.E.2d at 18).  If it finds such an intent, then any public trust claim fails as a matter of law.

### 2.     Legislative Intent and The Museum Act

The Court now looks to the legislative intent here. Defendants argue that the Museum Act's language reflects the requisite "manifestation of legislative intent." [29] at 23 (quoting 70 ILCS 1290/1).  The Court agrees.

The Museum Act explicitly authorizes cities and park districts with control or supervision over public parks to:

> purchase, erect, and maintain within any such public park or parks edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, *including presidential libraries, centers, and museums*....

70 ILCS 1290/1 (emphasis added).  The Museum Act also permits the City to contract with private parties to build a presidential center:

> The corporate authorities of cities and park districts…[may] permit the directors or trustees of any corporation or society organized for the

13

construction or maintenance and operation of an aquarium or museum as herinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within an public park...*and to contract with any such directors or trustees of any such aquarium or museum relative to the erection, enlargement, ornamentation, building, rebuilding, rehabilitation, improvement, maintenance, ownership, and operation of such aquarium or museum.*

*Id.* (emphasis added).

Overall, this legislative directive states a clear, broad, comprehensive, and definite intention to allow the City to contract with directors or trustees of the museum (the Obama Foundation) to build a president center (the OPC) in a public park (Jackson Park). *See, e.g., People v. Pack*, 862 N.E.2d 938, 940 (Ill. 2007) ("The best indication of legislative intent is the statutory language, given its plain and ordinary meaning."). The above quoted language also reflects the legislature's determination that presidential centers, as a type of museum, remain consistent with a parcel's designation as public parkland. *See, e.g., Furlong v. S. Park Comm'rs.*, 151 N.E. 510, 511 (Ill. 1926) (declining to enjoin South Park Commissioner's efforts to issue bonds to renovate the Fine Arts Building to include a museum—now the Museum of Science and Industry—in Jackson Park, because park purposes "are not confined to a tract of land with trees, grass and seats, but mean a tract of land ornamented and improved as a place of resort for the public, for recreation and amusement of the public."); *Fairbanks v. Stratton*, 152 N.E.2d 569, 575 (Ill. 1958) (upholding construction of an exposition building and auditorium—now McCormick Place convention center—on submerged land under the public trust doctrine).

A.016

Overall, the Illinois General Assembly, through the Museum Act, sufficiently authorizes the construction and operation of the OPC in Jackson Park.

Nonetheless, Plaintiffs argue that the reallocation here also violates the Public Trust Doctrine because the 2018 Use Agreement essentially gave the Obama Foundation the OPC site for free during which time the Obama Foundation will enjoy exclusive use of it and derive all economic value from it.  [69] at 32–33.  They argue that a trustee may never "transfer any property held in trust to a private party unless, at the very least, he or she receives full compensation for the property transferred."  [69] at 32.  Plaintiffs acknowledge that the Use Agreement does not explicitly grant the Obama Foundation exclusive use, but instead insist that discovery must proceed to determine whether the Use Agreement is, in fact, a "lease in disguise and reflective of a transfer equivalent to a sale." [69] at 33.  Overall, Plaintiffs argue that, if the Use Agreement constitutes a lease equivalent to a sale, then the Public Use Doctrine requires that the Obama Foundation pay the City "full compensation" for the sale.  *Id.*

Plaintiffs rely heavily upon *Friends of the Park v. Chicago Park Dist.*, 160 F. Supp. 3d 1060, 1068 (N.D. Ill. 2016) (*Lucas II*), in which a court evaluated a Park District proposal to enter into a 99-year ground lease with the Lucas Museum of Native Arts under the Museum Act.  [69] at 32–35.  There, the court denied the plaintiffs' motion to dismiss public trust doctrine, due process and *ultra vires* claims, finding that, *inter alia,* the 99-year ground lease, by its terms, suggested the leaseholders were "owners" in a "constitutional sense" because it gave the

15

leaseholders ownership rights over the museum facilities and other improvements, and "exclusive control over the construction, maintenance and operation, repair and management of the building." *Lucas II*, 160 F. Supp. 3d at 1062–63, 1068.

Even assuming that *Lucas II* was rightly decided (which this Court need not address), that ruling is inapposite. First, it involved formerly submerged land, rather than statutorily-created, never-submerged parkland, and thus the case involved a different level of deference. *Id*. at 1063. Second, the ground lease at issue there cannot be analogized to the 2018 Use Agreement here. The 2018 Use Agreement—which Plaintiffs attach to the Complaint, [1-2], Ex. 2 (Ex. D)—unambiguously provides that the City retains ownership over the OPC site. *Id*. §§ 2.1–2.2, 4.4. Further, unlike the lease agreement with the private party in *Lucas II*, the Obama Foundation will bear the cost to construct the OPC facilities, and then must give the City ownership over the facilities upon completion. *Id.* Clearly, the City also does not give up control over the OPC site: if the Foundation ceases to use the OPC for its permitted purposes under the Use Agreement, the City may terminate the Agreement. *Id*. §§ 6.1–6.2. And, as Defendants point out, [29] at 24, the 2018 Use Agreement does not give the Obama Foundation the right to exclude the public from the OPC site but requires it to remain open to the public during Park District hours, [1-2] § 6.2(a)–(c).

Simply put, the 2018 Use Agreement is not a lease agreement giving the Obama Foundation effective "ownership" in the "constitutional sense." Plaintiffs' contrary allegations fail as a matter of law. *See Forrest v. Universal Savs. Bank, F.A.*,

16

507 F.3d 540, 542 (7th Cir. 2007) (holding that a court need not credit allegations contradicted by exhibits attached to a complaint).

