No. 22-3190

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

PROTECT OUR PARKS, INC., et al.,

Plaintiffs-Appellants,

v.

PETE BUTTIGIEG, Secretary of the U.S.
Department of Transportation, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 21-cv-02006
The Honorable John Robert Blakey, Judge Presiding

————

### BRIEF OF DEFENDANTS-APPELLEES
### CITY OF CHICAGO, CHICAGO PARK DISTRICT,
### AND THE BARACK OBAMA FOUNDATION

————

David H. Hoffman
Tacy F. Flint
Rachel L. Hampton
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
Peter R. Steenland
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*Attorneys for The Barack Obama
Foundation*

Corporation Counsel
 of the City of Chicago
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
SUZANNE LOOSE
Chief Assistant Corporation Counsel
ELIZABETH TISHER
Assistant Corporation Counsel
2 N. LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 744-7764
*Counsel for City of Chicago*

Joseph P. Roddy
Elizabeth Meyer Pall
BURKE, WARREN, MACKAY &
SERRITELLA, P.C.
330 North Wabash Avenue, Suite 210
Chicago, Illinois 60611
(312) 840-7000
*Counsel for Chicago Park District*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, et al. v. Buttigieg, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Barack Obama Foundation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Sidley Austin LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ David H. Hoffman    Date: December 19, 2022

Attorney's Printed Name: David H. Hoffman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address: Sidley Austin LLP, One South Dearborn

    Chicago, IL  60603

Phone Number: (312) 853-7000    Fax Number: (312) 853-7036

E-Mail Address: david.hoffman@sidley.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, et al. v. Buttigieg, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   The Barack Obama Foundation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Sidley Austin LLP

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and
      N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   N/A

Attorney's Signature: /s/ Tacy F. Flint          Date: December 19, 2022

Attorney's Printed Name:  Tacy F. Flint

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✓]

Address:  Sidley Austin LLP, One South Dearborn

   Chicago, IL  60603

Phone Number:  (312) 853-7000          Fax Number:  (312) 853-7036

E-Mail Address: tflint@sidley.com

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, et al. v. Buttigieg, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 The Barack Obama Foundation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Sidley Austin LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Peter R. Steenland          Date: December 19, 2022

Attorney's Printed Name:  Peter R. Steenland

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address:  Sidley Austin LLP, 1501 K Street, N.W.

 Washington, D.C. 20005

Phone Number:  (202) 736-8000          Fax Number:  (312) 736-8711

E-Mail Address: psteenland@sidley.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, et al. v. Buttigieg, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   The Barack Obama Foundation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Sidley Austin LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

       N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Rachel L. Hampton    Date: December 19, 2022

Attorney's Printed Name:  Rachel L. Hampton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  Sidley Austin LLP, One South Dearborn

   Chicago, IL  60603

Phone Number:  (312) 853-7000    Fax Number:  (312) 853-7036

E-Mail Address: rhampton@sidley.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3190

Short Caption: Protect Our Parks, Inc., et al v. Pete Buttigieg, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Chicago Park District

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Burke, Warren, MacKay & Serritella, P.C.

(3)     If the party, amicus or intervenor is a corporation:

i)          Identify all its parent corporations, if any; and
N/A

ii)         list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Joseph P. Roddy          Date: December 23, 2022

Attorney's Printed Name:   Joseph P. Roddy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑     **No** ☐

Address:   330 N. Wabash Avenue, 21st Floor

Chicago, IL 60611

Phone Number:  (312) 840-7000          Fax Number:  (312) 840-7900

E-Mail Address: jroddy@burkelaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-3190</u>

Short Caption: <u>Protect Our Parks, Inc., et al v. Pete Buttigieg, et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Chicago Park District</u>

<u> </u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Burke, Warren, MacKay & Serritella, P.C.</u>

<u> </u>

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and
<u>N/A</u>

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
<u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

Attorney's Signature: <u>/s/ Elizabeth M. Pall</u>   Date: <u>December 28, 2022</u>

Attorney's Printed Name:  <u>Elizabeth M. Pall</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  <u>330 N. Wabash Avenue, 21st Floor</u>

<u>Chicago, IL 60611</u>

Phone Number: <u>(312) 840-7000</u>   Fax Number:  <u>(312) 840-7900</u>

E-Mail Address: <u>epall@burkelaw.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

———

**Page**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ........................................ 1

ISSUES PRESENTED .......................................................... 1

STATEMENT OF THE CASE ............................................... 1

SUMMARY OF ARGUMENT ............................................. 13

ARGUMENT ...................................................................... 16

I.     THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' PUBLIC TRUST CLAIM. ....................................................... 17

    A.    The Museum Act Authorizes The City To Contract With The Foundation To Build And Operate The Presidential Center In Jackson Park. ............................................ 18

    B.    The Presidential Center Will Provide Significant Public Benefits. ................................................................. 22

    C.    Plaintiffs' Novel Public Trust Theories Are Baseless. ................ 27

II.    THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' ULTRA VIRES ACTION AND STATE CONSTITUTIONAL CLAIMS. . 37

    A.    Plaintiffs Forfeited Their Arguments For Reversal. ................. 38

    B.    Dismissal Was Proper Regardless. ................................. 39

III.   THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' NON-DELEGATION CLAIM. ................................................. 44

IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND. ......................................... 46

    A.    Amendment Was Futile. ............................................. 46

    B.    Plaintiffs' Request Was Untimely. ................................. 50

CONCLUSION ................................................................. 51

# TABLE OF AUTHORITIES

———

**CASES** **Page(s)**

A.B.A.T.E. of Illinois, Inc. v. Quinn,
   957 N.E.2d 876 (Ill. 2011) ...................................................................... 20, 29-30

Altevogt v. Brinkoetter,
   421 N.E.2d 182 (Ill. 1981) ................................................................................ 47

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) .......................................................................................... 37

Barry v. St. Mary's Hospital Decatur,
   68 N.E.3d 964 (Ill. App. 2016) ......................................................................... 47

Bell Atlantic Corp. v. Twombly,
   550 U.S. 544 (2007) .......................................................................................... 36

Benson v. Fannie May Confections Brands, Inc.,
   944 F.3d 639 (7th Cir. 2019) ........................................................................ 49-50

Bethany Pharmacal Co. v. QVC, Inc.,
   241 F.3d 854 (7th Cir. 2001) ....................................................................... 16, 46

Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.,
   840 N.E.2d 1174 (2005) .................................................................................... 42

Brodner v. City of Elgin,
   420 N.E.2d 1176 (Ill. App. 1981) ..................................................................... 45

Centers v. Centennial Mortgage, Inc.,
   398 F.3d 930 (7th Cir. 2005) ............................................................................ 36

Choose Life Illinois, Inc. v. White,
   547 F.3d 853 (7th Cir. 2008) ............................................................................ 20

Cleary v. Philip Morris Inc.,
   656 F.3d 511 (7th Cir. 2011) ............................................................................ 50

Clement v. O'Malley,
   420 N.E.2d 533 (Ill. App. 1981), aff'd sub nom.
   Clement v. Chicago Park District, 449 N.E.2d 81 (Ill. 1983) .......................... 30

DiSabato v. Board of Trustees of State Employees' Retirement System,
    674 N.E.2d 852 (Ill. App. 1996) ........................................................ 44

Doe v. Howe Military School,
    227 F.3d 981 (7th Cir. 2000) ............................................................ 51

Douglass v. City Council of Montgomery,
    24 So. 745 (Ala. 1898) .................................................................... 33

Empress Casino Joliet Corp. v. Giannoulias,
    896 N.E.2d 277 (Ill. 2008) ............................................................... 41

Envirite Corp. v. Illinois EPA,
    632 N.E.2d 1035 (Ill. 1994) ............................................................. 20

FCC v. Beach Communications, Inc.,
    508 U.S. 307 (1993) ....................................................................... 37

Friends of the Parks v. Chicago Park District,
    160 F. Supp. 3d 1060 (N.D. Ill. 2016) ......................................... 32-33

Friends of the Parks v. Chicago Park District,
    786 N.E.2d 161 (Ill. 2003) ....................................................... 24-25, 41

Fumarolo v. Chicago Board of Education,
    566 N.E.2d 1283 (Ill. 1990) ............................................................. 43

Furlong v. South Park Commissioners,
    151 N.E. 510 (Ill. 1926) .................................................................. 27

Hackett v. City of South Bend,
    956 F.3d 504 (7th Cir. 2020) ........................................................... 38

Heng v. Heavner, Beyers & Mihlar, LLC,
    849 F.3d 348 (7th Cir. 2017) ........................................................... 16

HPI Health Care Services v. Mt. Vernon Hospital, Inc.,
    545 N.E.2d 672 (Ill. 1989) ............................................................... 50

Hukic v. Aurora Loan Services,
    588 F.3d 420 (7th Cir. 2009) ........................................................... 46

Idaho v. Coeur d'Alene Tribe of Idaho,
    521 U.S. 261 (1997) ....................................................................... 23

Illinois Central Railroad v. Illinois,
    146 U.S. 387 (1892) ................................................................... 23

In re Emerald Casino, Inc.,
    867 F.3d 743 (7th Cir. 2017) .................................................... 18

Jones v. Municipal Employees' Annuity & Benefit Fund,
    50 N.E.3d 596 (Ill. 2016) ......................................................... 20

Kaplan v. Shure Brothers,
    266 F.3d 598 (7th Cir. 2001) ............................................. 46-47

Kelo v. City of New London,
    545 U.S. 469 (2005) .................................................................. 28

Key v. Sullivan,
    925 F.2d 1056 (7th Cir. 1991) .................................................. 16

Lake Michigan Federation v. U.S. Army Corps of Engineers,
    742 F. Supp. 441 (N.D. Ill. 1990) ................................... 31-32, 36

La Salle National Trust, N.A. v. Village of Westmont,
    636 N.E.2d 1157 (Ill. App. 1994) ............................................. 45

Malec v. City of Bellville,
    891 N.E.2d 1039 (Ill. App. 2008) ............................................. 47

McCormick Harvesting Machine Co. v. C. Aultman & Co.,
    169 U.S. 606 (1898) .................................................................. 29

McCoy v. Iberdrola Renewables, Inc.,
    760 F.3d 674 (7th Cir. 2014) .................................................... 51

Milhau v. Sharp,
    15 Barb. 193 (N.Y. Gen. Term 1853) ....................................... 34

National Paint & Coatings Association v. City of Chicago,
    45 F.3d 1124 (7th Cir. 1995) .................................................... 37

National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,
    470 U.S. 451 (1985) .................................................................. 20

Nelson v. Napolitano,
    657 F.3d 586 (7th Cir. 2011) .................................................... 39

Paepcke v. Public Building Commission,
    263 N.E.2d 11 (Ill. 1970)......................................................................*passim*

People ex rel. Attorney General v. Kirk,
    45 N.E. 830 (Ill. 1896)............................................................................ 23-24

People ex rel. Chicago Dryer Co. v. City of Chicago,
    109 N.E.2d 201 (Ill. 1952)........................................................................ 45

People ex rel. Lumpkin v. Cassidy,
    703 N.E.2d 1 (Ill. 1998)............................................................................ 43

People ex rel. Scott v. Chicago Park District,
    360 N.E.2d 773 (Ill. 1976).............................................................. 31, 32, 36