Overall, the Court finds that the OPC does not violate the public trust doctrine as a matter of law, based upon the legislature's manifestation of intent in the Museum Act (which is all this Court must examine). Nonetheless, in the alternative, the Court next analyzes Plaintiffs' public trust claim based upon the level of scrutiny applicable to formerly submerged public trust land for clarity and finality.

### 3. Formerly Submerged Land: No Corresponding Benefits Test

The scrutiny used for formerly submerged land holds that a diversion of formerly submerged parkland violates the public trust only if it: (1) does not contain sufficient legislative authorization, pursuant to *Paepcke*; and (2) primarily benefits a private entity, with no corresponding public benefit. *See Friends of the Parks*, 786 N.E.2d at 169−70 (citing *Paepcke*, 263 N.E.2d at 21).

In *Friends of the Parks,* the Illinois Supreme Court examined a project to improve Burnham Park and Soldier Field and give the Chicago Bears football team certain use rights. *Id*. The plaintiffs argued that the project (and the legislation that permitted it) violated the public trust doctrine because it allowed a private party (the Bears) to use and control Soldier Field "for its primary benefit with no corresponding public benefit." *Id*. The court disagreed. It first noted that the City will continue to own Burnham Park and Soldier Field and did not abdicate control or ownership to the Bears. It also found that the legislature, through the Sports Facilities Authority Act, had manifested clear intent for the park's reallocation and renovations. And,

17

finally, it found that the public will benefit from the improvements to Soldier Field and Burnham Park. *Id.* Notably, it also held that the project did not violate the public trust doctrine even if the Bears would also benefit from it. *Friends of the Parks*, 786 N.E.2d at 170.

The same holds true here as a matter of law. As discussed above, the City did not abdicate control or ownership of the OPC site to the Obama Foundation and the Museum Act manifests clear legislative intent for the OPC. Further, the Museum Act confirms that presidential centers, like the OPC here, confer a public benefit because they "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290.[8] This explanation of the OPC's public benefits aligns with well-established caselaw. *See, e.g.*, *Furlong*, 151 N.E. at 511 (Ill. 1926) (finding that because parks exist as places "of resort for the public, for recreation and amusement" the "construction and maintenance of a building for museums, art galleries…and many other purposes, for the public benefit" are legitimate park purposes."); *Fairbanks*, 152 N.E.2d at 575 (upholding construction of an exposition building and auditorium on submerged land

---

[8] While *Friends of the Parks* was decided on summary judgment, the court focused on the legislation and the government's stated purpose for the project, rather than engage in an independent analysis of the purpose. It also relied on *People ex rel City of Urbana v. Paley*, 368 N.E.2d 915 (Ill. 1977) in which the Illinois Supreme Court found redevelopment of blighted public land conferred a public benefit after reviewing the government's stated public purpose for the redevelopment project. *See Friends of the Parks*, 368 N.E.2d at 910–11. Here, because the legislature set out the public benefit of presidential centers and also allowed the City to contract with third parties to construct, maintain and operate such a facility, Plaintiffs' public trust doctrine claim can be resolved as a matter of law on a motion to dismiss even under the heightened standard for formerly-submerged public trust land.

in Burnham Park because they were "in the public interest" and thus did not violate the public trust doctrine).

Plaintiffs insist the OPC primarily benefits the Obama Foundation because the 2018 Use Agreement gives to the Obama Foundation all "economic value" associated with it while the City (and public) get virtually nothing in return. [69] at 33. Even if the Court assumes that the Obama Foundation will enjoy all the "economic value"—even though that allegation finds no support in 2018 Use Agreement[9]—that does not invalidate it under *Friends of the Park*'s heightened scrutiny test. Plaintiffs' narrow focus on the OPC's "economic value" ignores the incontrovertible fact that public benefits are not measured merely in terms of "economic value." As set out above, the OPC will confer public benefits even if they are not "economic" in nature. And, as the *Friends of the Park* Court made clear, private parties may enjoy private benefits from public land use without it running afoul of the public trust doctrine. 786 N.E.2d at 169–70.

Accordingly, even accepting Plaintiffs' unsupported "economic value" allegation as true, the OPC does not violate the public trust doctrine under the *Friends of the Parks* heightened burden standard applicable to formerly-submerged lands. Accordingly, Plaintiffs' public trust doctrine claim still fails as a matter of law under the heightened (and inapplicable) standard.

---

[9] The 2018 Use Agreement's terms demonstrate that the City will enjoy some "economic value." First, the Obama Foundation will bear the cost to construct the OPC, which it must then give to the City. This certainly constitutes a significant "economic value" for the City. It also provides that all the revenue the Obama Foundation collects shall go to the "the use, maintenance and management" of the OPC or shall be deposited into the Obama Foundation's Endowment whose sole purpose is to pay "the costs to operate, enhance and maintain" the OPC. [1-1], Ex. 2 (Ex. D § 6.9). Thus, the City will enjoy some of the "economic value" of revenue used to maintain property and facilities that it owns.