People v. Pepitone,
    106 N.E.3d 984 (Ill. 2018)........................................................................ 43

People v. Pollution Control Board,
    404 N.E.2d 352 (Ill. App. 1980) .............................................................. 45

Petersen v. Chicago Plan Commission,
    707 N.E.2d 150 (Ill. App. 1998) .............................................................. 42

Protect Our Parks, Inc. v. Buttigieg,
    10 F.4th 758 (7th Cir. 2021) ...................................................................... 9

Protect Our Parks, Inc. v. Buttigieg,
    39 F.4th 389 (7th Cir. 2022) ....................................................... 1, 9-10, 15-16

Protect Our Parks, Inc. v. Chicago Park District,
    385 F. Supp. 3d 662 (N.D. Ill. 2019),
    aff'd in part, vacated in part, 971 F.3d 722 (7th Cir. 2020) ........................ 2, 22

Protect Our Parks, Inc. v. Chicago Park District,
    971 F.3d 722 (7th Cir. 2020)..................................................................*passim*

Rawoof v. Texor Petroleum Co.,
    521 F.3d 750 (7th Cir. 2008)..................................................................... 48

Reichelderfer v. Quinn,
    287 U.S. 315 (1932)................................................................................. 19

Scachitti v. UBS Financial Services,
    831 N.E.2d 544 (Ill. 2005)........................................................................ 48

Shively v. Bowlby,
    152 U.S. 1 (1894) .................................................................... 22-23

Southwestern Illinois Development Authority v. National City Environmental, LLC,
    768 N.E.2d 1 (Ill. 2002) ............................................................. 42

Village of Rosemont v. Jaffe,
    482 F.3d 926 (7th Cir. 2007) ..................................................... 30

## OTHER AUTHORITIES

5 ILCS 220/3 ............................................................................. 40

5 U.S.C. § 701, et seq. ............................................................... 9

20 ILCS 3420 ............................................................................ 11

23 U.S.C. § 138 .......................................................................... 8

33 U.S.C. § 401 et seq. ............................................................... 8

33 U.S.C. § 1251 et seq. ............................................................. 8

42 U.S.C. § 4321 et seq. ............................................................. 8

49 U.S.C. § 101 et seq. ............................................................... 7

49 U.S.C. § 303 .......................................................................... 8

50 ILCS 605 ....................................................................... 10, 39-40

54 U.S.C. § 200501 et seq. .......................................................... 7

54 U.S.C. § 306108 ..................................................................... 8

70 ILCS 1205 ............................................................................. 37

70 ILCS 1290/1 ....................................................................passim

Fed. R. App. P. 28(a)(8)(A) ....................................................... 38

Fed. R. Civ. P. 8(a)(2) ............................................................... 37

Fed. R. Civ. P. 12(b)(6) ....................................................... 16, 46

Ill. const. art. I, § 2...................................................................37

Ill. const. art. I, § 15..........................................................37, 42

Ill. const. art. I, § 16.................................................................37

Ill. const. art. VII, § 10(a) ........................................................40

Ill. const. art. VIII, § 1(a)..................................................37, 41

Restatement (Second) of Contracts § 84 (1981).......................49

# INTRODUCTION

———————

This appeal marks the third time plaintiffs seek this court's review of claims challenging the construction of the Obama Presidential Center in Chicago's Jackson Park.  When Protect Our Parks first sued in 2018, this court ruled that its federal claims were "easily dispatched" on the merits and ordered the state-law claims dismissed for lack of standing.  Protect Our Parks, Inc. v. Chicago Park District, 971 F.3d 722, 737, 738 (7th Cir. 2020) ("POP I").  When plaintiffs brought this second lawsuit in 2021, this court affirmed the denial of a preliminary injunction because the federal claims lacked merit.  Protect Our Parks, Inc. v. Buttigieg, 39 F.4th 389, 392 (7th Cir. 2022) ("POP II").

In this iteration, plaintiffs add nothing to the theories this court has already rejected.  Instead, they ask this court to depart from every decision that has come down against them.  Plaintiffs' appeal is meritless, and the judgment should be affirmed.

# JURISDICTIONAL STATEMENT

———————

The jurisdictional statement of plaintiffs-appellants is complete and correct.

# ISSUES PRESENTED

———————

1.     Whether the district court properly dismissed plaintiffs' public trust claim, where the Illinois Park District Aquarium and Museum Act ("Museum Act") authorizes the City of Chicago to contract with The Barack Obama Foundation ("Foundation") to build and operate the Presidential Center in Jackson Park.

1

2.      Whether plaintiffs forfeited their ultra vires action and state

constitutional claims by failing to develop their arguments, and, regardless,

whether the district court properly dismissed those claims.

3.      Whether the district court properly dismissed plaintiffs' nondelegation

claim, where the Foundation's application to construct the Presidential Center in

Jackson Park was approved through the legislative process.

4.      Whether the district court abused its discretion in denying plaintiffs

leave to amend, where plaintiffs are not parties or third-party beneficiaries to the

contract they claim was breached, failed to allege any breach or unjust enrichment,

and did not timely request amendment.

## STATEMENT OF THE CASE
————

## I.  Factual Background.

**The Presidential Center.**  The Presidential Center has been under

construction since August 2021.  Dedicated to telling the story of the Obama

Presidency and the journey of President Barack and First Lady Michelle Obama to

the White House, R. 1-1 at 24-25, 39, the Presidential Center will join 13 existing

presidential libraries and centers, R. 1-1 at 25, 39, and "provide[ ] a multitude of

benefits to the public," Protect Our Parks, Inc. v. Chicago Park District, 385 F.

Supp. 3d 662, 682 (N.D. Ill. 2019), aff'd in part, vacated in part, 971 F.3d 722 (7th

Cir. 2020).[1]  The Presidential Center "will offer a range of cultural, artistic, and

---

[1]  We cite the record in the district court as R. ___, the appendix as A___, and the
supplemental appendix as SA___.  We cite this court's docket as ECF No. ___.

recreational opportunities – including an educational museum, branch of the Chicago Public Library, and space for large-scale athletic events – as well as provide increased access to other areas of Jackson Park and the Museum of Science and Industry."  Id.; see also R. 1-1 at 28-29, 39-40, 84-86.

The Chicago City Council found that the Presidential Center, which will show visitors the history of the nation's first Black President and first President from Chicago, R. 1-1 at 25, will be a local, national, and global destination and will create a new South Side museum campus, R. 1-1 at 26.  City Council also found that the Presidential Center will "inspire visitors to engage actively in their own communities, showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits, strengthen Chicago's reputation as a global city, and enable the City to directly advance its previously adopted Cultural Plan."  R. 1-1 at 34.  The City's Department of Planning and Development ("DPD"), moreover, found that the Presidential Center will "increase recreational opportunities on the South Side," "bring more visitors to Jackson Park and the surrounding communities," increase the use and enjoyment of the park, and "improve safety."  R. 29-2 at 22.  DPD additionally found that locating the Presidential Center in Jackson Park is consistent with the Lakefront Plan of Chicago, "which endorses the siting and development of museums in lakefront and large regional parks," R. 29-2 at 25; will continue the City's "heritage of the pairing of cultural institutions and parks, which is a significant and historic distinction for

the Chicago park and boulevard system," R. 29-2 at 21-22; and will "enhance Chicago's cultural identity," R. 29-2 at 18.

The Presidential Center will sit on a narrow sliver of land at the western edge of Jackson Park, occupying 19.3 acres (3.5%) of the park's 551.52 acres.  R. 29-2 at 5.  Before construction of the Presidential Center, the site was isolated from the remainder of Jackson Park by six lanes of automobile traffic, R. 29-2 at 7, creating a "barrier" between the western edge of the park and the lakefront, R. 29-1 at 19. Portions of two of those roads will be vacated, creating new parkland and restoring the site's connection to the rest of the park, the lagoons, and the Museum of Science and Industry, so that visitors and nearby residents can walk or bike the entire east-west length of the park.  R. 29-2 at 13, 14, 17, 20, 21, 23, 24.

**City Approval.**  The Foundation undertook a nationwide search for the home of the future Presidential Center, considering a dozen locations around the United States, including several sites in Chicago.  Recognizing that the Presidential Center would "expand the City's cultural resources, promote economic development, strengthen surrounding communities, . . . bring greater national and international visibility to the City, and serve other important public purposes," R. 1-1 at 6, City Council enacted an ordinance demonstrating the City's "robust commitment to bringing the Presidential Center to Chicago," R. 1-1 at 4.  The 2015 ordinance authorized acceptance of a transfer of the proposed Jackson Park site from the Park District to the City, finding it "useful, desirable, necessary and convenient" for the City to acquire the selected site "for the public purpose of facilitating the location,

4

development, construction and operation of the Presidential Center." R. 1-1 at 7. Additionally, the 2015 ordinance noted that "a separate ordinance authorizing the development, construction and operation of the Presidential Center" in Jackson Park would be necessary if that site were selected. R. 1-1 at 6.

The Foundation proposed the Jackson Park site, and in January 2018, applied to the City for the required municipal approvals, kicking off an extensive review process involving multiple public hearings, as well as evaluations by DPD, the City's Plan Commission, and City Council. POP I, 971 F.3d at 738. First, DPD prepared a detailed report on the Presidential Center's compliance with the Chicago Lakefront Protection Ordinance and the Lakefront Plan of Chicago, concluding that the project complied with these laws, would promote substantial public benefits, and should be approved. R. 29-2. The Plan Commission then held a public hearing on both the project's compliance with the Lakefront Protection Ordinance and the Foundation's planned development application, R. 61-10 at 398, and recommended approval, R. 61-10 at 632. Various City Council committees also held public hearings on the application, R. 61-10 at 886-87, on proposed roadway changes, R. 61-10 at 1299-1300, and on the ordinance that would authorize the project, R. 1136. In May 2018, City Council enacted a "Planned Development Ordinance" approving use of the Jackson Park site for the Presidential Center. R. 29-1.

Finally, in October 2018, following public hearings and unanimous recommendations for approval, City Council enacted two additional ordinances: an operating ordinance, which authorized the City to accept title to the Jackson Park

site and enter into agreements with the Foundation governing its use of the site, R. 1-1 at 23, and an ordinance authorizing the City to vacate portions of Midway Plaisance Drive South and Cornell Drive, R. 29-3 at 3.  City Council also found the Presidential Center would continue Chicago's history of building great public institutions in lakefront parks, further progress toward a South Side museum campus, enhance Jackson Park's ecology, add greenspace, improve Jackson Park's accessibility and usability, and increase public safety, among other public benefits. R. 1-1 at 25-34.

**Use Agreement.**  The use agreement, one of the agreements that City Council authorized in the operating ordinance, sets the terms of the Foundation's use of the Jackson Park site.  R. 1-1 at 39.  It specifies that the Foundation will build the Presidential Center at its sole expense, R. 1-1 at 48, the City will retain title to the land and acquire title to the buildings and site improvements, R. 1-1 at 49, and, if the Foundation ceases to use the Presidential Center for its authorized purpose, the City may terminate the agreement, R. 1-1 at 53.  The use agreement also specifies that the Presidential Center will maintain hours consistent with other museums in public parks, R. 1-1 at 53, and operate in accord with the free admission requirements of the Museum Act, 70 ILCS 1290/1; R. 1-1 at 53.