19

C.    *Ultra Vires* **Claim (Count VII)**

Plaintiffs also bring a claim that the City and Park District acted *ultra vires* based on multiple theories.  First, Plaintiffs allege that the Park District's transfer of the Jackson Park site to the City violated the Illinois Property Transfer Act, 50 ILCS 605/1, and contravened law that prohibits "the Park District from a transfer to a non-governmental entity without an 'exchange for other real property of substantially equal or greater value.'" *Id*. ¶¶ 239–40.  Second, Plaintiffs allege that the 2018 Use Agreement violates the Museum Act, which "requires that a lease be utilized by the City."  *Id.* ¶ 241.  Third, in their Response, Plaintiffs contend that the City acted *ultra vires* during the federal review process, when it failed to review alternatives and "exerted improper dominance and control over" the process.  [69] at 43.

In moving to dismiss, Defendants argue that a plain reading of the relevant statutes dispels Plaintiffs' theories.  [29] at 23–24, 30–33.  They also argue that Plaintiffs fail to allege how the City acted beyond its authority during the federal review process; and even if they could marshal such evidence, the City's actions during that process have no bearing on whether the Park District could transfer the land to the City, or whether the Foundation may use the OPC site.  [78] at 18.  Again, the Defendants prevail on the record here.

1.    **The Property Transfer Act Authorizes the Park District's Transfer to the City.**

Plaintiffs' *ultra vires* theory based upon the Property Transfer Act, 50 ILCS 605/1, rests on Section 2 of the Act, which provides:

> If the territory of any municipality shall be wholly within, coextensive with, or partly within and partly without the corporate limits of any

20

other municipality . . . and the first mentioned municipality (herein called "transferee municipality"), shall by ordinance declare that it is necessary or convenient *for it to use, occupy or improve* any real estate held by the last mentioned municipality (herein called the "transferor municipality") in the making of any public improvement or for any public purpose, the corporate authorities of the transferor municipality shall have the power to transfer *all of the right, title and interest* held by it immediately prior to such transfer, in and to such real estate, whether located within or without either or both of said municipalities, to the transferee municipality upon such terms as may be agreed upon by the corporate authorities of both municipalities . . .

*Id.* at 605/2 (emphases added). Plaintiffs contend that this provision only authorizes the Park District to transfer the Jackson Park site if the transferee itself (here, the City) will "use, occupy, or improve" the site. [1] ¶¶ 239–40. Because, according to Plaintiffs, the City impermissibly "transferred exclusive possession to the Obama Foundation," the Park District's transfer violates the Property Transfer Act. *Id.*

First, to the extent Plaintiffs' claim rests on the theory that the 2018 Use Agreement gives the Obama Foundation "exclusive possession" of the OPC site, the Court already found that it does not. It only gives the Obama Foundation the right to use, maintain, operate and improve the OPC site. [1-1], Ex. 2 (Ex. D).

Second, Plaintiffs fail to read the relevant statutory provisions in context. The Property Transfer Act remains silent as to whether municipalities can contract with third parties to improve, operate or maintain transferred land. *See* 50 ILCS 605/2. But the Museum Act expressly authorizes the City to contract with third parties "to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate" a presidential center. 70 ILCS 1290/0.01. Further, Article VII, § 10(a) of the Illinois Constitution permits units of local government to "contract and otherwise associate with individuals, associations, and corporations" in any manner not

prohibited by law. That same section also allows local governments to "transfer any power or function, in any manner not prohibited by law or ordinance" to other units of local government. Likewise, the Intergovernmental Cooperation Act, 5 ILCS 220/2−3, allows units of local governments to exercise, combine, transfer, and "enjoy jointly" any of their "powers, privileges, functions, or authority," except where expressly prohibited by law. Read together with the Property Transfer Act, these provisions demonstrate that: (1) the Park District and City, as individual units of local government, can separately contract with third parties on land that they already own; and (2) either of them can transfer land to the other, along with their power to contract with third parties on that land.

Moreover, Plaintiffs' proposed reading of the Property Transfer Act would create the absurd result of prohibiting transferee municipalities from ever contracting with engineers, architects, or builders to improve or manage a site. This Court rejects Plaintiffs' approach, and instead reads each of the relevant provisions of Illinois law in context, together, and gives each statute effect according to its plain terms.[10] Accordingly, Plaintiffs fail as a matter of law to make out a claim that the Park District acted *ultra vires* when it transferred the property to the City.[11]

---

[10] Even if the Property Transfer Act's silence could somehow be construed as ambiguous (which it is not), this Court would reach the same result by reading each provision and construing them together (Property Transfer Act, Museum Act, Intergovernmental Cooperation Act, and Article VII, section 10(a) of the Illinois Constitution). *People v. 1946 Buick, VIN 34423520*, 537 N.E.2d 748, 750 (Ill. 1989) (Illinois recognizes the doctrine of *in pari materia*, but only to resolve statutory ambiguities).

[11] Plaintiffs' Complaint also alleges that the Park District acted *ultra vires* because the Park District cannot transfer public property "to a non-governmental entity without an 'exchange for other real property of substantially equal or greater value.'" *Id.* ¶¶ 239–40. The Complaint does not identify the legal basis for this allegation, and Plaintiffs fail to address it in their opposition. To the extent this refers to the Illinois Park District Code, 70 ILCS 1205/10-7, which includes the Complaint's quoted

22

### 2.    The Museum Act Does Not Require A Lease

Plaintiffs next allege that the City acted *ultra vires* because the Museum Act requires the City to lease the site to the Obama Foundation.  [1] ¶ 241.[12]  Again, not so.  The Museum Act states that the City "*may* enter into a lease for an initial term not to exceed 99 years . . . to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate" a presidential center "together with grounds immediately adjacent".  70 ILCS 1290/0.01 (emphasis added).  But it does not require a lease.  Instead, the Museum Act's prior sentence—not relating to leases—controls. It authorizes the City to "contract" with "the directors or trustees of any corporation or society organized for the construction or maintenance and operation of" a presidential center relative to its "erection, enlargement, ornamentation, building, rebuilding, rehabilitation, improvement, maintenance, ownership, and operation." *Id* The 2018 Use Agreement constitutes such a "contract."  Accordingly, as a matter of law, the City did not act *ultra vires* when it entered into it.