**Prior Litigation.**  In 2018, in the first of two lawsuits challenging the development of the Presidential Center in Jackson Park, Protect Our Parks and three individuals sued the City and Park District, contending the City's approval of the Presidential Center in Jackson Park violated federal and state law.  As in this

case, Protect Our Parks asserted public trust and ultra vires action claims and "maintained that the use agreement between the City and the Foundation violates Illinois law." <u>POP I</u>, 971 F.3d at 728.  Protect Our Parks also brought federal takings and due process claims.  <u>Id</u>. at 728-29.  The district court granted summary judgment to the City and the Park District on all claims.  <u>Id.</u> at 729.  This court affirmed on the federal claims, concluding they were "easily dispatched" on the merits, <u>id.</u> at 737, and ordered the state-law claims dismissed for lack of Article III standing, <u>id.</u> at 738.  This court also discussed the public trust doctrine and agreed that "[d]edication to a public purpose isn't an irrevocable commitment" and that a new use is permissible so long as "the legislature has made a sufficient manifestation of legislative intent to permit the diversion and reallocation."  <u>Id.</u> at 730 (quotation omitted).  The United States Supreme Court denied Protect Our Parks' petition for certiorari.  141 S. Ct. 2583 (2021).

**Federal Review.**  The City's approval of the Jackson Park site prompted a number of required federal agency reviews, A52, including: (1) review by the National Park Service of the City's request to convert a small amount of parkland subject to the Urban Parks and Recreation Recovery Act, 54 U.S.C. § 200501 et seq., to nonrecreational use and to offset the conversion with nearby replacement recreation, SA30-31; and (2) review by the Federal Highway Administration of the City's request to be eligible to use federal funds for roadway, bicycle, and pedestrian improvements, under the Department of Transportation Act ("DOT Act"), 49 U.S.C. § 101 et seq., SA453.  The actions also triggered reviews under section 106 of the

National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108, SA54; the

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., SA81; and

section 4(f) of the DOT Act, 23 U.S.C. § 138; 49 U.S.C. § 303, SA451.  Minor work

associated with the Presidential Center and transportation improvements also

required permits from the U.S. Army Corps of Engineers pursuant to the Rivers and

Harbors Appropriation Act of 1899, 33 U.S.C. § 401 et seq., and the Clean Water

Act, 33 U.S.C. § 1251 et seq., SA94-95.

After three years and numerous rounds of public participation, the federal

agencies prepared an environmental assessment, SA70-156, and found that the

Presidential Center would have no significant impact on environmental resources,

pursuant to NEPA, SA562-70; prepared an assessment of effects to historic

properties, SA49-65.3, and entered into a memorandum of agreement with several

consulting parties pursuant to section 106 of the NHPA, SA434-42; and found that

there are no prudent and feasible alternatives to the use of section 4(f) resources

and that all efforts were made to minimize harm, as required by the DOT Act,

SA444-539.  The Corps also prepared an environmental assessment, SA94-95,

determined that the Park District qualified for a permit under the Rivers and

Harbors Act, SA613-18, and verified the City's use of a regional permit under the

Clean Water Act, SA541-53.  The federal defendants describe those reviews in

detail, Brief of Federal Defendants-Appellees 6-15, and we adopt that discussion.

## II.  Procedural History

On April 14, 2021, plaintiffs filed this lawsuit to halt construction of the

Presidential Center, bringing challenges to the federal agency actions pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq., and eight state-law claims, A93-174, many of which are identical to those dismissed in the prior lawsuit.

**Preliminary Injunction.**  On June 15, 2021, plaintiffs moved for a preliminary injunction based on their federal claims, R. 30, which the district court denied on August 5, 2021, on the ground that plaintiffs failed to demonstrate they were likely to succeed on the merits, A44-92.  Plaintiffs then sought an emergency injunction pending appeal, which the district court denied on August 12, 2021, SA624, and this court denied on August 13, 2021, ECF No. 34.  This court concluded that plaintiffs "fail[ed] to take into account the deference courts owe to agencies with respect to the relevant scope of a project"; the agency actions were not a proximate cause of plaintiffs' asserted harm; the agencies "consider[ed] the full environmental impact" of the Presidential Center; and plaintiffs are "unlikely to show that the agencies made a clear error in judgment when weighing the benefits of change against history."  Protect Our Parks, Inc. v. Buttigieg, 10 F.4th 758, 763-65 (7th Cir. 2021)

Following briefing and oral argument, this court, on July 1, 2022, affirmed the denial of plaintiffs' preliminary injunction motion, concluding that plaintiffs are not likely to succeed on the merits of their federal claims.  POP II, 39 F.4th at 393. This court rejected plaintiffs' argument that the agencies acted arbitrarily and capriciously, concluding that their review was "very thorough."  Id. at 398.  This

9

court also rejected plaintiffs' argument that the agencies were required "to consider alternatives to the Jackson Park site in their evaluation of possible environmental harms," explaining that "[t]he problem with this argument is that none of the federal defendants had anything to do with the site selection – it was the City that chose Jackson Park, and the federal agencies had (and have) no authority to move the project elsewhere." Id. at 393. "Federal law does not require agencies to waste time and resources evaluating environmental effects that those agencies neither caused nor have the authority to change." Id.

**Motion To Dismiss.** The City, the Park District, and the Foundation filed a motion to dismiss the state-law claims for failure to state a claim, R. 28-29, which the district court granted, A39.[2] As to the public trust claim, the court explained that, because Jackson Park was dedicated as parkland by statute, the only inquiry is whether there has been a "sufficient manifestation of legislative intent" to permit the new use. A12 (quotation omitted). Because the Museum Act authorizes presidential centers in public parks, such as Jackson Park, there is no public trust violation. A15-17. The court further explained that the Presidential Center would nonetheless satisfy the requirements for submerged land – which do not apply here – because the Presidential Center serves a public purpose. A19-21.

As to the ultra vires action claim, that failed because the Property Transfer Act, 50 ILCS 605, authorizes the Park District to transfer the Jackson Park site to

---

[2] The court held that, unlike in the 2018 case, plaintiffs here adequately alleged facts to support Article III standing. A9.

the City, and the Museum Act authorizes the City to enter into the use agreement with the Foundation.  A22-25.  As to the state constitutional claims, the claim under the public purpose clause failed because there was a "clear legislative determination that the [Presidential Center] site has a public purpose and confers a public benefit," A29; the takings claim failed because "[p]laintiffs have no private property interest in Jackson Park," A31; the due process claims failed because plaintiffs lack any property interest in Jackson Park, the Museum Act and four separate ordinances authorized the Presidential Center, and there was a rational basis for the 2018 ordinance, A31-34; and the claim alleging that the use agreement effected an "irrevocable grant of special privilege" failed because the use agreement "did not transfer ownership of the [Presidential Center] site to the Obama Foundation," nor "give the Foundation any irrevocable rights to it," A36, and because "there exists a rational basis for the" use agreement, A37.  As to the claim for improper delegation of authority, that failed because "the City's decision-making authority regarding public parkland use" had not been "abdicate[d]" to the Foundation.  A36.

Finally, the district court dismissed plaintiffs' claim under the Illinois State Agency Historic Preservation Act, 20 ILCS 3420, because the Act does not apply where there has been federal section 106 review, which occurred here.  A37-A39.

**Leave to Amend.**  After full briefing and oral argument on the motion to dismiss plaintiffs' state-law claims, plaintiffs sought leave to amend their complaint to add two new state-law claims, one for breach of the master agreement between the City and the Foundation, R. 107 at 7-10, and one for unjust enrichment based

on the Foundation's purported failure to comply with the master agreement, R. 107 at 11-13.  The court denied leave to amend on January 6, 2022, explaining that amendment would be futile because plaintiffs "have no standing to sue for breach of a contract to which they are not parties" and because the unjust enrichment claim is "tied" to the breach of contract claim and thus "adds nothing new."  A1.  The court also explained that the proposed amendment was untimely "because the parties and the Court have already devoted significant resources addressing the current complaint."  A1.

**Stipulated Judgment.**  Following the district court's dismissal of plaintiffs' state-law claims, and this Court's decision affirming denial of a preliminary injunction on the ground that plaintiffs' federal claims lacked merit, the parties stipulated to entry of judgment for defendants.  SA626-28.  The parties stipulated that: (1) plaintiffs' federal claims were properly decided on the administrative record; (2) the administrative record was complete; (3) there were "no pertinent facts" outside the administrative record; (4) "no additional briefing [was] necessary beyond what was submitted by the parties during the preliminary injunction hearing"; and (5) "final judgment in favor of Defendants" should be entered "on all counts so as to facilitate appellate review."  SA627-28 ¶¶ 4-5.  Plaintiffs also clarified that they were "explicitly waiving any arguments, claims, or theories as to the [federal claims] that they did not advance in their motion for preliminary injunction and supporting memorandum," and there was accordingly "no attempt to 'preserve issues and arguments not yet raised in this Court.'"  SA632 ¶ 4.

On November 3, 2022, the district court entered final judgment for defendants, determining that, "[b]ased on the Parties' stipulations and submissions, the record before the Court, and the Court's Memorandum Opinion denying Plaintiffs' request for preliminary injunction," there are "no genuine disputes of material fact" on the federal claims and that summary judgment should be entered on those claims "for the reasons set forth in the Court's Memorandum Opinion." A41-42. The court noted plaintiffs' "explicit[ ] waiver" of "any arguments, claims, or theories as to the [federal counts] not advanced in their motion for preliminary injunction and supporting memorandum." A42. Thus, "[t]he remaining [state law] counts having been previously dismissed," the court directed entry of final judgment for defendants. A42. Plaintiffs appeal.

## SUMMARY OF ARGUMENT

———

The district court properly dismissed plaintiffs' public trust claim. Plaintiffs reassert the same claim this court rejected in POP I, when it recognized that Paepcke v. Public Building Commission, 263 N.E.2d 11 (Ill. 1970), controls the public trust issue because Jackson Park was dedicated as parkland by statute. POP I, 971 F.3d at 730. And under Paepcke, the only question is whether the General Assembly expressly authorized the parkland's new use. Id. The Museum Act expressly authorizes municipalities to contract with private entities to build and operate presidential centers in public parks. 70 ILCS 1290/1. Thus, the General Assembly amply authorized the Presidential Center. No further inquiry is required to reject plaintiffs' public trust claim.

Plaintiffs urge this court to apply law governing land that was submerged at the time of statehood. But Jackson Park was not submerged when Illinois entered the Union, so that law does not apply. Regardless, the Presidential Center satisfies the requirements for submerged land. The State may dispose of or divert submerged land to a new use if doing so benefits the public, which the Presidential Center unquestionably does. The campus will contain a museum, public library, and spaces for presentations, events, athletics, and other activities. These will indisputably provide cultural, educational, and recreational benefits. The City's detailed findings that the Presidential Center will provide significant public benefits support this, as do the General Assembly's findings. Plaintiffs' public trust theory, which asks this court to examine the City's due diligence and second-guess legislative determinations, has no support in Illinois law.