### 3.    Plaintiffs Fail to Identify Any other *Ultra Vires* Actions.

The Court has now addressed Plaintiffs' *ultra vires* claims as set forth in their Complaint.  [1] ¶¶ 239–41.  Nonetheless, in their Response, Plaintiffs conclusorily state that their Complaint "identifies many activities that are *ultra vires*" including the City's conduct during the federal review process.  [69] at 43.  Specifically,

---

"exchange" language, *id*. § 10-7(b), Plaintiffs' theory fails as a matter of law because the Park District Code does not apply to the Chicago Park District.  *See id*. § 1-2(d).

[12] Of course, elsewhere Plaintiffs allege that the 2018 Use Agreement, in fact, constitutes a lease agreement (albeit an impermissible one).  Because the Court found that the 2018 Use Agreement by its plain terms does not constitute a Lease Agreement, the Court will still consider Plaintiffs' *ultra vires* argument notwithstanding these inconsistent allegations.

A.025

Plaintiffs assert that the City failed to review certain alternatives and "exerted improper dominance and control over" the federal review process. *Id.* (citing [1] ¶¶ 74, 88–89, 190–92). With respect to its federal review process allegations, Plaintiffs fail to explain how such conduct, even if true, constitutes an *ultra vires* act.[13] To the extent Plaintiffs imply that the City's conduct during the federal review process rendered *ultra vires* the 2018 Use Agreement or land transfer, this too fails to state a plausible claim. As Defendants point out, the City's actions in the 2018 federal review process—undertaken after the Park District transferred the land to the City and after the City executed the 2018 Use Agreement—have no bearing on whether state law authorized the land transfer or the 2018 Use Agreement.

Finally, although Plaintiffs assert that the Complaint somehow "identifies many activities that are *ultra vires*," [69] at 43, the Court need not accept as true such conclusory allegations, nor will it attempt to divine other theoretical *ultra vires* acts from the Complaint's factual allegations that Plaintiffs have failed to develop in their briefing. In short, Plaintiffs' Complaint fails to allege a plausible *ultra vires* claim, and thus, it is dismissed without prejudice.

### D.    Illinois Constitution Article VIII, Section 1 (Count VIII)

Plaintiffs' Count VIII alleges that the 2018 Use Agreement also violates Article VIII, Section 1 of the Illinois Constitution. [1] ¶¶ 242–45. This provision, known as the Public Purpose Clause, states that "[p]ublic funds, property or credit shall be used

---

[13] Plaintiffs bring separate federal claims based, in part, on these federal review process allegations. The Court offers no opinion here about the viability of those claims.

only for public purposes."  Ill. Const. Art. VIII, § 1(a).  Plaintiffs allege that the Use Agreement violates this clause because it transfers public property to the Obama Foundation for its sole private benefit and at public expense.  [1] ¶¶ 242–45.

In order to "proceed under article VIII, section 1(a) of the Illinois Constitution, facts must be alleged indicating that governmental action has been taken which directly benefits a private interest without a corresponding public benefit." *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 293 (Ill. 2008) (quoting *Paschen v. Vill. of Winnetka*, 392 N.E.2d 306 (Ill. App. Ct. 1979)).  Yet, "what is for the public good and what are public purposes are questions which the legislature must in the first instance decide." *Empress Casino*, 896 N.E.2d at 294.  Thus, "the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private." *Id.*

Defendants move to dismiss, arguing that the Museum Act and City's 2018 Ordinance, attached to the Complaint, evinces a clear "public benefit" and Plaintiffs fail to "make a threshold showing that the findings are evasive and that the purpose of the legislation is principally to benefit private interests."  [29] at 33 (quoting *Friends of the Parks*, 786 N.E.2d at 166–67).  In response, Plaintiff insist that their claim must proceed to discovery to determine "who is a primary beneficiary" of the OPC.  [69] at 46.  They also contend that the City clearly intended to benefit the Obama Foundation and the Complaint alleges numerous "dislocations involved in bringing the OPC to Jackson Park" that support their claim. *Id*. Once again, Defendants win the day.

A.027

First, Plaintiffs contend that the key question under the Public Purpose Clause is whether the "primary beneficiary" is the public or a private entity. *Id*. This implies that the test is comparative. Not true. Illinois law asks whether there exists a public benefit, and if the "purpose sought to be achieved by the legislation is a public one and it contains elements of public benefit, then the question of how much benefit the public derives is for the legislature, not the courts." *Empress Casino*, 896 N.E.2d at 295. Therefore, if the OPC site serves a public purpose, then it does not matter if the Obama Foundation will also enjoy a private benefit or precisely how much of a benefit it may enjoy. *See, e.g., People ex rel. City of Urbana v. Paley*, 368 N.E.2d 915, 921 (Ill. 1977) ("[I]f the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests." (collecting cases)).