As to plaintiffs' ultra vires action and state constitutional claims, plaintiffs have forfeited any arguments for reversal by not developing them. Regardless, dismissal was proper. On the ultra vires action claim, the Property Transfer Act gives the City the same right, title, and interest held by the Park District, and the Museum Act allows municipalities to contract with private entities to build and operate presidential libraries, centers, and museums and does not limit such contracts to leases. POP I also disposes of most of plaintiffs' remaining state-law claims. There, this court held that: (1) the City's extensive findings that the Presidential Center will provide significant public benefits are entitled to deference; (2) plaintiffs do not possess a property right in maintaining the parkland

unchanged; and (3) myriad legislative approvals provided plaintiffs all the process that is due.  971 F.3d at 737-38.  Plaintiffs' state constitutional claims under the public purpose, takings, due process, and special privilege clauses accordingly fail because the legislative findings demonstrate the Presidential Center will serve a public purpose, plaintiffs have no protected interest in the parkland, the Presidential Center was approved through a robust legislative process, and the use agreement does not transfer control of Jackson Park to the Foundation.  Plaintiffs' nondelegation claim was properly dismissed for the same reasons – the Presidential Center was legislatively approved.

There was, moreover, no abuse of discretion in denying plaintiffs leave to amend.  Plaintiffs improperly sought to allege breach of a contract to which they are not a party or beneficiary, and their own allegations expose the claim to be baseless.  Their proposed unjust enrichment claim fails because it is premised on their baseless contract claim, and because they allege a detriment only to Jackson Park, in which they lack a property interest.

Plaintiffs also reprise their federal claims under NEPA, section 106 of the NHPA, and section 4(f) of the DOT Act, which this court resoundingly rejected in POP II.  We adopt the federal defendants' arguments on those claims.  As the federal defendants explain, POP II is the law of the case.  Indeed, plaintiffs stipulated that there are no new facts, theories, or arguments beyond what was presented in connection with the preliminary injunction.  And the prior decision is sound; the agencies' evaluations under the federal statutes "were very thorough,"

15

POP II, 39 F.4th at 398, as they conducted an "exhaustive" assessment of the tree replacement plan and impacts to migratory birds, considered the project's cumulative impacts, and evaluated the effects on historic resources, id. at 398-99. The court also correctly concluded that the City's decision to locate the Presidential Center in Jackson Park was a local one, and thus "no federal agency had the authority to dictate to the Obama Foundation where the Center would be located." Id. at 399.  Summary judgment was therefore proper on plaintiffs' federal claims.

## ARGUMENT

———

Plaintiffs' current attempt to halt construction of the Presidential Center fares no better than their previous ones, and their claims were properly dismissed. This court reviews "de novo a district court's decision granting a motion to dismiss under Rule 12(b)(6), accepting all well-pleaded factual allegations in the complaint as true and drawing all reasonable inferences in favor of the appellants."  Heng v. Heavner, Beyers & Mihlar, LLC, 849 F.3d 348, 351 (7th Cir. 2017).  "To avoid dismissal, the complaint must state a claim to relief that is plausible on its face." Id. (quotation omitted).  This court reviews denials of leave to amend for "abuse of discretion."  Bethany Pharmacal Co. v. QVC, Inc., 241 F.3d 854, 861 (7th Cir. 2001). Finally, where "an appellate court either expressly or by necessary implication decides an issue," that decision is "binding upon all subsequent proceedings in the same case."  Key v. Sullivan, 925 F.2d 1056, 1060 (7th Cir. 1991).

Under these standards, the district court's judgment should be affirmed.  We discuss the dismissal of the state-law claims below.  For the federal claims, we

adopt the arguments of the federal defendants.

## I.    THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' PUBLIC TRUST CLAIM.

The Museum Act authorizes municipalities to contract with private entities, like the Foundation, to build and operate presidential centers in public parks. That alone disposes of plaintiffs' public trust claim. The General Assembly dedicated Jackson Park to be held as parkland, and under controlling Illinois law, where the General Assembly dedicates parkland by statute, it is free to authorize new uses on that parkland. The General Assembly's intent here could not have been more clearly manifested – it expressly authorized presidential centers in public parks. And, in fact, presidential centers and other museums *are* park purposes, so there is not even any diversion of use.

Plaintiffs invoke public trust law that applies only to land that was submerged at statehood.[3] But plaintiffs do not dispute that the Presidential Center was not submerged when Illinois entered the Union, so that law does not apply here. Regardless, the Presidential Center easily satisfies the requirements for submerged land, too. In addition to considering the legislative authorization, courts ask whether the new use provides a public benefit. The Presidential Center plainly does. Presidential centers provide valuable educational, cultural, and recreational benefits. The findings of the General Assembly and the City support this, as does

---

[3]  For purposes of this appeal, we use the term "submerged land" to mean both land that is currently submerged and land that was formerly submerged but has been "reclaimed." In either case, the courts consider whether the new use provides a public benefit.

common sense.

Plaintiffs also attempt to inject private trust principles into settled law governing the use of statutorily dedicated parkland.  Relying solely on academic commentary and political theorists, they argue that the City is required to show it exercised good business judgment and received fair value for the Presidential Center.  That has no basis under Illinois law.  "When applying state law, federal courts are bound by the decisions of the state's highest court," In re Emerald Casino, Inc., 867 F.3d 743, 765 (7th Cir. 2017), and cannot rewrite the law as the parties wish.  Controlling Illinois Supreme Court precedent unequivocally supports the City's ability to contract with the Foundation to build and operate the Presidential Center in Jackson Park, and plaintiffs' contrary theories should be rejected.

### A.     The Museum Act Authorizes The City To Contract With The Foundation To Build And Operate The Presidential Center In Jackson Park.

As this court observed in POP I, where land is dedicated by statute for public use, "the government 'holds the properties in trust for the uses and purposes specified and for the benefit of the public,'" but that dedication is not an "'irrevocable commitment.'"  971 F.3d at 730 (alteration omitted) (quoting Paepcke, 263 N.E.2d at 15-16).  Instead, the Illinois Supreme Court held in Paepcke that where the General Assembly dedicates parkland by statute and then reallocates the land for a different use, the only inquiry for a court is "whether there has been a sufficient manifestation of legislative intent to permit the diversion and

reallocation." 263 N.E.2d at 18.

Paepcke considered the construction of a public school in Chicago's
Washington Park, which was dedicated as parkland by the General Assembly. 263
N.E.2d at 14-15. The plaintiffs argued that, because the General Assembly
dedicated the land "for use only as park or recreational grounds," it could not divert
it for use as a school. Id. at 15. The court disagreed. To accept the claim that the
government made "irrevocable commitments about the use of particular
government resources," the court observed, "would be to prohibit the government
from ever accommodating new public needs by reallocating resources," a notion that
"strikes at the very essence of governmental power." Id. at 16 (quotation omitted).
The "freezing of any future configuration of policy judgments," the court continued,
"would seriously hamper the government's attempt to cope with the problems
caused by changes in the needs and desires of the citizenry." Id. (quotation
omitted); see also id. at 16-17 (discussing Reichelderfer v. Quinn, 287 U.S. 315, 319-
20 (1932) (when legislature dedicates land "by statute to park purposes," it merely
"declare[s] a public policy, but [does] not purport to deprive itself of the power to
change that policy by devoting the lands to other uses," meaning there is no limit on
"the legislative power to change the use" or "to make other disposition of the land")).
The court therefore concluded that the proper inquiry in determining whether
parkland created by statute can be put to a new use asks only "whether there has
been a sufficient manifestation of legislative intent to permit the diversion and
reallocation." Id. at 18. The enactment need not reference the specific park in

question, so long as it "is sufficiently broad, comprehensive and definite to allow the diversion in use." Id. at 19.  Finally, the court noted that "[t]he resolution of this conflict" over how parkland should be used "is for the legislature and not the courts," for "[t]he courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations." Id. at 21.

Paepcke thus makes clear that the ability of the legislature to reallocate statutorily created parkland derives from its inherent power to revise prior legislative determinations.  It is "'axiomatic' that one legislature cannot bind a future legislature." A.B.A.T.E. of Illinois, Inc. v. Quinn, 957 N.E.2d 876, 884 (Ill. 2011) (quoting Choose Life Illinois, Inc. v. White, 547 F.3d 853, 858 n.4 (7th Cir. 2008)).  Holding otherwise would "limit drastically the essential powers of a legislative body'" and place "an unconstitutional restraint on the legislature's plenary power" to make, revise, and repeal laws establishing state policies.  Id. (quoting National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470 U.S. 451, 466 (1985)); accord Jones v. Municipal Employees' Annuity & Benefit Fund, 50 N.E.3d 596, 605 (Ill. 2016) ("[T]he principal function of a legislature . . . is to make laws that establish the policy of the state," and "[t]hese policies are inherently subject to revision and repeal.") (quotation omitted); Envirite Corp. v. Illinois EPA, 632 N.E.2d 1035, 1037 (Ill. 1994) ("The legislature has an ongoing right to amend a statute.").

Plaintiffs do not dispute that the General Assembly dedicated the Jackson

Park site as parkland in 1869, by an "Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake," Private Laws, 1869 vol. 1, p. 358, which provided for the formation of the South Park Commissioners and authorized the Commissioners to select land "to be held, managed and controlled by them and their successors, as a public park, for recreation, health and benefit of the public, and free to all persons forever." Id. at 360; see A160. This is the same statute by which the land at issue in Paepcke was dedicated to public use. 263 N.E.2d at 14-15. Thus, as in Paepcke, the only question is whether the General Assembly authorized the Presidential Center in Jackson Park. And it did so in the Museum Act.

The Museum Act explicitly authorizes municipalities "to purchase, erect, and maintain within any such public park or parks edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, including presidential libraries, centers, and museums." 70 ILCS 1290/1. The Presidential Center fits squarely within this authorization. It will house a museum telling the story of the Obamas and featuring artifacts and records from Barack Obama's presidency. R. 1-1 at 3, 24-25, 39. The proposed operation of the Presidential Center is proper, too. The Act allows municipalities "to contract" with "the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an aquarium or museum . . . to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within any public park." 70 ILCS 1290/1. The Foundation was

21

established to develop a center dedicated to the history of Barack Obama's presidency, R. 1-1 at 39, and has contracted with the City to build and operate the Presidential Center for those purposes, R. 1-1 at 39-40, 53. Moreover, the use agreement specifies that the Presidential Center will maintain hours consistent with other museums in public parks, R. 1-1 at 53, and operate in accord with the free admission requirements of the Museum Act, 70 ILCS 1290/1; R. 1-1 at 53. In short, the General Assembly has expressed a clear legislative intent to permit the City to contract with the Foundation to build and operate the Presidential Center in Jackson Park. As <u>Paepcke</u> holds, no further inquiry is required.

## B. The Presidential Center Will Provide Significant Public Benefits.

Because the Presidential Center site was dedicated as parkland by statute and is legislatively authorized, the court need not go any further to reject plaintiffs' public trust claim. Plaintiffs urge this court to apply public trust law that governs land that was submerged at the time of statehood, Opening Brief of Plaintiffs-Appellants ("Plaintiffs Br.") 21-32, but that is irrelevant. Plaintiffs do not dispute that the Presidential Center site was not submerged at the time Illinois entered the Union – indeed, as the district court previously determined, early-nineteenth-century maps show Jackson Park above water, <u>Protect Our Parks</u>, 385 F. Supp. 3d at 677 – so that law is inapposite.[4] Nevertheless, as the City and General Assembly

---

[4] Plaintiffs argue that whether the land was submerged is "wholly irrelevant." Plaintiffs Br. 22. But the protection of submerged lands traces its roots to the English common law of public navigation and fishing rights over tidal lands. <u>Shively v. Bowlby</u>, 152 U.S. 1, 11 (1894). These tidal lands, being "incapable of

found, the Presidential Center provides myriad public benefits, so it easily satisfies the requirements for submerged land.