As discussed above, the Museum Act clearly indicates that museums and presidential centers like the OPC have a public purpose and provide important public benefits. Here, Plaintiffs allege nothing to demonstrate that this legislative finding is evasive or deceptive.[14] That ends the matter. But Plaintiffs disagree, asserting that their Complaint purportedly contains numerous "dislocations involved in bringing the OPC to Jackson Park" that support the claim. [69] at 46. Plaintiffs do not explain what "dislocations" they mean by this undeveloped argument, but

---

[14] Plaintiffs also admit that the City's 2018 Ordinance outlined "extensive benefits" to the public, [1] ¶ 66, but allege that the City rubber-stamped the 2018 Ordinance and Use Agreement to benefit the Obama Foundation, *id*. ¶¶ 7, 44, 244. Regardless of these conclusory allegations, however, Plaintiffs fail to allege how the Museum Act's findings were, in fact, evasive or deceptive.

presumably they refer to the roadwork, environment remediation, and construction of other facilities around the OPC site.  *See, e.g.,* [1] ¶¶ 67, 74, 222.

Nevertheless, such "dislocations" are not material to whether the OPC site has a public purpose.[15]  Even if these "dislocations" constitute costs, Plaintiffs fail to explain how they undermine the OPC's public purpose set out in the Museum Act.  Plaintiffs fail to cite any legal authority that no public purpose exists if the record also includes incidental public costs,[16] or that the Public Purpose Clause requires that property be used for public purposes that confer the highest net public benefit (as defined by a court, rather than the legislature).  Based upon the clear legislative determination that the OPC site has a public purpose and confers a public benefit, the Court denies Count VIII as a matter of law.

### E.    Violation of Illinois Constitution Takings Clause (Count IX)

In the prior case before this Court, the plaintiffs asserted a due process claim based upon the US Constitution's Fifth Amendment Takings Clause.  This Court dismissed the claim on summary judgment, finding that it failed as a matter of law because the federal Takings Clause only applies to private property, not property that is already public.  *POP I*, 385 F. Supp. 3d at 686.  The Seventh Circuit affirmed, holding that: (1) the Takings Clause only applies to private property and under Illinois law, public trust beneficiaries do not have a private property interest in public

---

[15] As the Seventh Circuit noted during its discussion of standing, the City's projects are not relevant to plaintiffs' claims over the transfer or use of the OPC site.  *See POP II*, 971 F.3d at 735.  The same reasoning applies equally here.

[16] Taking such a theory to its logical conclusion, the government would always violate the Public Purpose Doctrine when it used public funds because, by definition, any such use imposes public costs (*i.e.*, the money itself).

trust land; and (2) regardless, the Takings Clause only calls for "just compensation" and the plaintiffs sought only declaratory and injunctive relief. *POP II*, 971 F.3d at 737.

Unsatisfied, Plaintiffs seek another bite at the apple with their takings clause theory, but this time bring it under the Illinois Constitution's Takings Clause. [1] ¶¶ 246–50.[17] They allege that, as Illinois citizens, they "have a beneficial fractional ownership interest in such public trust property" and Defendants violated Illinois' Taking Clause as to them through its "giveaway and damage" of Jackson Park "without payment of any compensation, let alone just compensation." *Id.* ¶¶ 249–50. Again, they only seek declaratory and injunctive relief. *Id.* at 81–82.

Plaintiffs' new version of the old claim fares no better, and indeed, it runs directly contrary to the Seventh Circuit's findings in *POP II*. Like the federal Takings Clause, Illinois' Takings Clause states that "*[p]rivate property* shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. Art. I § 15 (emphasis added). As the Seventh Circuit held, "the Illinois cases make clear that the public trust doctrine functions as a restraint on government action, not as an affirmative grant of property rights." *POP II*, 971 F.3d at 737. As a matter of law,

---

[17] Of course, the Illinois' Takings Clause is coterminous with its federal counterpart generally, and coterminous specifically with respect to "what constitutes a taking." *Hampton v. Metro Water Reclamation Dist. Of Greater Chi.*, 57 N.E.3d 1229, 1240 (Ill. 2016). Nonetheless, Plaintiffs contend that their reassertion of a rejected claim possesses merit, notwithstanding the Seventh Circuit's clear ruling, because the Seventh Circuit noted that "even if the [public trust] doctrine conferred a property interest on members of the public, that interest would not necessarily qualify for protection under the [Federal] Constitution." [69] at 44 (quoting *POP II*, 971 F.3d at 737 n.5). The Seventh Circuit, however, also found that Illinois does not confer upon the public a property interest in public trust land. *See POP II*, 971 F.3d at 737. Thus, Plaintiffs fail to present any good-faith reason to revisit the Takings Clause issue, and their efforts at a "do-over" border on the frivolous.

"absent a 'built in' cause of action and special property interest given by statute," Illinois citizens do not have a beneficial fractional ownership interest in public trust property. *Paepcke*, 263 N.E.2d at 17 (holding that owners of property adjacent to or in the vicinity of public use parks do not have a private property interest in those parks). Thus, Plaintiffs have no private property interest in Jackson Park. This proves dispositive of Plaintiffs' state Takings claim as a matter of law. The Court dismisses Count IX with prejudice.