As this court discussed in <u>POP I</u>, states may dispose of or divert the use of submerged lands when the new use benefits the public.  971 F.3d at 729 (discussing <u>Illinois Central</u>).  In <u>Illinois Central</u>, the Supreme Court upheld a City ordinance approving a tract to be reclaimed from Lake Michigan to facilitate construction and operation of the railroad, because the railroad never acquired the land in "absolute fee," use was "restricted to the purpose" of constructing and operating a railroad to serve as a public highway, and the line and related facilities did not "interfer[e] with any useful freedom in the use of the waters of the lake for commerce."  146 U.S. at 444.  Thus, <u>Illinois Central</u> stands for the rule that, if the new use of submerged land will benefit the public, the grant is permissible, even if a private entity uses the land.

Relying on <u>Illinois Central</u>, the Illinois Supreme Court has upheld the use of submerged land by private entities, when the new use benefits the public.  For example, in <u>People ex rel. Attorney General v. Kirk</u>, 45 N.E. 830 (Ill. 1896), the

_____

ordinary and private occupation, cultivation, and improvement," were to be held for the public for "navigation and commerce" and "for the purpose of fishing."  <u>Id.</u>  Thus, each State, upon entry into the Union, received title to the navigable waters and submerged lands within its borders to be held in trust, <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 283-84 (1997), so that the public "may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties," <u>Illinois Central Railroad v. Illinois</u>, 146 U.S. 387, 452 (1892); <u>see also</u> <u>POP I</u>, 971 F.3d at 729.  There is no similar constraint on a State's use of non-submerged land, so the State is free to dedicate its interest in that land and change that use later.

court upheld the General Assembly's conveyance of 93 acres of reclaimed land to adjacent shore owners to help defray the costs of extending a boulevard along Lake Michigan, id. at 837, on the ground that, because the boulevard would "become a part of the public park" and "be maintained and controlled" by the park commissioners, id. at 831, it would provide a public benefit, id. at 834-35. Importantly, the court explained that its role was not to question "the propriety or impropriety" of the General Assembly's authorization, but only to determine whether the reclaimed land would be "used in the improvement of" or disposed of "without detriment to the public interest." Id. at 834.

Likewise, in Friends of the Parks v. Chicago Park District, 786 N.E.2d 161 (Ill. 2003), the court upheld legislation authorizing the Park District to enter into an agreement with the Chicago Bears to improve 97 acres of reclaimed lakefront parkland surrounding Soldier Field to be used as parking for patrons of the stadium, lakefront museums, and other nearby venues. Id. at 163-65. The court looked to the General Assembly's findings "that there was a shortage of suitable sports facilities" in the area and that improvements "would confer public benefits," such as job growth and tourism, id. at 167, in addition to improved parking and better access to the cultural amenities along the lakefront, id. at 170, to conclude that the improvements would benefit the public with only incidental benefit to the Bears, id. at 168, 170. Importantly, the court distinguished cases where the State abdicated complete control over the lakefront to private entities with only incidental public benefits. No such concern was present in Friends of the Parks, as the

agreement between the Park District and the Bears allowed the Park District to maintain control over the property and ensure the public's continued access to the stadium for athletic, artistic, and cultural events.  Id. at 170.

Here, the Presidential Center will undoubtedly benefit the public.  The campus will feature a museum telling the story of the Obama Presidency and the Obamas in the broader context of African-American history, civil rights, and Chicago history, and housing artifacts and records from the Obama Presidency, R. 1-1 at 28, 39, 84, 86; a branch of the Chicago Public Library, R. 1-1 at 29, 40, 85, 86; and numerous spaces for presentations, events, athletics, and other activities, R. 1-1 at 29, 40, 85, 86.  These facilities will provide cultural, educational, and recreational benefits to the public.  Indeed, in enacting the Museum Act, the General Assembly expressly found that presidential libraries, centers, and museums "serve valuable public purposes" by "furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities."  70 ILCS 1290/1.

City Council's findings, too, support these benefits.  City Council found that the Presidential Center will "inspire visitors to engage actively in their own communities, showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits, strengthen Chicago's reputation as a global city, and enable the City to directly advance its previously adopted Cultural Plan."  R. 1-1 at 34.  And DPD found that locating the Presidential

Center in Jackson Park is consistent with the Lakefront Plan of Chicago, "which endorses the siting and development of museums in lakefront and large regional parks," R. 29-2 at 25; will continue the City's "heritage of the pairing of cultural institutions and parks, which is a significant and historic distinction for the Chicago park and boulevard system," R. 29-2 at 21-22; will "enhance Chicago's cultural identity," R. 29-2 at 18; and will "increase recreational opportunities on the South Side," R. 29-2 at 22. As this court stated in POP I, plaintiffs can identify no basis on which the court "could 'second-guess the City's determination' that building the Center – with its museum, public library branch, auditorium, athletic center, gardens, and more – is a use with public benefits." 971 F.3d at 737 (alteration omitted) (quoting Kelo v. City of New London, 545 U.S. 469, 488 (2005)). Because the core mission of the Foundation is to build and operate the Presidential Center and to provide these indisputable public benefits, R. 1-1 at 3, 12, 24, 39, 53, to the extent there is any private interest of the Foundation, it is merely incidental to the Presidential Center's public purpose. In addition, there is no abdication of control to a private entity. The City will retain ownership of the Presidential Center site and obtain title to the buildings and site improvements, R. 1-1 at 49, and if the Foundation uses the site for any purpose other than operating the Presidential Center, the City may terminate the agreement, R. 1-1 at 53.

Nor will the Presidential Center prevent the public from using and enjoying Jackson Park as a public park. As the General Assembly determined in the Museum Act, a presidential center is itself a park use, and the placement of one in

Jackson Park continues longstanding historical practice of siting museums in public parks. Illinois law has long recognized that parks "are not confined to a tract of land with trees, grass, and seats," but are places of "recreation and amusement of the public," and thus museums are "legitimate [park] purposes." Furlong v. South Park Commissioners, 151 N.E. 510, 511 (Ill. 1926). And Chicago, for its part, has an enviable collection of privately operated museums in public parks, including the Museum of Science and Industry and the DuSable Museum of African American History, which, like the Presidential Center, are located on parkland created by the 1869 statute. R. 1-1 at 25-26. Just as the Soldier Field renovations created "better [public] access to the stadium, the museums, and the lakefront generally," 786 N.E.2d at 170, the changes associated with the Presidential Center will only enhance the public's use and enjoyment of Jackson Park, by creating 4.7 acres of park space, R. 29-2 at 14; creating picnic areas, a sledding hill, play areas for children, a nature walk, and other natural and contemplative spaces, R. 1-1 at 29, 40, 85; and improving public access to Jackson Park and adjacent lakeshore parks, R. 29-2 at 13, 14, 17, 20, 21, 23, 24. Thus, even though the requirements for land that was submerged at statehood do not apply here, the Presidential Center easily satisfies them.

### C. Plaintiffs' Novel Public Trust Theories Are Baseless.

Plaintiffs attempt to evade the inevitable effect of the Museum Act by arguing that the public trust doctrine "has constitutional dimensions that the legislature cannot avoid." Plaintiffs Br. 20. They further argue that Illinois law

"insist[s] that a state or municipality, like any fiduciary, must receive fair value for the property that it so transfers, just like any private trustee," and that this "duty is constant" whether the "trust property is fully submerged, formerly submerged, or never submerged." Id. at 22. Plaintiffs' position is legally and factually baseless.

First, none of plaintiffs' authority even remotely suggests a fiduciary duty analysis. Plaintiffs feebly attempt to cull private trust principles out of Paepcke. They latch onto the term "beneficiaries" as somehow signaling fiduciary duties, Plaintiffs Br. 27, but the court used that term only to explain that "taxpayers who are the beneficiaries" of the trust property have standing to enforce the public trust doctrine, Paepcke, 263 N.E.2d at 18. The court did not extend to taxpayers the right to demand that the park remain unchanged; nor did it require government entities to show they exercised a duty of care. Furthermore, this court already rejected the argument that plaintiffs "are similarly situated to beneficiaries of a private trust." POP I, 971 F.3d at 737. This court described Paepcke as "particularly devastating" to plaintiffs in its holding that members of the public "possess no private property right in having the parkland committed to a particular use." Id. (citing Paepcke, 263 N.E.2d at 16). Indeed, Paepcke refused to view the General Assembly's dedication of parkland as an "irrevocable commitment[ ]," as doing so "would be to prohibit the government from ever accommodating new public needs by reallocating resources," a notion that "strikes at the very essence of governmental power." 263 N.E.2d at 16 (quotation omitted). And it clarified that courts cannot question "legislative wisdom," but "can serve only as an instrument of

determining legislative intent as evidenced by existing legislation." Id. at 21.  Thus, Paepcke made abundantly clear that the General Assembly may authorize new uses on parkland it created, and the only inquiry is whether the new use was sufficiently authorized.  Id. at 18-19.  For these reasons, plaintiffs' contention that the Paepcke court "well knew" that statutory dedications of parkland "could not be repealed or modified at will," Plaintiffs Br. 25, is baffling.

Plaintiffs contort Paepcke even further by likening the dedication of parkland in the 1869 Act to a patent or a land grant, both of which "are 'entitled to the same legal protection as other property,' *and thus cannot be set aside by legislative action*."  Plaintiffs Br. 24 (quoting McCormick Harvesting Machine Co. v. C. Aultman & Co., 169 U.S. 606, 609 (1898)).  Plainly, Paepcke did not share plaintiffs' view of the nature of the property right, as the court allowed the reallocation of Washington Park to a new use based solely on the legislative authorization.  263 N.E.2d at 19.  Moreover, plaintiffs' lead authority, McCormick, does not address land held in trust for the public.  What can be gleaned from McCormick is that patents and land grants, once conveyed, become private property exclusively owned and controlled by the patentee or grantee.  169 U.S. at 609.  This does not describe the 1869 Act, which was a dedication of land to be held in trust for public use, and, unlike a conveyance of land in absolute fee, is not irrevocable.  The Illinois Supreme Court, elsewhere, has held that the General Assembly cannot create an irrevocable trust because doing so "would be contrary to settled principles of law and would place an unconstitutional restraint on the legislature's plenary power."  A.B.A.T.E.,

957 N.E.2d at 883. The 1869 General Assembly established a policy to preserve parkland for the public, but it did not constrain the General Assembly, 150 years later, from authorizing presidential centers on that same parkland. "'It is for each elected legislature to express the will of the people as it sees fit.'" Id. at 884 (alteration omitted) (quoting Village of Rosemont v. Jaffe, 482 F.3d 926, 937 (7th Cir. 2007)).