### F.    Plaintiff's Procedural and Substantive Due Process Claim Pursuant to Illinois Constitution Article I, Section 2 (Count XII)

In the prior case before this Court, the plaintiffs also brought a federal procedural due process claim. The Seventh Circuit affirmed dismissal on summary judgment. *POP II*, 971 F.3d at 737–38. Now, Plaintiffs try again, this time bringing a state law procedural and substantive due process claim. [1] ¶¶ 259–63. They allege that the City and Park district violated their state due process rights by allowing the Obama Foundation to control decision-making, and "by rubber stamping" the Foundation's demands to transfer critical public trust land to it. *Id*. They also allege that the City accelerated the improper approval process during the ongoing coronavirus pandemic, which curtailed Plaintiffs' rights to meaningfully participate in the City's meetings and reviews. *Id*. ¶ 264. Defendants move to dismiss arguing the claim fails as a matter of law. [29] at 41–44.

Like its federal counterpart, Illinois due process protections "pertain to deprivations of life, liberty or property" and a procedural due process claim cannot succeed without a threshold showing that the government interfered with one of these

protected interests. *See Big Sky Excavating, Inc. v. Ill. Bell-Tel. Co.*, 840 N.E.2d 1174, 1186 (Ill. 2005) ("If no protected interest is present, due process protections are not triggered"). As discussed, Plaintiffs do not have a property interest in Jackson Park. Thus, Plaintiffs fail to allege a protected interest and their procedural due process claim does not get off the ground.

Regardless, even if Plaintiffs possessed a cognizable property interest, Plaintiffs fail to adequately allege any deprivation of that interest. The Court found above that the General Assembly—through the Museum Act—authorized the OPC. Further, Plaintiffs' Complaint agrees that the City took four separate votes to approve aspects of the OPC. [1] ¶¶ 42, 58–63. As the Seventh Circuit held in affirming dismissal of the federal due process claims in the last case, "legislative determination provides all the process that is due" and if "one legislative determination is enough, then *five* determinations are overkill." *POP II*, 971 F.3d at 738. The same holds true for Plaintiffs' state law procedural due process claim and it fails as a matter of law.[18]

Turning to Plaintiffs' substantive due process claim, Defendants argue that the City's 2018 Ordinance approval must only meet the rational basis test. [29] at 43. Plaintiffs disagree, arguing that *Paepcke* requires a heightened showing because it

---

[18] Plaintiffs complain that the City's votes merely "rubber-stamped" the Obama Foundation's demands. But this characterization simply attacks the elected officials' internal reasoning in voting in favor of the OPC, not whether votes took place pursuant to a legislative process. Plaintiffs also assert, without support, that the coronavirus pandemic curtailed their ability to participate in the City's meetings about the OPC. But Plaintiffs fail to explain how the coronavirus pandemic could have any bearing on their ability to meaningfully participate in meetings and votes, especially ones which all occurred in 2018 or earlier.

would be pointless to confer standing to sue if "some low rational basis test" always applies. [69] at 42.

The Court already found that *Paepcke* affords significant deference to decisions involving statutorily-created public trust land. Nothing in that opinion indicates that courts should apply a heightened standard to a substantive due process claim over such legislative decisions. The rational basis test applies.

Under Illinois law, a rational basis exists if the Court can "hypothesize" one, even if it is "based on rational speculation unsupported by evidence or empirical data" and even if that basis did not actually motivate the legislative action. *People ex rel. Lumpkin v. Cassidy*, 703 N.E.2d 1, 4 (Ill. 1998). Here, the Museum Act offers a rational basis for the 2018 Ordinance and the OPC: "furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/0.01. The 2018 Ordinance's findings also set out reasons. [1-1], Ex. 2. There also exists a rational basis for the City to allow a third party to operate the OPC site where that third party's sole purpose relates to the OPC and where it will cover the cost to build the facilities (which the City will then own).

Of course, Plaintiffs believe that any public benefits that the OPC may provide do not compare, in their view, to the benefits that Jackson Park provided in its former glory. But as the *Paepcke* Court emphasized:

> [T]he issues presented in this case illustrate the classic struggle between those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an

A.033

increasingly complex society, find it necessary, in good faith and for the public good, to encroach to some extent upon lands heretofore considered inviolate to change. The resolution of this conflict in any given case is for the legislature and not the courts.

*Paepcke*, 263 N.E.2d at 21.  There exists a rational basis for the 2018 Ordinance.

Thus, Plaintiffs' substantive due process claim fails as a matter of law.

## G.     Illinois Constitution—Improper Delegation of Authority (Count XI)

Plaintiffs' Count XI alleges that the City violated Article II, Section 1 of the Illinois Constitution because it improperly delegated to the Obama Foundation its decision-making authority about the location and design of the OPC.  [1] ¶ 256.  To support this allegation, Plaintiffs rely on the following clause in the 2015 Ordinance:

> WHEREAS, While the City Council is confident in the quality and thoroughness of both UIC's and UChicago's proposals, the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library.

*Id.* (quoting [1-1], Ex. 1 (2015 Ordinance)).

Defendants move to dismiss, arguing that the ordinances and laws at issue demonstrate, as a matter of law, that "only the appropriate legislative bodies have determined what the law shall be with respect to use of the Jackson Park site."  [29] at 38.[19]  Plaintiffs disagree, arguing that the 2015 Ordinance does not speak "in terms of mere 'advice' but of 'deference'" to the Obama Foundation and, therefore, it conferred "on a powerful private party an unfettered choice of location for its own private development."  [69] at 37.

---

[19] Defendants also comment that Article II of the Constitution may not apply to home rule municipal governments like the City, but Defendants do not move to dismiss on that basis. [29] at 38 n.11.