Plaintiffs double-down on their misreading of Paepcke by insisting that the court required the application of certain factors Wisconsin courts have developed to weigh the public benefits of diversions of trust property. Plaintiffs Br. 25 (citing Paepcke, 263 N.E.2d at 19). But the court explicitly stated that these factors are "not controlling" and "might serve" only "as a useful guide for future administrative action," Paepcke, 263 N.E.2d at 19, such as where a municipality reallocates public trust land to a new use *without* legislative authorization, see Clement v. O'Malley, 420 N.E.2d 533, 540-41 (Ill. App. 1981) (applying Wisconsin factors to uphold construction of driving range on 11 acres of Jackson Park), aff'd sub nom. Clement v. Chicago Park District, 449 N.E.2d 81 (Ill. 1983). Because the General Assembly already had authorized a public school in Washington Park, there was no need for further inquiry. Paepcke, 263 N.E.2d at 18-19, 21. The same is true here. The General Assembly authorized the Presidential Center through the Museum Act, so these factors do not apply, and in any event would be amply satisfied in view of the Presidential Center's extensive public benefits.

The remaining cases plaintiffs cite are either inapplicable, non-precedential,

or both.  And none suggests anything approximating a fiduciary duty analysis.

People ex rel. Scott v. Chicago Park District, 360 N.E.2d 773 (Ill. 1976), merely
stands for the unremarkable proposition that, when the State disposes of
submerged land, it can do so only if the new use will primarily benefit the public.
Id. at 781.  While the court cautioned that the General Assembly's "self-serving
recitation of a public purpose within a legislative enactment is not conclusive of the
existence of such purpose," id. (quotation omitted), it did not require the State to
show that it exercised due care or received fair value for the property.  Nor did it
second-guess the legislative findings about public benefits.  The court merely
concluded that those benefits were incidental to the corporation's private purpose,
id., because the submerged lands were conveyed, in fee, to a private entity with a
purpose wholly independent from the public's interest in the land.  Here, the
Foundation was established to build a presidential center, R. 1-1 at 3, 12, 24, 39, 53,
which will provide myriad public benefits, as we explain, so there can be no concern
that the primary purpose is private.  And, in any event, the Presidential Center site
was never submerged, so the public purpose inquiry is not even necessary.

　　　Plaintiffs find no support in Lake Michigan Federation v. U.S. Army Corps of
Engineers, 742 F. Supp. 441 (N.D. Ill. 1990), either.  That case invalidated a grant
of submerged lands to Loyola University to expand its campus, id. at 442-43, and it
did so for the same reason as in Scott – because the General Assembly authorized a
conveyance to a private entity, in fee, for a wholly private purpose, id. at 445.
Again, the court did not second-guess the General Assembly's findings that the

project would have public benefits, but instead concluded that those stated benefits – aesthetic improvements to the coastline – were merely incidental to Loyola's private purpose of a larger campus. No such concerns are present here, and, regardless, Lake Michigan Federation is not controlling.

Plaintiffs urge that Scott and Lake Michigan Federation require this court to ask whether the Presidential Center's "promised benefits" are "worth their cost, or even capable of being realized," and to assess whether the project has "huge corresponding negative impacts." Plaintiffs Br. 31. But the courts in those cases asked no such questions. On the contrary, they accepted without question the public benefits identified in the legislative findings. Their only concerns were that the submerged land was conveyed in absolute fee to a private party, with a wholly private purpose, with only incidental benefit to the public. This case, on the other hand, involves no submerged land, no conveyance of the fee title, and no wholly private purpose.

Plaintiffs next cite Friends of the Parks v. Chicago Park District, 160 F. Supp. 3d 1060 (N.D. Ill. 2016) ("Lucas"). Plaintiffs Br. 32.[5] There, the plaintiffs challenged construction of the Lucas Museum of Narrative Art on reclaimed land along Lake Michigan. Friends of the Parks, 160 F. Supp. 3d at 1062. The Park District entered into a 99-year ground lease with the museum, which gave the museum "exclusive control over the construction, maintenance and operation, repair

---

[5] Plaintiffs cite an earlier unpublished order. The published decision we cite has a more thorough discussion of the facts but is not substantively different.

and management of the building," id. at 1062-63, and granted the museum ownership of the building and other improvements upon their completion, id. at 1068. The district court ruled that the public trust claim survived a motion to dismiss because the lease agreement "may convey an interest in real property" such that the land will be placed "entirely beyond the direction and control of the state," id. at 1068 (quotation omitted), and that the complaint sufficiently plead that the museum will primarily serve a private purpose, id. at 1069.

Lucas does not help plaintiffs. Besides being non-precedential, it is also inapposite because it involved both submerged land and a lease agreement that allegedly gave the museum exclusive control over the site and ownership of the buildings and improvements. The use agreement here does not cede control or ownership. Again, it limits the Foundation's use of the site to the purposes set forth in the agreement, R. 1-1 at 53; requires the Foundation to open the grounds and buildings to the public, R. 1-1 at 53; and grants title in the buildings and site improvements to the City, R. 1-1 at 49.

Plaintiffs' final two cases are particularly inapt, as they were decided in the nineteenth century under Alabama and New York law and involved unauthorized municipal decisions to transfer land held in trust to a private entity. See Plaintiffs Br. 22-23, 28. In Douglass v. City Council of Montgomery, 24 So. 745 (Ala. 1898), the parkland was deeded to the city by a private citizen with the condition that it be used "as a common or street," or otherwise "revert to me or my heirs." Id. at 746. Here, in contrast, the General Assembly dedicated the land and thus is free to

change that use.  In <u>Milhau v. Sharp</u>, 15 Barb. 193 (N.Y. Gen. Term 1853), the New

York City Board of Aldermen approved construction of a rail line through a public

street.  <u>Id.</u> at 206-07.  The city claimed to derive authority from its charter, but the

court concluded that, because the grant was in "disregard of the public interest," it

was unauthorized.  <u>Id.</u> at 217-18.  Here, there is no disregard of the public interest.

In addition to having no legal basis, plaintiffs' argument collapses under its

factual inaccuracies.  Plaintiffs' theory rests on their claim that the City is

transferring ownership and control of Jackson Park to the Foundation.  <u>E.g.,</u>

Plaintiffs Br. 24 (Jackson Park will be "given away to a private party"); <u>id</u> at 26

("deal cedes control over a huge section of Jackson Park to a private entity"); <u>id.</u> at

31 (Presidential Center "will be kept under the Foundation's lock and key").  These

assertions are false.  Again, the use agreement specifies that the City will retain

ownership of the site and obtain title to the buildings and improvements, R. 1-1 at

49; the Foundation may use the site only for the Presidential Center, R. 1-1 at 53;

the Foundation will pay for construction and maintenance of the Presidential

Center, R. 1-1 at 48; and the Presidential Center will be open to the public the same

as other museums in public parks, provide public access to the grounds during Park

District hours, and operate in accord with the free admission requirements of the

Museum Act, R. 1-1 at 53.  Plaintiffs further assert that the Presidential Center will

destroy a "huge chunk" of Jackson Park, "including arguably the most valuable

acreage," <u>id.</u> at 24, 26, and "transform huge portions – in excess of ten percent of

usable space in Jackson Park – by ripping out roads, cutting down trees, obstructing

bird migration, and removing historical resources," id. at 26.  There is nothing to support this.  The Presidential Center site will encompass approximately 19.3 acres, or a mere 3.5%, of Jackson Park's 551.52 acres, R. 29-2 at 5 – hardly a "huge chunk" – and will even create 4.7 acres of additional parkland through the closure of roadways, R. 29-2 at 14.  And the site is far from being the "most valuable acreage" in Jackson Park.  It is located on the far western edge, R. 29-2 at 5, and is bordered today by a heavily traveled six-lane roadway that generates substantial air and noise pollution, R. 29-2 at 13, conveys stormwater runoff into the lagoons, R. 29-2 at 19, and damages natural habitat, R. 29-2 at 19.[6]

In fact, the Presidential Center – rather than wreaking the cultural and environmental havoc plaintiffs portend – will enhance the public's use and enjoyment of the park.  The site improvements, including the conversion of roadways into parkland and the establishment of new pedestrian access points, safety features, and ADA-compliant design features, will improve access to Jackson Park and other adjacent lakeshore parks, R. 29-2 at 20; improve pedestrian movement through the park by reconnecting the lake and the lagoons with the park's western edge, R. 29-2 at 13, 14, 17, 20, 21, 23, 24; and offer unimpeded

---

[6]  Plaintiffs contend that the lagoons and certain other features are not part of the park's usable acreage, Plaintiffs Br. 6, while at the same time challenging the "destruction" of the six-lane roadway that goes through the park, id. at 12, 38, 46.  That is absurd.  The lagoons are recreational features that provide opportunities for fishing, birdwatching, and enjoying scenic views.  The six-lane roadway, on the other hand, disturbs visitors' quiet enjoyment of the park.  Plaintiffs' assertion that the road network was part of Olmsted's original vision, id. at 12, 46, is equally absurd.  A nineteenth-century carriage path bears no resemblance to a modern highway.  See R. 29-2 at 19.

pedestrian and bike access to the Museum of Science and Industry from the South
Side, R. 29-2 at 13.  The conversion of roads into parkland also will reduce
impervious pavement cover by 80%, reducing the volume of stormwater runoff, salt
spray, and other airborne pollutants, R. 29-2 at 19; will attract new wildlife to the
area, R. 29-2 at 13; and will improve park-like acoustics, R. 29-2 at 18, existing bird
habitats, R. 29-2 at 13, and the public's enjoyment of the lagoons and Wooded
Island, R. 29-2 at 18.  And these are in addition to the myriad cultural, educational,
and recreational benefits that the Presidential Center itself will bring to the public,
which we detail above.  For these reasons, plaintiffs' contention that the
conveyances in Scott and Lake Michigan Federation were far less damaging to the
trust property than the use of the site here, Plaintiffs Br. 29, borders on ridiculous.

On a final note, plaintiffs' public trust claim rests entirely on allegations that
the use agreement is a "sham," A162, and a "giveaway," A165, and that the
Presidential Center will result in the "wholesale destruction" of Jackson Park and
"other environmental perils," A162.  Those "labels and conclusions" are not entitled
to the presumption of truth afforded a complaint on review of a motion to dismiss.
Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Moreover, the use
agreement itself refutes plaintiffs' characterization of the transfer, R. 1-1 at 49, 53,
and "to the extent that the terms of an attached contract conflict with the
allegations of the complaint, the contract controls," Centers v. Centennial Mortgage,
Inc., 398 F.3d 930, 933 (7th Cir. 2005).  City Council's findings similarly refute
plaintiffs' allegations regarding the Presidential Center's harms to the public

interest.  And because such legislative findings are "'not subject to courtroom factfinding,'" National Paint & Coatings Association v. City of Chicago, 45 F.3d 1124, 1127 (7th Cir. 1995) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993)), they too control over plaintiffs' contrary allegations.  See POP I, 971 F.3d at 737 ("It's hard to see [ ] how we could second-guess the City's determination that building the Center – with its museum, public library branch, auditorium, athletic center, gardens, and more – is a use with public benefits.") (alteration and quotation omitted).  Finally, plaintiffs' allegations are mere hyperbole and speculation, which enjoy no presumption of truth.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (citing Fed. R. Civ. P. 8(a)(2)).