Article II, Section 1 of the Illinois Constitution provides: "The legislative, executive and judicial branches are separate.  No branch shall exercise powers properly belonging to another."  [1] ¶ 258.  Illinois has long held, however, that while the "legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet cannot understandingly or advantageously do itself."  *Hamann v. Lawrence*, 188 N.E. 333, 335 (Ill. 1933).[20]

The 2015 Ordinance found that the City identified numerous locations proposed by University of Illinois–Chicago ("UIC") and University of Chicago ("UChicago"), and noted various benefits, risks and challenges as to each.  [1-1], Ex. 2.  Although the 2015 Ordinance states that "the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library", this plainly refers to the Foundation's ongoing nationwide selection process and the City's desire to offer proposals to the Obama Foundation that give "our City the greatest chance for selection" by the Foundation.  *Id*.  The 2015 Ordinance also makes clear that, if the Foundation likes a site located in a Chicago parkland, then

---

[20] Cases that consider nondelegation under the federal constitution reveal that Plaintiffs' nondelegation theory—which is sometimes referred to as the private nondelegation doctrine—may flow from concepts of due process rather than the provision on which they rely.  *See, e.g., Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (relying on the Fifth Amendment's due process clause to invalidate a statute that gave a group of coal producers the right to set regulations to bind the coal industry).  *But see Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1237–38, 1252–53 (Alito, J. and Thomas, J. concurring) (implying that the private nondelegation doctrine is rooted in the Constitution's Vesting Clauses).  Overall, the exact contours of this doctrine remain uncertain under both the U.S. Constitution and the constitutions of the states, but the Court need not enter into this ongoing constitutional debate, because the record shows that the City did not delegate its decision-making authority to the Obama Foundation.

the City will need to "introduce a separate ordinance authorizing the development construction and operation of the Presidential Center on the Selected Site." *Id*.

Read in full, the 2015 Ordinance did not abdicate the City's decision-making authority regarding public parkland use to the Obama Foundation. Instead, it reaffirmed its desire to have the OPC in Chicago and held that the City would consider and vote on a second ordinance if the Obama Foundation wished to build and operate the OPC on public parkland. And that is exactly what happened: the City considered and approved the Jackson Park site through the 2018 Ordinance. Simply put, Plaintiffs' claim fails as a matter of law because the 2015 and 2018 ordinances belie their allegations. The Court dismisses Count XI with prejudice.

## H.    Violation of Illinois Constitution Article I, Section 16 (Count XIII)

Count XIII alleges that the City's 2018 Ordinance, which approved the 2018 Use Agreement, violated Article I, Section 16 of the Illinois Constitution, which states: "No ex post facto law, or law impairing the obligation of contracts or making an irrevocable grant of special privileges or immunities, shall be passed." [1] ¶¶ 265– 66 (quoting Ill. Const. Art. I, § 16). Plaintiffs maintain that the 2018 Use Agreement constitutes an "irrevocable grant of special privileges" to the Obama Foundation because it transferred to it "perpetual and largely full control over a large portion of Jackson Park." *Id*. ¶ 266.

Plaintiffs' theory fails as a matter of law. As the Court already found, the 2018 Use Agreement did not transfer ownership of the OPC site to the Obama Foundation nor did it give the Foundation any irrevocable rights to it. Instead, it gives the Obama

Foundation the right to use, maintain and build upon the land, provides that these rights expire after 99 years, and states that the City may revoke the Foundation's use early under certain conditions. Thus, the 2018 Use Agreement does not constitute an irrevocable grant of special privileges. *See, e.g., People v. Chi. Transit Auth.*, 64 N.E.2d 4 (Ill. 1945) (finding no "irrevocable grant of special privileges" for City ordinance that gave the Chicago Transit Authority certain rights); *People v. City of Chi.*, 182 N.E. 419 (Ill. 1932) (same regarding an Act relating to the City's right to grant permits to operate the local transportation system because the grant was terminable for misuse and did not grant exclusive street rights).

In addition, as Defendants correctly point out, Illinois law also states that a contract or law giving special privileges to a certain group does not violate Article I, Section 16 if there exists a "rational basis" for it. *See DiSabato v. Bd. of Trustees of State Emps.' Ret. Sys. of Ill.*, 674 N.E.2d 852 (Ill. 1996) (finding that, even though the State Employees' Retirement System calculated benefits differently for police officers than other employees, this did not violate the Special Privileges Clause because there existed a rational basis to do so). As discussed above, there exists a rational basis for the 2018 Use Agreement and any privileges that it affords the Obama Foundation. Accordingly, Plaintiffs' Count XIII fails as a matter of law.

## I.    Violation of Illinois State Agency Historic Preservation Act (Count XV)

Plaintiffs' final state law claim relies on Illinois State Agency Historic Preservation Act, 20 ILCS 3420. Plaintiffs allege the Defendants violated this act by failing to review alternatives to the OPC site project given its adverse effects on

35

historic resources (here Jackson Park, Midway Plaisance, and Chicago Boulevard Historic District).  [1] ¶¶ 280–88.  Plaintiffs bring this claim as an alternative to their federal claims for violations of the Department of Transportation Act § 4(f) (Count I); National Environmental Policy Act (Count II); and National Historic Preservation Act, § 106 (Count IV).  *Id*.

Defendants move to dismiss arguing that Illinois' State Agency Historic Preservation Act does not apply where there has been a federal Section 106 review, which occurred in this case.  [29] at 46.  In response, Plaintiffs agree that Illinois' State Agency Historic Preservation Act does not apply if a federal Section 106 process is applicable, but they insist their claim may still be viable because the "federal agencies improperly *declined* review of the adverse effects of the OPC based on what they claimed were purely 'local' issues associated with" it.  [69] at 40.  That is, Plaintiffs agree that their state law claim fails if the federal review *improperly* declined to review alternatives, because then federal review will need to be reopened and will take precedence.  *Id*.  But, they argue, if the federal review *properly* avoided a review of alternatives, then the Illinois State Agency Historic Preservation Act applies.  *Id*.