## II.     THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' ULTRA VIRES ACTION AND STATE CONSTITUTIONAL CLAIMS.

Plaintiffs claim the City and Park District, by authorizing the Foundation to build and operate the Presidential Center in Jackson Park, acted ultra vires in violation of the Property Transfer Act and the Museum Act, A164, and, along with the Foundation, violated several provisions of the Illinois constitution, including article VIII, section 1(a) ("public purpose clause"), A164-65; article I, section 15 ("takings clause"), A165; article I, section 2 ("due process clause"), A167-68; and article I, section 16 ("special privilege clause"), A168.[7]  The district court correctly

---

[7]  Plaintiffs also allege that "Illinois law prohibits the Park District from a transfer [sic] to a non-governmental entity without an 'exchange for other real property of substantially equal or greater value.'"  A163.  This statement lacks a citation but appears to reference the Park District Code, 70 ILCS 1205.  The Code does not apply to the Chicago Park District, see 70 ILCS 1205/1-2(d), so any claim that the transfer violates the Code is a nonstarter.

concluded defendants' actions were lawful.  A022-34, A36-37.  Plaintiffs forfeited

any arguments for reversal of those rulings.  Nonetheless, dismissal was proper.

### A.     Plaintiffs Forfeited Their Arguments For Reversal.

"An appellant who does not address the rulings and reasoning of the district

court forfeits any arguments he might have that those rulings were wrong."

Hackett v. City of South Bend, 956 F.3d 504, 510 (7th Cir. 2020); see Fed. R. App. P.

28(a)(8)(A) (brief must contain "appellant's contentions and the reasons for them"

with citations to authority and record).  Plaintiffs' arguments about their ultra vires

action and state constitutional claims fail to meet these minimum standards.

On their ultra vires action claim, plaintiffs do not even cite the statutory

provisions they believe the City violated, let alone engage with the district court's

analysis of those provisions.  They assert that the district court ignored their

allegations that the City is ceding control of the Presidential Center site to the

Foundation, Plaintiffs Br. 35-36, but they fail to parlay their grievances over the

use agreement into an argument for reversal.  Worse still, they ask this court to

parse their 82-page complaint for evidence of *other* ultra vires actions.  See id. at 35

("The complaint viewed as a whole identifies many ultra vires activities that cannot

be resolved at the pleading stage.").  Plaintiffs' argument on their state

constitutional claims is even more skeletal.  In a single sentence, they assert that,

because their claims "rely upon the transfer and the sham nature of the 'use'

agreement," the district court erroneously dismissed them.  Id.  But they do not cite

a single constitutional provision.  If plaintiffs are unwilling to do even the bare

minimum to advance their claims, this court should not do it for them.  See Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir. 2011).  Plaintiffs' challenge to the dismissal of their ultra vires action and state constitutional claims is forfeited.

### B.    Dismissal Was Proper Regardless.

Forfeiture aside, the ultra vires action and state constitutional claims were properly dismissed.  As plaintiffs admit, their claims rely on their contention that the use agreement is a "sham," Plaintiffs Br. 35, and transfers exclusive possession of the Presidential Center site to the Foundation solely for its benefit, id. at 36.  But, as we explain above, the use agreement unequivocally demonstrates that the City will maintain control of the Presidential Center site, R. 1-1 at 48-60, and plaintiffs' unsupported protestations cannot overcome that document's plain terms.  Plaintiffs' allegation that the Presidential Center solely benefits the Foundation, Plaintiffs Br. 36; A164, is likewise contradicted by both the use agreement and the City's findings.  As we also explain above, the use agreement details the significant public benefits the Presidential Center will provide, R. 1-1 at 39-40, and the City's findings also support those benefits, R. 1-1 at 3, 4, 6, 24-34; R. 29-2 at 6-26, as do the General Assembly's, 70 ILCS 1290/1.  Plaintiffs' contrary allegations cannot overcome these contractual provisions and legislative determinations.  When plaintiffs' deficient pleadings are cast aside, their claims disintegrate.

**Property Transfer Act.**  The Property Transfer Act provides that a municipality may transfer "all of the right, title and interest held by it" to another municipality, 50 ILCS 605/2, and that "[t]he transferee municipality shall

thereafter have the right to use, occupy or improve the real estate so transferred for any municipal or public purpose and shall hold said real estate by the same right, title and interest by which the transferor municipality held said real estate," id. § 2(a).  The Act thus gives the City, the transferee, the same "right, title and interest" held by the Park District, the transferor.  The Intergovernmental Cooperation Act, which allows a local government to transfer its "powers, privileges, functions, or authority" to another local government, 5 ILCS 220/3, likewise gives the City the same rights as the Park District.  The Museum Act allows park districts "to contract with" the "directors or trustees of any corporation or society organized for the construction or maintenance and operation" of a museum, 70 ILCS 1290/1, and the Illinois constitution provides that units of local government, like park districts, "may contract and otherwise associate with individuals, associations, and corporations in any manner not prohibited by law or by ordinance," Ill. const., art. VII, § 10(a).  Thus, because the Park District has the right to contract with the Foundation to use the land, the City does as well.

**Museum Act.**  The Museum Act allows the City to enter into an agreement with the Foundation to build and operate the Presidential Center in Jackson Park.  Plaintiffs allege that the Museum Act "requires that a lease be utilized by the City." A164.  Not so.  The first sentence of the Act provides that municipalities may "contract" with private entities to build and operate presidential centers in public parks.  70 ILCS 1290/1.  The second sentence provides that, "[n]otwithstanding the previous sentence, a city or park district may enter into a lease" allowing private

40

entities to build and operate presidential centers and use the surrounding grounds, "on the conditions that (1) the public is allowed access to such grounds in a manner consistent with its access to other public parks, and (2) the city or park district retains a reversionary interest in any improvements made by the corporation or society on the grounds." Id. The import of the second sentence is not that the contract *must* be a lease, but that *if* the parties enter into a lease, the public must have access to the grounds and the municipality must obtain title to the improvements. As we explain, the use agreement nevertheless complies with the conditions in the Act and also contains a number of other provisions that ensure the City will continue to control the site.

**Public Purpose Clause.** The public purpose clause provides that "[p]ublic funds, property or credit shall be used only for public purposes," Ill. const. art. VIII, § 1(a), a requirement that is satisfied so long as the legislative findings are not "evasive" and instead demonstrate the use of public funds or property will serve a public purpose, notwithstanding any "incidental benefit to private interests," Friends of the Parks, 786 N.E.2d at 166-67; accord Empress Casino Joliet Corp. v. Giannoulias, 896 N.E.2d 277, 295 (Ill. 2008) ("If the purpose sought to be achieved by the legislation is a public one and it contains elements of public benefit, then the question of how much benefit the public derives is for the legislature, not the courts."). The legislative findings make abundantly clear that the Presidential Center will serve a public purpose, as we explain above, and plaintiffs have identified nothing evasive about these findings.

41

**Takings Clause.**  Plaintiffs' takings claim fails for the simple reason that the takings clause prohibits the taking only of "[*p*]*rivate* property" for public use without just compensation, Ill. const. art. I, § 15 (emphasis added), and no private property has been taken here.  Paepcke explicitly held that "[t]he mere dedication by the sovereign of lands to public park uses" does not confer a protected property interest in the continued use of the park unchanged, 263 N.E.2d at 16, and this court agreed in POP I that Paepcke is "devastating" to any claim that members of the public hold a protected interest in public land, 971 F.3d at 737; see also Petersen v. Chicago Plan Commission, 707 N.E.2d 150, 155 (Ill. App. 1998) (public has no "protectable interest" in parkland).  Paepcke is equally devastating to plaintiffs here.  Moreover, plaintiffs seek only injunctive relief, not damages, A173-74, so their complaint can be read only as challenging the "public purpose" requirement of the takings clause, which is easily satisfied here, as the legislative findings are "entitled to deference," POP I, 971 F.3d at 737; accord Southwestern Illinois Development Authority v. National City Environmental, LLC, 768 N.E.2d 1, 8 (Ill. 2002) ("Great deference should be afforded the legislature and its granting of eminent domain authority.").

**Due Process Clause.**  Plaintiffs' lack of a protected property interest also dooms their due process claim.  "If no protected interest is present, due process protections are not triggered."  Big Sky Excavating, Inc. v. Illinois Bell Telephone Co., 840 N.E.2d 1174, 1186 (2005); see also POP I, 971 F.3d at 736-37 (affirming dismissal with prejudice of Protect Our Parks' federal due process claim).

Furthermore, plaintiffs have not even alleged any denial of due process. The General Assembly enacted the Museum Act, 70 ILCS 1290/1, and the City enacted four separate ordinances approving the Presidential Center, <u>POP I</u>, 971 F.3d at 738, and both legislative bodies made numerous findings on the Presidential Center's benefit to the public, as we detail above. A legislative determination provides "all the procedural safeguards necessary to provide the plaintiffs with due process," <u>Fumarolo v. Chicago Board of Education</u>, 566 N.E.2d 1283, 1307 (Ill. 1990), and here we have five, which is more than sufficient, <u>POP I</u>, 971 F.3d at 738 ("If one legislative determination is enough, then *five* determinations are overkill."). These determinations are also entitled to great deference under a substantive due process analysis. Indeed, where, as here, the legislation does not affect fundamental rights or impact a suspect class, it is subject to a rational basis test and will be upheld so long as it "is rationally related to a legitimate state interest." <u>People ex rel. Lumpkin v. Cassidy</u>, 703 N.E.2d 1, 4 (Ill. 1998). The rational basis test is "highly deferential to the findings of the legislature." <u>People v. Pepitone</u>, 106 N.E.3d 984, 990 (Ill. 2018). Again, the findings on the public benefits are extensive and entitled to deference.

**Special Privilege Clause.** Finally, plaintiffs' claim that the use agreement confers "an irrevocable and special privilege on the Obama Foundation, supplying perpetual and largely full control over a large portion of Jackson Park," A168, also fails because the use agreement does not transfer control to the Foundation, as we explain above. Moreover, legislation affording a special privilege will be upheld if

43

there is a rational basis for it.  <u>DiSabato v. Board of Trustees of State Employees'</u> <u>Retirement System</u>, 674 N.E.2d 852, 859 (Ill. App. 1996).  And in this case, the extensive benefits to the public demonstrate such a basis.

## III.   THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' NON-DELEGATION CLAIM.

Plaintiffs allege the City "delegated its decision-making authority over the location and design" of the Presidential Center to the Foundation, and cite the 2015 ordinance, A167, which states: "the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library," R. 1-1 at .  This is a nonstarter.  The 2015 ordinance was just the first step in the City's robust, years-long legislative approval process, as the ordinance itself makes clear.  City Council explicitly provided that, before the Foundation could build the Presidential Center in Washington or Jackson Park, it would be necessary for the City Council to "introduce a separate ordinance authorizing the development, construction and operation of the Presidential Center on the Selected Site." R. 1-1 at 6.  Plaintiffs ignore that City Council did just that.  The Foundation proposed the Jackson Park site and went through the zoning application process, which involved review by various agencies, public hearings, and City Council approval, R. 1-1, 29-1, 29-2, 29-3, and the City enacted four separate ordinances, <u>POP I</u>, 971 F.3d at 738.