As a matter of law, the plain language of the Illinois State Agency Historic Preservation Act easily defeats Plaintiffs' theory.  It states that, when an "undertaking is being reviewed pursuant to Section 106 of the National Historic Preservation Act of 1966, the procedures of this law shall not apply."  20 ILCS 3420/4(g).  Plaintiffs identify no authority that conditions non-application on the

findings and breadth of the Section 106 review.  Instead, the law clearly states it does not apply to projects reviewed pursuant to Section 106, and even Plaintiffs' own Complaint admits that the "magnitude, location and funding of the proposed project has triggered several major federal reviews" including a Section 106 review.  [1] ¶ 2; *see also id.* ¶¶ 75–85.  Accordingly, the Illinois State Agency Historic Preservation Act does not apply, and Plaintiffs' Count XV fails as a matter of law.

## V.    Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss [28].  The Court dismisses with prejudice Counts VI, VIII, IX, XI, XII, XIII and XV and dismisses without prejudice Count VII.

Dated: March 29, 2022

Entered:

John Robert Blakey
United States District Judge

A.039

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3
### Eastern Division

Protect Our Parks Inc, et al.

Plaintiff,

v.

Case No.: 1:21−cv−02006
Honorable John Robert Blakey

Pete Buttigieg, et al.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, November 3, 2022:

      MINUTE entry before the Honorable John Robert Blakey: Civil Based on the Parties' stipulations and submissions, the record before the Court, and the Court's Memorandum Opinion denying Plaintiffs' request for preliminary injunction [94] ("Memorandum Opinion"), which found that the Plaintiffs failed to demonstrate a likelihood of success on the merits of the Seven Federal Counts, and which was affirmed on appeal, Protect Our Parks, Inc. v. Buttigieg, 34 F.4th 389 (7th Cir. 2022), the Court determines that no genuine disputes of material fact exist in connection with the Seven Federal Counts (Counts I through V, X, and XIV), and that final judgment is now appropriate as to these counts. Enter Final Judgment Order. The remaining counts having been previously dismissed, see [119], the Clerk shall enter final judgment for Defendants and against Plaintiffs on all counts. All set dates and deadlines are stricken. Civil case terminated. Mailed notice(gel, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Protect Our Parks, Inc., *et al.*,

                          Plaintiffs,

            vs.

Pete Buttigieg, *et al.*,

                          Defendants.

Case No.  21-cv-02006

Hon. John Robert Blakey

## <u>FINAL JUDGMENT IN FAVOR OF DEFENDANTS</u>

Before the Court is the Parties' Stipulations and Proposed Order of Judgment, [138], which requests that the Court enter final judgment in favor of Defendants on all remaining counts before this Court, Counts I through V, X, and XIV (the "Seven Federal Counts"), as well as the Joint Supplemental Submission by All Parties in Support of Joint Stipulation [146].  The Parties have advised the Court that additional briefing beyond what they submitted in the preliminary injunction proceedings remains unnecessary; that no pertinent facts exist, other than what is contained in the Administrative Record, which stands complete on the docket, [112]; and that no disputes of fact material exist concerning the disposition of the Seven Federal Counts.

Based on the Parties' stipulations and submissions, the record before the Court, and the Court's Memorandum Opinion denying Plaintiffs' request for preliminary injunction [94] ("Memorandum Opinion"), which found that the Plaintiffs failed to demonstrate a likelihood of success on the merits of the Seven Federal

Counts, and which was affirmed on appeal, *Protect Our Parks, Inc. v. Buttigieg*, 34 F.4th 389 (7th Cir. 2022), the Court determines that no genuine disputes of material fact exist in connection with the Seven Federal Counts. Accordingly, Defendants are entitled to judgment by this Court as a matter of law, and judgment should be entered for Defendants on these counts pursuant to Fed. R. Civ. P. 56 for the reasons set forth in the Court's Memorandum Opinion.

In addition, Plaintiffs explicitly waive any arguments, claims, or theories as to the Seven Federal Counts not advanced in their motion for preliminary injunction and supporting memorandum. *See*, *e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal. Moreover, even arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.") (citations omitted).

The remaining counts having been previously dismissed, *see* [119], the Clerk shall enter final judgment for Defendants and against Plaintiffs on all counts. All set dates and deadlines are stricken. Civil case terminated.

Dated: November 3, 2022

                              ENTERED:

                              John Robert Blakey
                              United States District Judge

2

A.042

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Protect Our Parks Inc. et al,

Plaintiff(s),

v.

Pete Buttigieg, et al,

Defendant(s).

Case No.  21 CV 2006
Judge John Robert Blakey

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $       ,

       which ☐ includes     pre–judgment interest.
             ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant(s) Pete Buttigieg, et al
and against plaintiff(s) Protect Our Parks Inc. et al

.

Defendant(s) shall recover costs from plaintiff(s).

---

☐    other:

---

This action was *(check one)*:

☐ tried by a jury with Judge    presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☒ decided by Judge John Robert Blakey.

Date:  11/3/2022

Thomas G. Bruton, Clerk of Court

<u>G. Lewis</u> , Deputy Clerk

A.043