Furthermore, plaintiffs simply describe an unremarkable application process.  Applicants always propose the sites of their projects; that is not a legislative function.  Nor is it unusual that the Foundation designed the project.  <u>See</u> Plaintiffs

Br. 40.  Project design is also not a legislative function; the City merely approves the applicant's designs, as occurred here.  Plaintiffs also complain that the City agreed to close or expand roadways and allow other changes to the Presidential Center site.  Id. at 38.  But those changes were reviewed and approved through the legislative process, as well, R. 29-1, 29-2, 29-3, and, again, there is nothing unusual about a municipality approving site and infrastructure improvements connected with new development.  That is evidence of a responsible municipal government, not improper delegation.

None of the cases plaintiffs cite involves the robust approval process that occurred here.  In fact, in those cases, the legislative bodies conferred upon private parties absolute discretion to decide the law.  See People ex rel. Chicago Dryer Co. v. City of Chicago, 109 N.E.2d 201, 204 (Ill. 1952) (authorizing private parties to name streets); Brodner v. City of Elgin, 420 N.E.2d 1176, 1178 (Ill. App. 1981) (requiring consent of owner to amend zoning ordinance); La Salle National Trust, N.A. v. Village of Westmont, 636 N.E.2d 1157, 1169 (Ill. App. 1994) (authorizing private parties to impose restrictive covenants preventing municipality from rezoning property); People v. Pollution Control Board, 404 N.E.2d 352, 355 (Ill. App. 1980) (authorizing private parties to exempt certain activities from noise pollution regulations).  Here, the City did not confer discretion on the Foundation; it allowed the Foundation to submit a development proposal, and it approved that proposal through the same processes that apply to any other.

45

## IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND.

District courts have broad discretion to deny leave to amend on futility and untimeliness grounds.  Hukic v. Aurora Loan Services, 588 F.3d 420, 432 (7th Cir. 2009).  The district court concluded that amendment was futile because plaintiffs' proposed counts could not survive Rule 12(b)(6), and that their request was untimely.  A1.  There was no abuse of discretion.

### A.  Amendment Was Futile.

Leave to amend is properly denied where the plaintiff "would be unable to succeed on that claim."  Bethany, 241 F.3d at 861.  Neither proposed count states a claim against the Park District because there are no allegations of any conduct by the Park District whatsoever.  Additionally, neither proposed count states a claim against any defendant for the following reasons.

**Breach of Contract.**  Plaintiffs propose a count alleging breach of the master agreement, R. 107 at 7-10, which is a contract between the City and the Foundation, R. 115-5.  Plaintiffs contend that the Foundation failed to satisfy two conditions precedent to the City's obligation to execute the agreement authorizing the Foundation's use of the property, as described in sections 12(h) and 12(j) of the master agreement, R. 107 at 7-8, and that, "[d]espite its full knowledge of these discrepancies and failures," "the City ignored its obligations and proceeded toward closing with the Foundation," R. 107 at 10.

This count fails to state a claim.  "Under Illinois law, a cause of action based on a contract may be brought only by a party to that contract, by someone in privity

with such a party, or by an intended third-party beneficiary of the contract."
Kaplan v. Shure Brothers, 266 F.3d 598, 602 (7th Cir. 2001) (citation omitted).
Where a contract expressly excludes third-party beneficiaries, no third party may
sue. Barry v. St. Mary's Hospital Decatur, 68 N.E.3d 964, 975-76 (Ill. App. 2016);
see also Altevogt v. Brinkoetter, 421 N.E.2d 182, 187 (Ill. 1981) (third party has no
right to sue unless "the contracting parties have manifested in their contract an
intention to confer a benefit upon the third party"). Here, only the City and
Foundation are parties to the master agreement, R. 115-5 at 2, and the agreement
explicitly disclaims any third-party beneficiaries, R. 115-5 at 22 ("Nothing in this
Agreement is intended or shall be construed to confer upon any person or entity
(other than the parties hereto and their respective successors and permitted
assigns) any benefit, right, remedy or cause of action under or by reason of this
Agreement."). Plaintiffs therefore have no right to sue.

Plaintiffs deny any "third-party beneficiary claim," and instead assert they
have standing as "taxpayers and residents who under Illinois law have long been
allowed to challenge illegal transfers." Plaintiffs Br. 42-43 (citing Malec v. City of
Bellville, 891 N.E.2d 1039 (Ill. App. 2008)). But while a taxpayer may have
*standing* to sue a municipality to "enjoin the misuse of public funds, based upon
taxpayers' ownership of such funds," Malec, 891 N.E.2d at 1042 (quotation omitted),
plaintiffs cite no authority granting taxpayers *substantive contract rights* merely

because the municipality is a party to the contract.[8]

Turning 180 degrees, plaintiffs assert that this is a "derivative action," on behalf of the City, to enforce the City's contractual rights. Plaintiffs Br. 43 (quoting Scachitti v. UBS Financial Services, 831 N.E.2d 544, 550 (Ill. 2005)). This is ludicrous. Plaintiffs neither sue on the City's behalf nor seek a remedy that will benefit the City. In fact, they name the City as *a defendant*, contend it breached the master agreement, and seek relief *against* it. R. 107 at 10. Moreover, even on plaintiffs' erroneous view that Illinois law authorizes this claim, they do not have standing to bring this claim in federal court. "[A] litigant cannot sue in federal court to enforce the rights of third parties." Rawoof v. Texor Petroleum Co., 521 F.3d 750, 757 (7th Cir. 2008).

Regardless, the claim fails. Plaintiffs allege that the Foundation did not satisfy two conditions precedent of the master agreement before the City closed on the transaction by entering into the use agreement, R. 107 at 7-8 – namely, section 12(h), which requires the Foundation to "have submitted to the City a certification that the Foundation has received funds and/or gift pledge commitments in writing that in the aggregate equal or exceed the Projected Total Construction Costs of the Presidential Center," R. 115-5 at 15, and section 12(j), which requires the Foundation to create an endowment for costs of the Presidential Center, R. 115-5 at

---

[8] In evaluating Article III standing, the district court elsewhere held that plaintiffs lacked taxpayer standing because "they failed to identify both 'an action on the city's part that is allegedly illegal' related to the City's monetary expenditures or 'adequately show[ ] that city tax dollars will be spent on that illegal activity.'" A9 n.5 (quoting POP I, 971 F.3d at 735-36 (rejecting municipal taxpayer standing)).

16.  Plaintiffs acknowledge that the Foundation *did* provide a certification and *did* create an endowment before the transaction was closed.  R. 107 at 8, 10.  And they make no argument in their brief why, despite this, there was nevertheless a breach.  To the extent the proposed amended complaint alleges that the tendered certification and the endowment were insufficient, that would not state a claim for breach of contract.  Even if plaintiffs' allegations that the conditions were not satisfied were true (which they are not, as we explained in the district court, R. 110 at 5-6), the agreement expressly allows the conditions to be waived, R. 115-5 at 16.  Thus, even if the parties had closed *without* a certification or endowment, there would have been no breach.  <u>See</u> Restatement (Second) of Contracts § 84 cmt. d, illus. 3, 4 (1981) (conditions relating to time or manner of performance or giving of notice or supplying proofs may be waived).

**Unjust Enrichment.**  Plaintiffs' proposed unjust enrichment count is also futile.  First, plaintiffs assert this count against the City, the Park District, and the Foundation, but allege conduct only by the Foundation, so they state no claim against other defendants.  As to the Foundation, plaintiffs allege it "has unjust[ly] enriched itself through proceeding with its private development" when "it had no right to under the conditions of the Master Agreement."  R. 107 at 12.  But Illinois does not recognize a "stand-alone claim for unjust enrichment."  <u>Benson v. Fannie May Confections Brands, Inc.</u>, 944 F.3d 639, 648 (7th Cir. 2019).  Instead, it is "a condition that may be brought about by unlawful or improper conduct as defined by law," meaning a "request for relief based on unjust enrichment" must be "tied to the

49

fate of the claim" of improper conduct.  Id. (quotations omitted); accord Cleary v. Philip Morris Inc., 656 F.3d 511, 517 (7th Cir. 2011) ("unjust enrichment will stand or fall with related claim").  Because plaintiffs' unjust enrichment theory is premised on the Foundation's non-existent breach of the master agreement, the claim adds nothing and is equally futile.

Finally, the proposed unjust enrichment claim also fails because plaintiffs allege no "detriment" to themselves, as required under Illinois law.  HPI Health Care Services v. Mt. Vernon Hospital, Inc., 545 N.E.2d 672, 679 (Ill. 1989).  At most, plaintiffs allege a detriment to Jackson Park, R. 107 at 12, but this court has already held that plaintiffs have no property interest in Jackson Park, POP I, 971 F.3d at 737.  This disposes of plaintiffs' unjust enrichment claim.

## B.    Plaintiffs' Request Was Untimely.

The district court also properly concluded that plaintiffs' proposed amendment was filed too late, after "the parties and the Court ha[d] already devoted significant resources addressing the current complaint."  A1.  Plaintiffs have been litigating this case since 2018, asserting many of the same or similar state-law claims.  Defendants spent significant time and resources moving to dismiss plaintiffs' meritless and repetitive state-law claims here, and the motion was fully briefed and argued before plaintiffs sought leave to amend.  R. 28-29.  In addition, the parties extensively litigated plaintiffs' preliminary injunction motion on the federal claims, in both the district court and this court – again, all before plaintiffs devised these new claims.  This court routinely upholds denials of

proposed amendments based on delay where, as here, the "plaintiff seeks leave to amend deep into the litigation." McCoy v. Iberdrola Renewables, Inc., 760 F.3d 674, 687 (7th Cir. 2014) (finding prejudice where, although still in pleading stage, "the parties had already invested significant resources in the case"). "Pleading is not like playing darts: a plaintiff can't keep throwing claims at the board until she gets one that hits the mark." Doe v. Howe Military School, 227 F.3d 981, 990 (7th Cir. 2000). It was well within the court's discretion to deny plaintiffs' request for yet another shot here.

## CONCLUSION

———

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

Corporation Counsel
  of the City of Chicago

s/ Elizabeth M. Tisher
BY:   ELIZABETH M. TISHER
      Assistant Corporation Counsel
      2 N. LaSalle Street, Suite 580
      Chicago, Illinois 60602
      (312) 744-3173
      elizabeth.tisher@cityofchicago.org
      appeals@cityofchicago.org

*Attorneys for City of Chicago*

s/Joseph P. Roddy
BY:   JOSEPH P. RODDY
      Joseph P. Roddy
      Elizabeth Meyer Pall
      Burke, Warren, Mackay &
      Serritella, P.C.
      330 North Wabash Avenue, Suite 2100

51

Chicago, Illinois 60611
(312) 840-7000

*Attorneys for*
*Chicago Park District*

s/ David H. Hoffman
BY:   DAVID H. HOFFMAN
Tacy F. Flint
Rachel L. Hampton
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
david.hoffman@sidley.com
tflint@sidley.com
rhampton@sidley.com

Peter R. Steenland
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
psteenland@sidley.com

*Attorneys for The Barack Obama*
*Foundation*

## CERTIFICATE OF COMPLIANCE

––––––

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 32(a)(7)(B)(i) and Cir. R. 32(c).  This brief contains 13,822 words, beginning with the words "Introduction" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word word processing system used to prepare the brief.

s/ Elizabeth M. Tisher
ELIZABETH M. TISHER, Attorney

## CERTIFICATE OF SERVICE

––––––

I certify that on June 2, 2023, I electronically filed the attached Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Elizabeth M. Tisher
ELIZABETH M. TISHER, Attorney